**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **OTIS FRENCH, SR., as Personal Representative of the Estate of OTIS FRENCH, JR.,** | ) ) ) ) | |
| Plaintiffs, | ) ) | **COMPLAINT** |
| v. | ) ) | |
| **THE CITY OF BAY MINETTE, by and through Bay Minette Police Department; BRANDON THOMPSON; and DOEs 1 through 10,** | ) ) ) ) ) | **DEMAND FOR JURY TRIAL** |
| Defendants. | ) ) ) | |

## COMPLAINT

**COMES NOW** Plaintiff OTIS FRENCH, SR., as Personal Representative of the Estate of OTIS FRENCH JR., and alleges upon information and belief as follows.

## I.      INTRODUCTION

Plaintiff, OTIS FRENCH, SR. ("PLAINTIFF"), brings this action on behalf of his deceased son, OTIS FRENCH, JR. ("OTIS JR."). On August 20, 2022, OTIS JR., a 32-year-old African American male, was driving in Bay Minette, Alabama, and was not violating any traffic laws. Bay Minette police officer BRANDON THOMPSON ("THOMPSON") followed OTIS JR. and executed an unlawful traffic stop. Upon exiting his patrol vehicle, THOMPSON approached OTIS JR.'s vehicle and requested his driver's license and registration. OTIS JR. complied with THOMPSON's requests. After issuing OTIS JR. a warning citation related to a tail-light, THOMPSON demanded that OTIS JR. exit his vehicle and proceeded to engage in an unlawful search and seizure. Thereafter, THOMPSON used excessive force against OTIS JR. and attempted

1

to forcibly search and handcuff him without legal justification. When OTIS JR. attempted to distance himself from THOMPSON to avoid further violations against him, THOMPSON used a taser against OTIS JR. without legal justification. THOMPSON then discharged multiple bullets at and into OTIS JR.'s body, killing him. Plaintiff alleges multiple constitutional, federal, and state law violations against THOMPSON and the CITY OF BAY MINETTE.

## II.     JURISDICTION

1.      Jurisdiction of this Court over Defendants is proper under 42 U.S.C. §§ 1983 and 1988. Jurisdiction is further based on 28 U.S.C. §§ 1331 and 1343. Supplemental jurisdiction exists over the municipal claims and the Defendants under 28 U.S.C. § 1367(a).

## III.     VENUE

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2) because the claims alleged herein arose from events or omissions that occurred in Baldwin County, Alabama.

## IV.     PARTIES

### A.     Plaintiffs

3.      Plaintiff OTIS FRENCH, SR. is an adult resident of Bay Minette, Alabama. He is the father of OTIS FRENCH, JR., who was killed on August 22, 2022. OTIS FRENCH, SR. has been duly appointed as the personal representative of the estate of OTIS FRENCH, JR. As such, he has standing to bring all claims alleged in this complaint on behalf of OTIS FRENCH, JR. and his estate.

### B.     Defendants

4.      Defendant CITY OF BAY MINETTE ("CITY"), acting by and through the BAY MINETTE POLICE DEPARTMENT ("BMPD"), is a municipal governmental entity

located in Baldwin County, Alabama, which employed Officer THOMPSON as a police officer. At all relevant times, Officer THOMPSON was working within the line and scope of his employment with the CITY. The CITY is sued in its official capacity.

5.      Defendant BRANDON THOMPSON is an officer for the BMPD, a resident of Baldwin County, and is sued in his individual capacity.

6.      Plaintiff is ignorant of the true names and capacities of defendants sued herein as DOEs 1 through 10, inclusive, and therefore sues these defendants by such fictitious names. Upon information and belief, DOEs 1 through 10 were employees of the Bay Minette Police Department and/or City of Bay Minette and were at all relevant times acting in the course of their employment and agency and under color of law. Each Defendant is the agent of the other. Plaintiff will give notice of this complaint, and of one or more DOE's true names and capacities, when ascertained. Plaintiff alleges, based on information and belief, that defendants DOEs 1 through 10 are responsible in some manner for the damages and injuries hereinafter complained of.

## V.    **FACTUAL ALLEGATIONS**

7.      OTIS JR. was a 32-year-old African American man. He was 6'0 tall and weighed 170 lbs.

8.      OTIS JR. was born in Montgomery, Alabama, and raised in Bay Minette, Alabama. He was the son of Mr. Otis French, Sr. and Dr. Phyllis French, who are pillars of the Bay Minette community, and brother to Tamara French.

9.      It was well-known throughout the Bay Minette community that OTIS JR. suffered from clinically diagnosed bipolar disorder.

10.     At all times material hereto, OTIS JR. lived at 43860 Old Robinson Road in Bay Minette, Alabama, with his parents.

11.      On August 20, 2022, OTIS JR. was five minutes from home, and at approximately 10:20 a.m., THOMPSON was driving southbound on Shedrick Hardy Parkway while OTIS JR. was driving in the opposite direction northbound on Shedrick Hardy Parkway.

12.      THOMPSON saw OTIS JR., an African American male, driving his vehicle.

13.      THOMPSON then made a U-turn and started following OTIS JR. northbound on Shedrick Hardy Parkway and at some point activated his lights, but not his siren.

14.      OTIS JR. turned right, eastbound on Rain Drive and then another right going southbound on Lower Street.

15.      OTIS JR. turned left into the driveway of 1203 Lower Street.

16.      THOMPSON pulled up behind OTIS JR.'s vehicle and stepped out of his patrol vehicle.

17.      THOMPSON had no legal basis for pulling OTIS JR. over.

18.      THOMPSON approached the passenger side of OTIS JR.'s car and asked OTIS JR. for his driver's license and registration. He also asked OTIS JR. if he was headed home and if he still lived out on Old Robinson Road. OTIS JR. responded affirmatively and provided his driver's license and registration. Thus, THOMPSON knew who OTIS JR. was and where he lived before he obtained OTIS JR.'s documents, either through his own prior interactions with OTIS JR. and/or the flags that appeared in the BMPD dispatch system.

19.      THOMPSON also told OTIS JR. that he was pulling him over because he failed to use his left turn signal. However, at the time that THOMPSON made a U-turn to follow OTIS JR., OTIS JR. had never made a left-hand turn and had not committed any traffic infraction.

20.        After OTIS JR. handed THOMPSON his license and registration, THOMPSON returned to his vehicle, ran a vehicle and license check, received information from dispatch that the registration was valid, and began to write a warning ticket for failure to signal.

21.        A few minutes later, THOMPSON returned to OTIS JR.'s vehicle, this time on the driver's side. THOMPSON spoke to OTIS JR. through the driver's side window, as OTIS JR. had lowered his window. OTIS JR. remained in his vehicle. THOMPSON handed OTIS JR. the warning citation.

22.        THOMPSON began to walk back to his patrol vehicle and then returned to the driver's side of OTIS JR.'s window and demanded that OTIS JR. exit his vehicle.

23.        THOMPSON had no legal basis to insist that OTIS JR. exit his vehicle. In fact, THOMPSON stated that he had "no intention of writing a traffic ticket" to OTIS JR.

24.        THOMPSON continued to insist that OTIS JR. exit his vehicle even though OTIS JR. said that he did not want to exit his vehicle and asked THOMPSON why he needed to exit the vehicle.

25.        THOMPSON demanded OTIS JR. exit his vehicle.

26.        Against his wishes, OTIS JR. exited the vehicle, and THOMPSON immediately began to push OTIS JR. against the vehicle and forcefully patted OTIS JR. down, even though THOMPSON had no legal basis for doing so and even after OTIS JR. stated that he did not want to be touched by THOMPSON.

27.        THOMPSON had no legal basis for demanding OTIS JR. exit his vehicle.

28.        THOMPSON had no legal basis for using force against OTIS JR. to push him against his vehicle for a pat down.

29.     THOMPSON had no legal basis for conducting a pat down of OTIS JR. In fact, after the shooting, THOMPSON admitted that he had no probable cause or reasonable suspicion for pulling OTIS JR. out of his vehicle, conducting a pat down, or using force against OTIS JR. THOMPSON admitted to the shooting investigators that he had no legal basis for his actions and simply stated "something inside him thought that there may be more to the stop and that he is always on the lookout for guns and drugs."

30.     THOMPSON had no probable cause or reasonable suspicion to believe that OTIS JR. was in possession of guns.

31.     THOMPSON had no probable cause or reasonable suspicion to believe that OTIS JR. was in possession of drugs.

32.     OTIS JR., fearing THOMPSON's aggressive force, illegal stop and seizure, and display of handcuffs, distanced himself and ran away from THOMPSON.

33.     OTIS JR. ran towards the backyard of the home at which he had been stopped by THOMPSON, by running on the south or right side of the home located at 1203 Lower Street.

34.     THOMPSON took out his taser, ran after OTIS JR., and discharged his taser leads into OTIS JR.'s back.

35.     THOMPSON had no legal basis to discharge his taser leads against OTIS JR.

36.     THOMPSON then went to the opposite north or left side of the house located at 1203 Lower Street to illegally stop, seize, and arrest OTIS JR., who was coming from around the other side of the house.

37.     THOMPSON had no legal basis to stop, seize, and/or arrest OTIS JR. when he was coming from around the house.

38.     THOMPSON stepped in OTIS JR.'s path and tackled OTIS JR.

39.     During the tackle, THOMPSON threatened OTIS JR. as follows: "I'm gonna kill you!"

40.     As a result of the tackle, THOMPSON's head hit a nearby picnic table.

41.     After THOMPSON threatened OTIS JR., "I'm gonna kill you," THOMPSON discharged his firearm against OTIS JR. multiple times, approximately seven (7) times, with five of the bullets hitting OTIS JR.'s body.

42.     OTIS JR. was pronounced dead at the scene, or shortly thereafter.

43.     No weapons were recovered from the scene, the vehicle, or OTIS JR.'s person.

44.     No drugs were recovered from the scene, the vehicle, or OTIS JR.'s person.

45.     BMPD had flagged OTIS JR. in the BMPD system as "mental/probate," and this information was prominently displayed in the dispatch system that THOMPSON accessed before or during the stop.

46.     THOMPSON had knowledge of this flag and/or THOMPSON had prior interactions with OTIS JR., knew OTIS JR., and/or knew that OTIS JR. had a mental illness. In fact, during their interaction, THOMPSON asked OTIS JR. if he still lived out on Old Robertson Road.

47.     Despite this knowledge of OTIS JR.'s mental health condition, THOMPSON failed to employ de-escalation techniques or seek assistance from mental health professionals, actions that are in direct contravention of generally accepted practices for law enforcement interactions with mentally ill individuals. THOMPSON's failure to adjust his approach in light of this critical information directly contributed to the unnecessary escalation of the encounter.

48.     During the initial traffic stop and interaction, along with full knowledge of OTIS JR.'s mental health condition, there were no exigent circumstances justifying THOMPSON's failure to accommodate his known mental health disability.

49.     THOMPSON was wearing a body-worn camera during his interactions with OTIS JR.

50.     BMPD refuses to release the body-worn camera footage to anyone, including the family, notwithstanding the completion of the shooting investigation.

51.     The Baldwin County Sheriff's Department, Major Crimes Unit ("BCSD MCU") investigator who investigated the shooting, curiously and incredibly stated that there was a "malfunction" with the body-worn camera during portions of the video when THOMPSON shot OTIS JR. Upon information and belief, one or more Defendants and/or DOE Defendants have engaged in intentional spoliation of evidence in this case.

52.     In or around April 2023, the BCSD MCU conducted a criminal investigation and determined that THOMPSON's shooting of OTIS JR. was criminally justified.

53.     Neither BCSD MCU nor BMPD ever conducted an administrative investigation of the shooting.

54.     The chief of BMPD, Al Tolbert, is the chairperson of BCSD MCU. Thus, the investigation was conducted notwithstanding a clear conflict of interest. Further, there was no independent, objective investigation of the shooting under constitutional standards, contrary to generally accepted national standards for officer-involved shootings.

55.     The CITY and BMPD routinely use the BCSD MCU to conduct their investigations, resulting in a failure to provide an objective, impartial, and unbiased investigation, particularly given the chairperson role of BMPD's chief on the BCSD MCU.

56.     THOMPSON was previously employed by the BMPD and had been terminated by the previous police chief of BMPD and was rehired by the CITY for the BMPD in or around 2020.

57.     THOMPSON was previously employed by the Elberta Police Department and served approximately six (6) years before he was fired in 2005.

58.     THOMPSON was also previously employed by the Silverhill Police Department in Silverhill, Alabama. The circumstances of his termination or resignation are unknown.

59.     THOMPSON was also previously employed by the Flomaton Police Department in Flomaton, Alabama. The circumstances of his termination or resignation are unknown.

60.     The CITY knew or should have known with the exercise of due diligence, that THOMPSON was unfit to be a law enforcement officer both at BMPD, as well as other law enforcement agencies, and was (re)hired in deliberate disregard of knowledge and information that THOMPSON was unfit to be a law enforcement officer.

## VI.  CLAIMS AND CAUSES OF ACTION

### COUNT I
### Civil Rights Violation Under 42 U.S.C. § 1983-Fourth Amendment
### Illegal Stop
### (Plaintiff against Thompson in his Individual Capacity)

61.     Plaintiff re-alleges preceding and subsequent paragraphs as if fully set forth herein.

62.     Defendant THOMPSON was a member of the Bay Minette Police Department and acting under color of law during his unlawful interactions with OTIS JR.

63.      Defendant THOMPSON had no justification or reasonable suspicion for stopping OTIS JR., and THOMPSON's claim related to the left turn signal was pretextual and false.

64.      OTIS JR. made no left turn at any time before THOMPSON began to follow him. THOMPSON only saw that OTIS JR. was an African American male driving the vehicle.

65.      THOMPSON started following OTIS JR. without reasonable suspicion that OTIS JR. had engaged in any criminal or traffic violation.

66.      Defendant THOMPSON stopped OTIS JR. without reasonable suspicion that OTIS JR. had engaged in any criminal or traffic violation.

67.      Defendant THOMPSON violated OTIS JR.'s constitutional rights to be free from unlawful, unjustified, and unreasonable seizure in violation of the Fourth Amendment to the United States Constitution.

68.      Defendant THOMPSON's acts and omissions were not justified and not objectively reasonable.

69.      Defendant THOMPSON's acts and omissions violated clearly established law that any reasonable officer would have known.

70.      As a direct, proximate, and foreseeable result of Defendant THOMPSON'S actions and omissions, OTIS JR. was harmed and ultimately killed by Defendant THOMPSON.

71.      Plaintiff specifically alleges that Defendant THOMPSON's complained of acts and/or omissions were within his control and within his feasibility to alter, adjust, and/or correct so as to prevent some or all of the unlawful acts and injuries complained of herein by Plaintiff.

**COUNT II**
**Civil Rights Violation Under 42 U.S.C. § 1983-Fourth Amendment**
**Illegal Seizure**
**(Plaintiff against Thompson in his Individual Capacity)**

72.      Plaintiffs re-allege preceding and subsequent paragraphs as if fully set forth herein.

73.      Defendant THOMPSON was a member of the Bay Minette Police Department and acting under color of law during his unlawful interactions with OTIS JR.

74.      Defendant THOMPSON had no legal basis for requiring OTIS JR. to exit his vehicle.

75.      OTIS JR. did not voluntarily agree to exit his vehicle and stated as such to Defendant THOMPSON.

76.      Once OTIS JR. was compelled to exit his vehicle, Defendant THOMPSON had no legal basis for subjecting OTIS JR. to a pat down or search of his person.

77.      OTIS JR. did not consent to a pat down or search of his person and stated that he did not like people touching him.

78.      Defendant THOMPSON had no reasonable suspicion that OTIS JR. was armed with a weapon.

79.      Defendant THOMPSON had no reasonable suspicion that OTIS JR. was in the possession of drugs.

80.      Defendant THOMPSON had no lawful basis for demanding that OTIS JR. submit to a pat down search of his body.

81.      Defendant THOMPSON admitted that he had no reasonable suspicion that OTIS JR. had a weapon or drugs.

82.     Defendant THOMPSON violated OTIS JR.'s constitutional rights to be free from unlawful, unjustified, and unreasonable search in violation of the Fourth Amendment to the United States Constitution.

83.     Defendant THOMPSON's acts and omissions were not justified and not objectively reasonable.

84.     Defendant THOMPSON's acts and omissions violated clearly established law that any reasonable officer would have known.

85.     As a direct, proximate, and foreseeable result of Defendant THOMPSON'S actions and omissions, OTIS JR. was harmed and ultimately killed by Defendant THOMPSON.

86.     Plaintiff specifically alleges that Defendant THOMPSON's complained-of acts and/or omissions were within his control and within his feasibility to alter, adjust, and/or correct so as to prevent some or all of the unlawful acts and injuries complained of herein by Plaintiff.

## COUNT III
### Civil Rights Violation Under 42 U.S.C. § 1983-Fourth Amendment
### Excessive Force
### (Plaintiff against Thompson in his Individual Capacity)

87.     Plaintiff re-alleges preceding and subsequent paragraphs as if fully set forth herein.

88.     Defendant THOMPSON was a member of the Bay Minette Police Department and acting under color of law during his unlawful interactions with OTIS JR.

89.     Defendant THOMPSON pushed OTIS JR. against his vehicle and began to search him without legal justification.

90.     Defendant THOMPSON had no justification for using physical force against OTIS JR. when THOMPSON forced OTIS JR. against his vehicle.

91.     Defendant THOMPSON proceeded to use force to attempt to handcuff and arrest OTIS JR. without probable cause or reasonable suspicion of any criminal activity.

92.     Defendant THOMPSON had no justification for using excessive force to arrest OTIS JR.

93.     Defendant THOMPSON had no justification for using excessive force and discharging his taser against OTIS JR.

94.     Defendant THOMPSON had no justification for using excessive force and tackling OTIS JR. to the ground.

95.     Defendant THOMPSON had no justification for using excessive force, including deadly force, when he discharged his firearm against OTIS JR. no less than seven (7) times, five (5) of which hit OTIS JR.

96.     Defendant THOMPSON violated OTIS JR.'s constitutional rights to be free from unlawful, unjustified, and unreasonable excessive force, including deadly force, in violation of the Fourth Amendment to the United States Constitution.

97.     Defendant THOMPSON's acts and omissions were not justified and not objectively reasonable.

98.     Defendant THOMPSON's acts and omissions violated clearly established law that any reasonable officer would have known.

99.     Defendant THOMPSON was not in imminent and objectively reasonable fear of serious bodily injury from OTIS JR.

100.    At no point during the encounter did OTIS JR. display any aggressive behavior or pose any threat to THOMPSON or others. OTIS JR. was unarmed and was merely attempting to distance himself from THOMPSON's unlawful force and unreasonable aggressive actions.

THOMPSON's use of deadly force against an unarmed, retreating individual was grossly disproportionate and unjustified under the circumstances.

101.     As a direct, proximate, and foreseeable result of Defendant THOMPSON's acts and omissions, including his unlawful stop, illegal search, use of excessive force, and failure to accommodate OTIS JR.'s known disability, OTIS JR. was harmed and ultimately killed. Each of THOMPSON's actions, from the initial unlawful stop to the final, unjustified use of deadly force, formed a direct causal chain leading to OTIS JR.'s death.

102.     Defendant THOMPSON's complained-of acts and/or omissions were within his control and within his feasibility to alter, adjust, and/or correct so as to prevent some or all of the unlawful acts and injuries complained of herein by Plaintiff.

### COUNT IV
### Civil Rights Violation Under 42 U.S.C. § 1983-*Monell*
### (Plaintiff against City)

103.     Plaintiff re-alleges preceding and subsequent paragraphs as if fully set forth herein.

104.     Defendant THOMPSON was a member of the Bay Minette Police Department and was acting under color of law during his unlawful interactions with OTIS JR.

105.     The CITY's custom and practice included the absence of any administrative reviews of its constitutional obligations to its citizens. As a result, all BMPD officers know that they will not face any accountability for their unconstitutional policing customs and practices, unless and only if their conduct rises to the level of criminal violations.

106.     The CITY failed to supervise, train, and/or provide policies or procedures to its officers, including THOMPSON, regarding lawful stops, which constituted a custom and practice

of deliberate indifference to the rights of all individuals, including OTIS JR., who interact with BMPD.

107.    The CITY failed to supervise, train, and/or provide policies or procedures to its officers, including THOMPSON, regarding lawful seizures, including pat-downs, which constituted a custom and practice of deliberate indifference to the rights of all individuals, including OTIS JR., who interact with BMPD.

108.    The CITY failed to supervise, train, and/or provide policies or procedures to its officers, including THOMPSON, regarding lawful force, including deadly force, which constituted a custom and practice of deliberate indifference to the rights of all individuals, including OTIS JR., who interact with BMPD.

109.    The CITY failed to supervise, train, and/or provide policies or procedures to its officers, including THOMPSON, in the use of force and/or interactions with individuals with mental illness, which constituted a custom and practice of deliberate indifference to the rights of all individuals, including OTIS JR., who interact with BMPD.

110.    The CITY engages in a pattern or practice of deliberate indifference to the risks of constitutional violations and need for policies and procedures, supervision, and/or training to avoid and/or mitigate unconstitutional policing.

111.    Although it is axiomatic that armed law enforcement officers should be trained in the use of force, including deadly force, the International Association of Chiefs of Police has

stated that "Law enforcement agencies **must** provide officers with clear and concise policies that establish well-defined guidelines on the use of force."[1] (emphasis added).

112.    The International Association of Chiefs of Police[2] has also stated that "Law enforcement agencies **should** provide officer with training to determine whether a person's behavior is indicative of a mental health crisis and with guidance, techniques, response options, and resources so that the situation may be resolved in as constructive, safe, and humane a manner as possible."[3] (emphasis added).

113.    The CITY, by and through the BCSD MCU—chaired by Al Tolbert, the chief of BMPD—conducted the *criminal* investigation of the shooting of OTIS JR. by THOMPSON.

114.    The CITY, by and through BCSD MCU, refuses to disclose the results of the investigation, the facts and evidence in support of its findings that THOMPSON's shooting of OTIS JR. was justified, the legal basis for finding that THOMPSON's shooting of OTIS JR. was justified, and/or the existence, if any, of the training, supervision, and/or policies and procedures governing its justification findings.

115.    Moreover, it is also clear that the BCSD MCU's investigation was limited to a criminal investigation, and justification, of THOMPSON's shooting of OTIS JR.

---

[1] https://www.theiacp.org/sites/default/files/2020-07/National_Consensus_Policy_On_Of_Force%2007102020%20v3.pdf (last visited May 24, 2024).

[2] The IACP is the world's largest and most influential professional association for police leaders and is a recognized leader in global policing, committed to advancing safer communities through thoughtful, progressive police leadership. https://www.theiacp.org/about-iacp (last visited May 24, 2024).

[3] https://www.theiacp.org/resources/policy-center-resource/mental-illness (last visited May 24, 2024).

116.    Further, the BCSD MCU's justified shooting determination was based on an erroneous standard. Notwithstanding its failure to provide the family with its written findings, in a public statement, BCSD MCU provided that it "did not establish probable cause that [THOMPSON] committed an offense."[4] That is not the legal standard for determining whether an officer was criminally justified in shooting an individual, let alone whether a constitutional violation occurred.

117.    Again, the CITY, by and through the BCSD MCU, refused to release the basis of its findings and investigation, leaving Plaintiff only with the CITY's representations in the press. However, based on the CITY's press conferences and releases, through BCSD MCU, its determination was based on an erroneous review standard, and there was no administrative investigation of the shooting to even determine whether THOMPSON's acts and omissions as they related to OTIS JR. were in compliance with any policy, procedure, supervision, and/or training.

118.    The CITY's routine use of BCSD MCU to investigate itself, using improper and inapplicable criminal standards for its review, and failure to provide any administrative review of the policies, procedures, supervision, and/or training related thereto constitutes actual or constructive notice that the likelihood of constitutional violations is so high that the need for policies and procedures is obvious.

119.    The CITY's routine use of BCSD MCU to investigate itself, using improper and inapplicable criminal standards for its review, and failure to provide any administrative review of the policies, procedures, supervision, and/or training related thereto constitutes actual or

---

[4] https://www.wkrg.com/baldwin-county/investigation-into-police-killing-of-bay-minette-man-otis-french-jr-closed/ (last visited March 24, 2024).

constructive notice that the likelihood of constitutional violations is so high that the need for supervision is obvious.

120.     The CITY's routine use of BCSD MCU to investigate itself, using improper and inapplicable criminal standards for its review, and failure to provide any administrative review of the policies, procedures, supervision, and/or training related thereto constitutes actual or constructive notice that the likelihood of constitutional violations is so high that the need for training is obvious.

121.     The CITY's routine use of BCSD MCU to investigate itself, using improper and inapplicable criminal standards for its review, and failure to provide any administrative review of the policies, procedures, supervision, and/or training related thereto constitutes deliberate indifference to the constitutional rights of persons who interact with BMPD, including OTIS JR.

122.     The CITY's acts and omissions were a proximate cause of OTIS JR.'s death and injuries to OTIS JR.

123.     As a direct, proximate, and foreseeable result of Defendants' acts and omissions, OTIS JR. was harmed and ultimately killed.

124.     The CITY's complained-of acts and omissions were within its control and within its feasibility to alter, adjust, and/or correct so as to prevent some or all of the unlawful acts and injuries complained of herein by Plaintiff.

**COUNT V**
**Violations of the Americans with Disabilities Act**
**(Plaintiff against City)**

125.     Plaintiff re-alleges preceding and subsequent paragraphs as if fully set forth herein.

18

126.     OTIS JR. was a qualified individual with a disability under the Americans with Disabilities Act ("ADA"). OTIS JR.'s disability was mental illness, specifically a diagnosis of bipolar disorder.

127.     Defendants knew or should have known of OTIS JR.'s disability, either through a flag in the Defendants' system or personal knowledge of OTIS JR.'s disability.

128.     There were no exigent circumstances that excluded THOMPSON from interacting with OTIS JR. and/or providing him a reasonable accommodation before, during, and after THOMPSON engaged with OTIS JR., including, but not limited to, the stop, demand to exit the vehicle, pat-down, use of force, attempt to arrest, tasing, and shooting of OTIS JR.

129.     The CITY did not have policies, procedures, and/or protocols, or if they were available, THOMPSON failed to follow such policies, procedures, and/or protocols, for de-escalating and interacting with a person with a disability.

130.     Defendant THOMPSON was told specifically by OTIS JR. that he did not like people touching him, and although Defendant THOMPSON had no basis to physically touch OTIS JR., THOMPSON proceeded with force and a pat-down of OTIS JR. without lawful justification.

131.     Defendant THOMPSON unduly escalated his physical interaction with OTIS JR. without lawful justification, resulting in THOMPSON shooting OTIS JR. seven (7) times over a purported and pre-textual left tail-light warning citation.

132.     The ADA prohibits discrimination against persons with disabilities in the provision of governmental services such as law enforcement. Defendants CITY and THOMPSON are agents, employees, supervisors, and/or representatives of a governmental entity that is required to comply with the ADA.

133.     At all times during his interaction with THOMPSON, OTIS JR. was diagnosed with a mental illness and/or bipolar disorder, and he was a qualified individual under the ADA.

134.     The failure to accommodate OTIS JR.'s disability was intentional and deliberately indifferent to his rights under Title II of the ADA and was the proximate cause of his death.

135.     Defendant CITY, by and through THOMPSON, failed to make a reasonable accommodation for OTIS JR.'s mental health diagnosis and unduly escalated his interaction with OTIS JR.

136.     Defendant CITY failed to provide policies, procedures, and/or training to THOMPSON and BMPD officers regarding its obligations under the ADA.

137.     The CITY's failure to properly train its officers in interacting with individuals with mental illness directly led to THOMPSON's inappropriate escalation of the situation and ultimately to OTIS JR.'s death. Had THOMPSON been properly trained, he would have recognized OTIS JR.'s mental health status and employed de-escalation techniques, potentially preventing the tragic outcome.

138.     As a result of Defendant CITY's acts and omissions, OTIS JR.'s rights under the ADA were violated, and he was killed.

**COUNT VI**
**Violations of Section 504 of the Rehabilitation Act**
**(Plaintiff against City)**

139.     Plaintiff re-alleges preceding and subsequent paragraphs as if fully set forth herein.

140.     As a recipient of federal funds, the CITY is required by Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, ("Section 504") to make reasonable accommodations

to persons with disabilities in its facilities, program activities, and persons who receive BMPD services.

141.    Section 504 further requires such recipients of federal funds, such as the CITY, to modify such facilities, services, and programs as necessary to accomplish this purpose. Accordingly, Defendant CITY is subject to the mandate of Section 504.

142.    For the same reasons that OTIS JR. was deemed to have a disability for purposes of the ADA, OTIS JR. was also a qualified individual with a disability under Section 504.

143.    The same conduct of Defendant CITY that constituted an ADA violation also constituted failure to reasonably accommodate OTIS JR.'s disability under Section 504.

144.    Defendant CITY's acts and omissions in failing to accommodate OTIS JR.'s disability was intentional and/or deliberately indifferent to his rights under Section 504, thereby constituting a violation of Section 504 by a recipient of federal funds.

**COUNT VII**
**Wrongful Death, Alabama Code § 6-5-410**
**(Plaintiff against City)**

145.    Plaintiff re-alleges preceding and subsequent paragraphs as if fully set forth herein.

146.    For purposes of this Count, Plaintiff is entitled to relief against Defendant CITY under state law because it owed a duty of reasonable care to OTIS JR. and breached its duty to exercise reasonable care, pursuant to Alabama Code Section 6-5-410, through its wrongful acts, omissions, and/or negligence.

147.    Defendant CITY had a non-delegable duty of care owed to OTIS JR. and breached this duty in the following ways, including, but not limited to, failing to adequately provide policies, procedures, or training to BMPD officers, including, but not limited to Defendant

THOMPSON, regarding legal traffic stops, searches, seizures, uses of force, uses of less lethal force, uses of deadly force, and providing reasonable accommodations for individuals with disabilities.

148.    Defendant CITY had an obligation to make an appropriate investigation of its agents and employees and failed to do so, including the use of BCSD MCU, which includes the BMPD Police Chief as the chairperson, for the investigation of the shooting of OTIS JR. by BMPD and THOMPSON.

149.    Defendant CITY had an obligation to properly screen, train, supervise, control, discipline, and/or terminate its employees. Moreover, Defendant CITY had an obligation not to rehire THOMPSON as a law enforcement officer once he was terminated from BMPD, as well as other law enforcement agencies.

150.    The CITY's actions and omissions fell far below the standard of care required under Alabama law for municipalities in hiring, training, and supervising police officers. The CITY's failure to properly train its officers on interactions with mentally ill individuals and its negligent retention of THOMPSON despite his history of misconduct constitute gross negligence under Alabama law.

151.    As a direct and proximate cause of the aforementioned acts of Defendant CITY, OTIS JR. suffered great physical damage, suffering, and death, and Plaintiff is entitled to compensatory damages.

## COUNT VIII
## Wrongful Death, Alabama Code § 6-5-410
## (Plaintiff against Thompson)

152.    Plaintiff re-alleges preceding and subsequent paragraphs as if fully set forth herein.

153.     For purposes of this Count, individual Defendant THOMPSON acted negligently, or, in the alternative, willfully, maliciously, and/or in bad faith with respect to OTIS JR.'s wrongful death.

154.     Defendant THOMPSON had no legal justification for the shooting death of OTIS JR.

155.     THOMPSON's actions in shooting OTIS JR. multiple times, despite OTIS JR. posing no immediate threat, demonstrate a reckless or callous disregard for OTIS JR.'s rights. THOMPSON's threat to kill OTIS JR. before shooting him evidences malice and supports an award of punitive damages to punish THOMPSON and deter similar conduct in the future.

156.     As a direct and proximate cause of the aforementioned acts of Defendant THOMPSON, OTIS JR. suffered great physical damage, suffering, and death, and Plaintiff is entitled to compensatory damages.

## COUNT IX
### Negligent Hiring and Retention-Alabama Code § 11-47-190
### (Plaintiff against City)

157.     Plaintiff re-alleges preceding and subsequent paragraphs as if fully set forth herein.

158.     Defendant CITY knew or should have discovered in the exercise of due diligence that THOMPSON was unfit to be a law enforcement officer and would engage in unlawful acts towards OTIS JR. and others like him.

159.     Defendant CITY rehired THOMPSON after he had previously been terminated from BMPD and, at a minimum, the Elberta Police Department, and potentially the Silverhill and Flomaton Police Departments.

160.     Defendant CITY hired and/or rehired THOMPSON without exercising due diligence regarding THOMPSON's fitness to be a law enforcement officer.

161.     Defendant CITY either failed to contact THOMPSON's previous law enforcement employers and/or was deliberately indifferent to the facts obtained regarding THOMPSON's employment history and fitness for duty, including its own prior discharge of THOMPSON.

162.     For purposes of this Count, Plaintiff is entitled to relief against Defendant CITY under state law because the CITY owed a duty of reasonable care to OTIS JR. and breached this duty through its wrongful acts, omissions, and/or negligence, pursuant to Alabama Code Section 11-47-190.

**WHEREFORE**, Plaintiff demands judgment as follows:

1.      An amount to be determined at trial, including compensatory and punitive damages, where applicable, plus interest;

2.      Injunctive and declaratory relief;

3.      Plaintiff's attorneys' fees pursuant to 42 U.S.C. §1988, 42 U.S.C. § 12205 and 29 U.S.C. § 794a(b);

4.      Costs and disbursements incurred in this action; and

5.      Any other such relief as the Court may deem just and proper.

Respectfully submitted,
MAY JUNG LLP

/s/Je Yon Jung
Je Yon Jung (*pro hac vice forthcoming*)
333 City Blvd. West
Suite 327
Orange, CA 92868
Tel: (818) 869-6476

Fax: (202) 618-8282
jeyon@mayjung.com

*Counsel for Plaintiff*

## JURY TRIAL DEMAND

Plaintiff requests a jury trial on all counts.

           _/s/Je Yon Jung_____
           Je Yon Jung