**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **OTIS FRENCH, SR., as Personal** | ) | |
| **Representative of the Estate of** | ) | |
| **OTIS FRENCH, JR.,** | ) | |
| | ) | |
| Plaintiffs, | ) | **FIRST AMENDED COMPLAINT** |
| | ) | |
| v. | ) | |
| | ) | |
| **THE CITY OF BAY MINETTE, by** | ) | **DEMAND FOR JURY TRIAL** |
| **and through Bay Minette Police** | ) | |
| **Department; BRANDON THOMPSON;** | ) | **CIVIL ACTION NO.: 1:24-00265-JB-B** |
| **and DOEs 1 through 10,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

<u>**FIRST AMENDED COMPLAINT**</u>

**COMES NOW** Plaintiff OTIS FRENCH, SR., as Personal Representative of the Estate of

OTIS FRENCH JR., and alleges upon information and belief as follows.

## I.    <u>INTRODUCTION</u>

Plaintiff, OTIS FRENCH, SR. ("PLAINTIFF"), brings this action on behalf of his deceased

son, OTIS FRENCH, JR. ("OTIS JR."). On August 20, 2022, OTIS JR., a 32-year-old African

American male, was driving in Bay Minette, Alabama, and was not violating any traffic laws. Bay

Minette police officer BRANDON THOMPSON ("THOMPSON") followed OTIS JR. and

executed an unlawful traffic stop. Upon exiting his patrol vehicle, THOMPSON approached OTIS

JR.'s vehicle and requested his driver's license and registration. OTIS JR. complied with

THOMPSON's requests. After issuing OTIS JR. a warning citation related to a taillight,

THOMPSON demanded that OTIS JR. exit his vehicle and proceeded to engage in an unlawful

search and seizure. Thereafter, THOMPSON used excessive force against OTIS JR. and attempted

1

to forcibly search and handcuff him without legal justification. When OTIS JR. attempted to distance himself from THOMPSON to avoid further violations against him, THOMPSON used a taser against OTIS JR. without legal justification. THOMPSON then discharged multiple bullets at and into OTIS JR.'s body, killing him. Plaintiff alleges multiple constitutional, federal, and state law violations against THOMPSON and the CITY OF BAY MINETTE.

## II.    JURISDICTION

1.    Jurisdiction of this Court over Defendants is proper under 42 U.S.C. §§ 1983 and 1988. Jurisdiction is further based on 28 U.S.C. §§ 1331 and 1343. Supplemental jurisdiction exists over the municipal claims and the Defendants under 28 U.S.C. § 1367(a).

## III.    VENUE

2.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2) because the claims alleged herein arose from events or omissions that occurred in Baldwin County, Alabama.

## IV.    PARTIES

### A.    Plaintiffs

3.    Plaintiff OTIS FRENCH, SR. is an adult resident of Bay Minette, Alabama. He is the father of OTIS FRENCH, JR., who was killed on August 20, 2022. OTIS FRENCH, SR. has been duly appointed as the personal representative of the estate of OTIS FRENCH, JR. As such, he has standing to bring all claims alleged in this complaint on behalf of OTIS FRENCH, JR. and his estate.

### B.    Defendants

4.    Defendant CITY OF BAY MINETTE ("CITY"), acting by and through the BAY MINETTE POLICE DEPARTMENT ("BMPD"), is a municipal governmental entity

located in Baldwin County, Alabama, which employed Officer THOMPSON as a police officer. At all relevant times, Officer THOMPSON was working within the line and scope of his employment with the CITY. The CITY is sued in its official capacity.

5.       Defendant BRANDON THOMPSON, at all relevant times, was an officer for the BMPD, a resident of Baldwin County, and is sued in his individual capacity.

6.       Plaintiff is ignorant of the true names and capacities of defendants sued herein as DOEs 1 through 10, inclusive, and therefore sues these defendants by such fictitious names. Upon information and belief, DOEs 1 through 10 were employees of the Bay Minette Police Department and/or City of Bay Minette and were at all relevant times acting in the course of their employment and agency and under color of law. Each Defendant is the agent of the other. Plaintiff will give notice of this complaint, and of one or more DOE's true names and capacities, when ascertained. Plaintiff alleges, based on information and belief, that defendants DOEs 1 through 10 are responsible in some manner for the damages and injuries hereinafter complained of.

## V.    <u>FACTUAL ALLEGATIONS</u>

7.       OTIS JR. was a 32-year-old African American man. He was 6'0 tall and weighed 170 lbs.

8.       OTIS JR. was born in Montgomery, Alabama, and raised in Bay Minette, Alabama. He was the son of Mr. Otis French, Sr. and Dr. Phyllis French, who are pillars of the Bay Minette community, and brother to Tamara French.

9.       It was well-known throughout the Bay Minette community that OTIS JR. suffered from clinically diagnosed bipolar disorder.

10.      At all times material hereto, OTIS JR. lived at 43860 Old Robinson Road in Bay Minette, Alabama, with his parents.

3

A.        <u>**The Traffic Stop:**</u>

11.        On August 20, 2022, OTIS JR. was five minutes from home, when, at approximately 10:20 a.m., THOMPSON was driving southbound on Shedrick Hardy Parkway while OTIS JR. was driving northbound on Shedrick Hardy Parkway.

12.        THOMPSON saw OTIS JR., an African American male, driving his vehicle in the opposite direction of THOMPSON.

13.        After passing THOMPSON, OTIS JR. turned right, heading eastbound on Rain Drive, and turned right again, heading southbound on Lower Street.

14.        After passing OTIS JR., THOMPSON continued driving southbound on Shedrick Hardy Parkway for approximately eleven seconds, abruptly made a U-turn heading northbound on Shedrick Hardy Parkway, accelerated down Shedrick Hardy Parkway, and turned right onto Rain Drive, heading eastbound.

15.        Once on Rain Drive, he passed a pick-up truck in front of him to the left at which point he activated his lights—30 seconds after THOMPSON and OTIS JR. initially passed each other.

16.        THOMPSON turned right again, heading southbound on Lower Street.

17.        In response to THOMPSON'S approaching patrol car with its emergency lights activated, OTIS JR. immediately pulled over and turned left into the driveway of 1203 Lower Street.

18.        THOMPSON called in OTIS JR.'s license plate number while pulling up behind OTIS JR.'s vehicle and parked behind OTIS JR.'s vehicle. Thompson then stepped out of his patrol vehicle.

19.     THOMPSON approached the passenger side of OTIS JR.'s car, opened the passenger door, and asked OTIS JR. for his driver's license.

20.     When OTIS JR. asked THOMPSON "what's the issue?" THOMPSON said "you didn't use your signal back there and I see why now [inaudible] you have a light out on that left side."

21.     THOMPSON stated "no big deal, not something I am going to write a ticket on." Then THOMPSON asked OTIS JR. where he was headed and OTIS JR. responded that he was headed home.

22.     THOMPSON stated that he was going to issue a warning and let him go and that he needed to "get that left taillight fixed."

23.     After OTIS JR. handed THOMPSON his license, THOMPSON returned to his vehicle, ran a vehicle and license check, received information from dispatch that the license and registration were valid with no warrants, and proceeded to print a warning citation.

24.     THOMPSON had no legal basis for following OTIS JR., initiating his lights, and/or pulling OTIS JR. over, as evidenced by the facts that:

     a.     When THOMPSON first encountered OTIS JR. on Shedrick Hardy Parkway, OTIS JR. was driving cautiously, obeying the speed limit, maintaining his lane, and adhering to all traffic laws and regulations on Shedrick Hardy Parkway;

     b.     By the time THOMPSON turned around, eleven seconds had elapsed after their initial encounter such that THOMPSON could not observe OTIS JR. driving on Rain Drive or turning right on Lower Street;

      c.      Once THOMPSON was again able to observe OTIS JR. on Lower Street, OTIS JR. continued to drive cautiously, obey the speed limit, maintain his lane, and adhere to all traffic laws and regulations;

      c.      THOMPSON indicated a failure to use a turn signal due to a non-functioning left taillight as the basis for the stop; and

      d.      OTIS JR. did not make any left turns prior to THOMPSON activating his emergency lights; OTIS JR.'s only left turn occurred approximately 25 seconds *after* THOMPSON activated his emergency lights.

**B.**        **The Seizure from the Vehicle:**

25.      With citation in hand, THOMPSON returned to OTIS JR.'s vehicle, this time on the driver's side.

26.      THOMPSON ordered OTIS JR. out of his vehicle.

27.      After opening the door to exit the vehicle, THOMPSON asked if OTIS JR. had any weapons on him, and OTIS JR. responded "no."

28.      OTIS JR. exited his vehicle.

29.      THOMPSON had no legal basis to order OTIS JR. out of his vehicle, as evidenced by the facts that:

      a.      THOMPSON had already verified through dispatch that OTIS JR.'s license and registration were valid with no outstanding warrants;

      b.      THOMPSON had already printed and prepared the warning citation regarding the purported turn signal violation;

      c.      THOMPSON had no legitimate law enforcement purpose for demanding OTIS JR. to exit his vehicle;

      d.      The purpose of THOMPSON'S traffic stop was complete once THOMPSON returned to OTIS JR.'s vehicle with the warning citation; and

      e.      THOMPSON had no justification for extending the duration of the stop beyond the purpose of the stop.

**C.**      **The Pat Down:**

30.      Ater THOMPSON ordered OTIS JR. to exit his vehicle, THOMPSON ordered OTIS JR. to turn around for a pat down four times. OTIS JR. pleaded that he was not comfortable with "people" touching him.

31.      THOMPSON repeatedly insisted that OTIS JR. turn around and be subject to an unjustified pat down.

32.      OTIS JR. turned around to face the car and THOMPSON initiated a pat down by touching OTIS JR.'s left pocket.

33.      THOMPSON had no legal basis for ordering OTIS JR. to submit to a pat down, as evidenced by the facts that:

      a.      THOMPSON admitted that he had no reasonable articulable suspicion that OTIS JR. had any weapons;

      b.      The initial stop was based solely on an alleged turn signal violation;

      c.      OTIS JR.'s behavior during the entire encounter had been compliant and non-threatening, including immediately putting his hands in the air when ordered to submit to the pat down;

      d.      OTIS JR. had provided valid license and registration documentation when requested;

    e.    The warning citation for the turn signal violation provided no basis for expanding the stop to include a search of OTIS JR.'s person; and

    f.    No circumstances existed during the stop to support a reasonable belief that OTIS JR. was armed or dangerous.

**D.**    <u>**The Handcuffing:**</u>

34.     After subjecting OTIS JR. to an unlawful pat down, THOMPSON pulled out his handcuffs and ordered OTIS JR. to put his hands behind his back.

35.    THOMPSON pushed OTIS JR. against his vehicle.

36.    THOMPSON threatened to tase OTIS JR. if he did not put his hands behind his back.

37.    THOMPSON had no legal basis for handcuffing OTIS JR. or using force against him, as evidenced by the facts that:

    a.    The initial pat down of OTIS JR. was itself conducted without legal justification;

    b.    THOMPSON's decision to handcuff OTIS JR. stemmed solely from his claim of feeling something like a rock in OTIS JR.'s pocket during the unlawful pat down;

    c.    No weapons or contraband were ultimately recovered from OTIS JR.'s person or vehicle or the scene;

    d.    THOMPSON unduly escalated the encounter by pushing OTIS JR. against his vehicle without any showing of resistance or threatening behavior;

e.     THOMPSON further unduly escalated the situation by threatening to deploy his taser against OTIS JR. when OTIS JR. expressed reluctance to be handcuffed; and

f.     The entire sequence of events arose from what began as a purported traffic stop regarding a taillight, and what should have resulted in only a warning citation for a turn signal violation.

**E.     The Use of Excessive and Deadly Force:**

38.     OTIS JR., fearing THOMPSON's aggressive force, illegal stop and seizure, and display of handcuffs, distanced himself and ran away from THOMPSON.

39.     OTIS JR. ran towards the backyard of the home at which he had been stopped by THOMPSON, by running on the south or right side of the home located at 1203 Lower Street.

40.     THOMPSON went to the north or left side of the house to cut OTIS JR. off.

41.     OTIS JR. ducked and attempted to run past and away from THOMPSON, but THOMPSON took out his taser and discharged his taser leads against OTIS JR.

42.     THOMPSON had no legal basis to stop, seize, and/or arrest OTIS JR. when he was coming from around the house.

43.     THOMPSON stepped in OTIS JR.'s path, tased, and tackled OTIS JR., causing OTIS JR. to hit his head on a nearby picnic table.

44.     THOMPSON continued to use his taser in stun mode against OTIS JR. and threatened OTIS JR. as follows: "I'm gonna kill you!"

45.     After THOMPSON threatened OTIS JR., "I'm gonna kill you," THOMPSON distanced himself several feet away from OTIS JR. and discharged his firearm against OTIS JR. multiple times, approximately seven (7) times, with five of the bullets hitting OTIS JR.'s body.

46.     OTIS JR. was pronounced dead at the scene, or shortly thereafter.

47.     No weapons were recovered from the scene, the vehicle, or OTIS JR.'s person.

48.     No drugs were recovered from the scene, the vehicle, or OTIS JR.'s person.

49.     THOMPSON had no legal basis for using deadly force against OTIS JR., as evidenced by the facts that:

a.     The entire encounter stemmed from, at most, an alleged traffic violation that had already resulted in only a warning citation;

b.     OTIS JR. was merely attempting to distance himself from THOMPSON's escalating and unlawful uses of force;

c.     THOMPSON deliberately escalated the situation by running to the opposite side of the house to cut off OTIS JR.'s path of retreat;

d.     OTIS JR. attempted to duck and run past THOMPSON but THOMPSON discharged his taser leads against OTIS JR. without any threat of serious physical harm to THOMPSON or others;

e.     After the taser deployment and tackling OTIS JR., THOMPSON threatened "I'm gonna kill you" before creating distance and firing his weapon;

f.     THOMPSON shot OTIS JR. multiple times from several feet away while THOMPSON was in an upright position;

g.     THOMPSON had observed no weapons or contraband on OTIS JR.'s person or in his vehicle that could have justified the use of deadly force; and

h.     THOMPSON had multiple opportunities to de-escalate the situation rather than resort to deadly force.

10

### F.        Knowledge of OTIS JR.'s Mental Health Status:

50.      BMPD had flagged OTIS JR. in the BMPD system as "mental/probate," and this information was prominently displayed in the dispatch system that THOMPSON accessed before or during the stop.

51.      THOMPSON had knowledge of this flag and/or THOMPSON had prior interactions with OTIS JR., knew OTIS JR., and/or knew that OTIS JR. had a mental illness.

52.      Despite this knowledge of OTIS JR.'s mental health condition, THOMPSON failed to employ de-escalation techniques or seek assistance from mental health professionals, actions that are in direct contravention of generally accepted practices for law enforcement interactions with mentally ill individuals. THOMPSON's failure to adjust his approach in light of this critical information directly contributed to the unnecessary escalation of the encounter.

53.      During the initial traffic stop and interaction, along with full knowledge of OTIS JR.'s mental health condition, there were no exigent circumstances justifying THOMPSON's failure to accommodate his known mental  health disability.

### G.        The Investigation:

54.      The Baldwin County Sheriff's Department ("BCSD") maintains a Major Crimes Unit ("MCU"), which is assembled to investigate police shootings and other major crimes in Baldwin County. MCU functions as a coalition of local law enforcement officials, including police chiefs and sheriffs from Bay Minette and surrounding Baldwin County municipalities. BMPD Chief Al Tolbert serves as the chairperson of MCU.

55.      Neither BCSD nor BMPD ever conducted an administrative investigation or review of THOMPSON's conduct during his encounter with OTIS JR. Instead, MCU conducted only a criminal investigation of the shooting.

56.     Before completing its criminal investigation, MCU began making public statements supporting THOMPSON and BMPD's version of events, demonstrating bias and lack of objectivity in its investigation process.

57.     During the investigation, MCU reported a purported "malfunction" with THOMPSON's body-worn camera during the most critical portions of the encounter—specifically, approximately fifteen (15) seconds of footage during the moments leading up to and including the shooting of OTIS JR. are missing. Upon information and belief, one or more Defendants and/or DOE Defendants have engaged in intentional spoliation of evidence in this case.

58.     Previously viewed blacked out portions of the body-worn camera video included audio with the statement from THOMPSON "I'm gonna kill you." This video and audio have not been produced.

59.     In or around April 2023, MCU announced it had completed its criminal investigation and determined THOMPSON's shooting of OTIS JR. was justified. In public statements about its investigation, MCU stated that its investigation "did not establish probable cause that [THOMPSON] committed an offense."

60.     The CITY and BMPD routinely use MCU to investigate police shootings despite BMPD Chief Tolbert serving as MCU's chairperson, creating an inherent conflict of interest in these investigations. By relying on this system of self-investigation by conflicted parties and failing to conduct any administrative review, the CITY and BMPD have acted contrary to generally accepted national standards for officer-involved shootings, which require independent, objective investigations under constitutional standards. This system ensures that constitutional violations and policy infractions go unexamined and unchecked.

61.     This flawed investigative system became particularly significant in THOMPSON's case, as his employment history revealed a pattern of separations from multiple law enforcement agencies that should have raised serious concerns.

62.     THOMPSON was previously employed by the BMPD and had been terminated by the previous police chief of BMPD and was rehired by the CITY for the BMPD in or around 2020.

63.     At some point after this initial Complaint was filed, THOMPSON transferred to the Baldwin County Sheriff's Department.

64.     THOMPSON was previously employed by the Elberta Police Department and served approximately six (6) years before he was fired in 2005.

65.     THOMPSON was also previously employed by the Silverhill Police Department in Silverhill, Alabama. The circumstances of his termination or resignation are unknown.

66.     THOMPSON was also previously employed by the Flomaton Police Department in Flomaton, Alabama. The circumstances of his termination or resignation are unknown.

67.     The CITY knew or should have known with the exercise of due diligence, that THOMPSON was unfit to be a law enforcement officer both at BMPD, as well as other law enforcement agencies, and was (re)hired in deliberate disregard of knowledge and information that THOMPSON was unfit to be a law enforcement officer.

## VI.  CLAIMS AND CAUSES OF ACTION

### COUNT I
### Civil Rights Violation Under 42 U.S.C. § 1983-Fourth Amendment
### Illegal Stop
### (Plaintiff against Thompson in his Individual Capacity)

68.	Plaintiff re-alleges preceding and subsequent paragraphs as if fully set forth herein.

69.	THOMPSON was a member of the BMPD and acting under color of law during his unlawful interactions with OTIS JR.

70.	After passing OTIS JR. on Shedrick Hardy Parkway, THOMPSON made a U-turn to head in the same direction as OTIS JR. and initiate a traffic stop with his emergency lights.

71.	THOMPSON's initial traffic stop of OTIS JR. was unlawful and without legal basis.

72.	THOMPSON's purported basis for the stop—that he observed a non-functioning left taillight—was false and pretextual.

73.	Prior to THOMPSON activating his emergency lights, OTIS JR. had not made any left turns that would have required use of a left turn signal.

74.	THOMPSON had no probable cause or reasonable suspicion of any left turn signal violation at the time he initiated the traffic stop.

75.	THOMPSON had no probable cause or reasonable suspicion to believe that OTIS JR. had committed any crime.

76.	THOMPSON violated OTIS JR.'s constitutional rights to be free from unlawful, unjustified, and unreasonable seizure in violation of the Fourth Amendment to the United States Constitution.

77.    THOMPSON's acts and omissions were not justified and not objectively reasonable.

78.    THOMPSON's acts and omissions violated clearly established law that any reasonable officer would have known.

79.    As a direct, proximate, and foreseeable result of THOMPSON's actions and omissions, OTIS JR. was harmed and ultimately killed by THOMPSON.

80.    Plaintiff specifically alleges that THOMPSON's complained of acts and/or omissions were within his control and within his feasibility to alter, adjust, and/or correct so as to prevent some or all of the unlawful acts and injuries complained of herein by Plaintiff.

## COUNT II
### Civil Rights Violation Under 42 U.S.C. § 1983-Fourth Amendment
### Illegal Seizure from the Vehicle
### (Plaintiff against Thompson in his Individual Capacity)

81.    Plaintiffs re-allege preceding and subsequent paragraphs as if fully set forth herein.

82.    THOMPSON was a member of the BPMD and acting under color of law during his unlawful interactions with OTIS JR.

83.    After returning to OTIS JR.'s vehicle with the warning citation, THOMPSON ordered OTIS JR. to exit his vehicle.

84.    THOMPSON's order for OTIS JR. to exit his vehicle was unlawful and without legal basis.

85.    At the time THOMPSON ordered OTIS JR. to exit the vehicle, THOMPSON had already verified OTIS JR.'s license and registration were valid, confirmed there were no outstanding warrants, printed the warning citation, and completed the purpose of the traffic stop.

86.     THOMPSON had no legitimate law enforcement purpose for requiring OTIS JR. to exit his vehicle to view the alleged non-functioning taillight after having already decided to issue only a warning citation.

87.     THOMPSON's request to exit the vehicle constituted an unlawful extension of the duration of the traffic stop beyond the time necessary to complete its purpose.

88.     THOMPSON had no reasonable suspicion of any criminal activity to justify prolonging the stop.

89.     OTIS JR. did not voluntarily consent to exit his vehicle.

90.     OTIS JR. was not free to refuse THOMPSON's command to exit the vehicle.

91.     THOMPSON violated OTIS JR.'s constitutional rights to be free from unlawful, unjustified, and unreasonable seizure in violation of the Fourth Amendment to the United States Constitution.

92.     THOMPSON's acts and omissions were not justified and not objectively reasonable.

93.     THOMPSON's acts and omissions violated clearly established law that any reasonable officer would have known.

94.     As a direct, proximate, and foreseeable result of THOMPSON's actions and omissions, OTIS JR. was harmed and ultimately killed by THOMPSON.

95.     Plaintiff specifically alleges that THOMPSON's complained of acts and/or omissions were within his control and within his feasibility to alter, adjust, and/or correct so as to prevent some or all of the unlawful acts and injuries complained of herein by Plaintiff.

**COUNT III**
**Civil Rights Violation Under 42 U.S.C. § 1983-Fourth Amendment**
**Illegal Seizure – Pat Down**
**(Plaintiff against Thompson in his Individual Capacity)**

96.     Plaintiffs re-allege preceding and subsequent paragraphs as if fully set forth herein.

97.     THOMPSON was a member of the BMPD and acting under color of law during his unlawful interactions with OTIS JR.

98.     After THOMPSON ordered OTIS JR. out of his vehicle, he ordered OTIS JR. four times to turn around and submit to a pat down, after which he initiated a pat down of OTIS JR.'s left pocket.

99.     THOMPSON's order for OTIS JR. to submit to a pat down and subsequent pat down were unlawful and without legal basis.

100.     THOMPSON had no legal basis for unduly prolonging the traffic stop seizure by demanding that OTIS JR. submit to a pat down.

101.     THOMPSON had no legal basis to initiate a new and unjustified phase of his encounter with OTIS JR. by ordering him to submit to a pat down.

102.     OTIS JR. did not consent to a pat down and stated that he did not feel comfortable with people touching him and there was no legal basis for THOMPSON to touch him.

103.     A reasonable person would not feel free to terminate the encounter with THOMPSON and refuse THOMPSON's order to submit to a pat down.

104.     THOMPSON admitted that he did not have an individualized legal basis for ordering OTIS JR. to submit to a pat down and investigators reported: "something inside him told him though that there may be more to the stop and that he is always on the lookout for guns and drugs."

17

105.    THOMPSON had no probable cause or reasonable suspicion to believe that OTIS JR. was in possession of guns.

106.    THOMPSON had no probable cause or reasonable suspicion to believe that OTIS JR. was in possession of drugs.

107.    THOMPSON violated OTIS JR.'s constitutional rights to be free from unlawful, unjustified, and unreasonable seizure in violation of the Fourth Amendment to the United States Constitution.

108.    THOMPSON's acts and omissions were not justified and not objectively reasonable.

109.    THOMPSON's acts and omissions violated clearly established law that any reasonable officer would have known.

110.    As a direct, proximate, and foreseeable result of THOMPSON'S actions and omissions, OTIS JR. was harmed and ultimately killed by THOMPSON.

111.    Plaintiff specifically alleges that THOMPSON's complained of acts and/or omissions were within his control and within his feasibility to alter, adjust, and/or correct so as to prevent some or all of the unlawful acts and injuries complained of herein by Plaintiff.

**COUNT IV**
**Civil Rights Violation Under 42 U.S.C. § 1983-Fourth Amendment**
**Illegal Seizure and Arrest – Handcuffing**
**(Plaintiff against Thompson in his Individual Capacity)**

112.    Plaintiffs re-allege preceding and subsequent paragraphs as if fully set forth herein.

113.    THOMPSON was a member of the BMPD and acting under color of law during his unlawful interactions with OTIS JR.

114.    THOMPSON's attempt to handcuff and arrest OTIS JR. was unlawful and without legal basis.

115.    Even assuming arguendo that THOMPSON's pat down search was lawful—which it was not—THOMPSON's pat down was limited to a search for weapons.

116.    THOMPSON knew that OTIS JR. had no weapons.

117.    THOMPSON had no legal basis for expanding his already legally defective pat down for narcotics.

118.    THOMPSON'S purported basis that he believed he felt a small "rock like narcotic" in OTIS JR.'s pocket was an unlawful expansion of his already unlawful pat down search of OTIS JR. and an invalid basis for handcuffing and arresting OTIS JR.

119.    THOMPSON'S use of force to handcuff and arrest OTIS JR. was unlawful.

120.    No weapons were recovered from the scene, the vehicle, or OTIS JR.'s person.

121.    No narcotics were recovered from the scene, the vehicle, or OTIS JR.'s person.

122.    THOMPSON violated OTIS JR.'s constitutional rights to be free from unlawful, unjustified, and unreasonable seizure in violation of the Fourth Amendment to the United States Constitution.

123.    THOMPSON's acts and omissions were not justified and not objectively reasonable.

124.    THOMPSON's acts and omissions violated clearly established law that any reasonable officer would have known.

125.    As a direct, proximate, and foreseeable result of THOMPSON'S actions and omissions, OTIS JR. was harmed and ultimately killed by THOMPSON.

126.      Plaintiff specifically alleges that THOMPSON's complained of acts and/or omissions were within his control and within his feasibility to alter, adjust, and/or correct so as to prevent some or all of the unlawful acts and injuries complained of herein by Plaintiff.

**COUNT V**
**Civil Rights Violation Under 42 U.S.C. § 1983-Fourth Amendment**
**Excessive Force-Deadly Force**
**(Plaintiff against Thompson in his Individual Capacity)**

127.      Plaintiff re-alleges preceding and subsequent paragraphs as if fully set forth herein.

128.      THOMPSON was a member of the BMPD and acting under color of law during his unlawful interactions with OTIS JR.

129.      THOMPSON pushed OTIS JR. against his vehicle and began to search him without legal justification.

130.      THOMPSON had no justification for using physical force against OTIS JR. when THOMPSON forced OTIS JR. against his vehicle.

131.      THOMPSON proceeded to use force to attempt to handcuff and arrest OTIS JR. without probable cause or reasonable suspicion of any criminal activity.

132.      THOMPSON had no justification for using excessive force to arrest OTIS JR.

133.      THOMPSON had no justification for using excessive force and discharging his taser against OTIS JR.

134.      THOMPSON had no justification for using excessive force and tackling OTIS JR. to the ground.

135.      THOMPSON had no justification for using excessive force, including deadly force, when he discharged his firearm against OTIS JR. no less than seven (7) times, five (5) of which hit OTIS JR.

20

136.     OTIS JR. had not committed nor was alleged to have committed a serious crime involving the infliction or threatened infliction of serious physical harm, if any.  At most, he was alleged to have committed a turn signal traffic infraction.

137.     OTIS JR. did not pose an immediate threat of serious physical harm to THOMPSON or others.

138.     THOMPSON could not and did not have an objectively reasonable belief that the use of deadly force was necessary to prevent OTIS JR.'s from running away.

139.     OTIS JR. was unarmed and was removing himself from THOMPSON's unlawful actions, including unlawful search, arrest, and use of taser and force against him.

140.     OTIS JR. was attempting to avoid being tased and tackled by THOMPSON when he was tased and tackled by THOMPSON.

141.     OTIS JR. was attempting to avoid any further unlawful tasing by THOMPSON.

142.     OTIS JR. was attempting to avoid an unlawful arrest by THOMPSON.

143.     THOMPSON knew that his taser was no longer operable because his taser leads had already been discharged and that he could not be stunned by a taser when he created distance between him and OTIS JR. Even if THOMPSON could be "stunned" from the taser, he knew it was not a threat of serious bodily injury.

144.     THOMPSON backed away from OTIS JR. and knew that OTIS Jr. was not resisting.

145.     THOMPSON stood several feet away from OTIS JR. and repeatedly discharged seven bullets into OTIS JR. Each bullet was unreasonable and excessive deadly force.

146.     Defendants spoliated approximately fifteen (15) seconds of THOMPSON'S body worn camera, including the moments before and during THOMPSON'S use of deadly force against OTIS JR.

147.     THOMPSON violated OTIS JR.'s constitutional rights to be free from unlawful, unjustified, and unreasonable excessive force, including deadly force, in violation of the Fourth Amendment to the United States Constitution.

148.     THOMPSON's acts and omissions were not justified and not objectively reasonable.

149.     THOMPSON's acts and omissions violated clearly established law that any reasonable officer would have known.

150.     THOMPSON was not in imminent and objectively reasonable fear of serious bodily injury from OTIS JR.

151.     At no point during the encounter did OTIS JR. display any aggressive behavior or pose any threat to THOMPSON or others. OTIS JR. was unarmed and was merely attempting to distance himself from THOMPSON's unlawful force and unreasonable aggressive actions. THOMPSON's use of deadly force against an unarmed, retreating individual was grossly disproportionate and unjustified under the circumstances.

152.     As a direct, proximate, and foreseeable result of THOMPSON's acts and omissions, including his unlawful stop, illegal search, use of excessive force, and failure to accommodate OTIS JR.'s known disability, OTIS JR. was harmed and ultimately killed. Each of THOMPSON's actions, from the initial unlawful stop to the final, unjustified use of deadly force, formed a direct causal chain leading to OTIS JR.'s death.

153.     THOMPSON's complained-of acts and/or omissions were within his control and within his feasibility to alter, adjust, and/or correct so as to prevent some or all of the unlawful acts and injuries complained of herein by Plaintiff.

## COUNT VI
### Civil Rights Violation Under 42 U.S.C. § 1983-*Monell*
### (Plaintiff against the City)

154.     Plaintiff re-alleges preceding and subsequent paragraphs as if fully set forth herein.

155.     THOMPSON was a member of the BMPD and was acting under color of law during his unlawful interactions with OTIS JR.

156.     The CITY's custom and practice included the absence of any administrative reviews of its constitutional obligations to its citizens. As a result, all BMPD officers know that they will not face any accountability for their unconstitutional policing customs and practices, unless and only if their conduct rises to the level of criminal violations.

157.     The CITY failed to supervise, train, and/or provide policies or procedures to its officers, including THOMPSON, regarding lawful stops, which constituted a custom and practice of deliberate indifference to the rights of all individuals, including OTIS JR., who interact with BMPD.

158.     The CITY failed to supervise, train, and/or provide policies or procedures to its officers, including THOMPSON, regarding lawful seizures, including pat-downs, which constituted a custom and practice of deliberate indifference to the rights of all individuals, including OTIS JR., who interact with BMPD.

159.     The CITY failed to supervise, train, and/or provide policies or procedures to its officers, including THOMPSON, regarding lawful force, including deadly force, which constituted

a custom and practice of deliberate indifference to the rights of all individuals, including OTIS JR., who interact with BMPD.

160.    The CITY failed to supervise, train, and/or provide policies or procedures to its officers, including THOMPSON, in the use of force and/or interactions with individuals with mental illness, which constituted a custom and practice of deliberate indifference to the rights of all individuals, including OTIS JR., who interact with BMPD.

161.    The CITY engages in a pattern or practice of deliberate indifference to the risks of constitutional violations and need for policies and procedures, supervision, and/or training to avoid and/or mitigate unconstitutional policing.

162.    Although it is axiomatic that armed law enforcement officers should be trained in the use of force, including deadly force, the International Association of Chiefs of Police has stated that "Law enforcement agencies **must** provide officers with clear and concise policies that establish well-defined guidelines on the use of force."[1] (emphasis added).

163.    The International Association of Chiefs of Police[2] has also stated that "Law enforcement agencies **should** provide officer with training to determine whether a person's behavior is indicative of a mental health crisis and with guidance, techniques, response options,

---

[1] https://www.theiacp.org/sites/default/files/2020-07/National_Consensus_Policy_On_Use_Of_Force%2007102020%20v3.pdf (last visited May 24, 2024).

[2] The IACP is the world's largest and most influential professional association for police leaders and is a recognized leader in global policing, committed to advancing safer communities through thoughtful, progressive police leadership. https://www.theiacp.org/about-iacp (last visited May 24, 2024).

and resources so that the situation may be resolved in as constructive, safe, and humane a manner as possible."[3] (emphasis added).

164.     The CITY, by and through the BCSD MCU—chaired by Al Tolbert, the chief of BMPD—conducted the *criminal* investigation of the shooting of OTIS JR. by THOMPSON.

165.     The CITY, by and through BCSD MCU, refuses to disclose the results of the investigation, the facts and evidence in support of its findings that THOMPSON's shooting of OTIS JR. was justified, the legal basis for finding that THOMPSON's shooting of OTIS JR. was justified, and/or the existence, if any, of the training, supervision, and/or policies and procedures governing its justification findings.

166.     Moreover, it is also clear that the BCSD MCU's investigation was limited to a criminal investigation, and justification, of THOMPSON's shooting of OTIS JR.

167.     Further, the BCSD MCU's justified shooting determination was based on an erroneous standard. Notwithstanding its failure to provide the family with its written findings, in a public statement, BCSD MCU provided that it "did not establish probable cause that [THOMPSON] committed an offense."[4] That is not the legal standard for determining whether an officer was criminally justified in shooting an individual, let alone whether a constitutional violation occurred.

168.     Again, the CITY, by and through the BCSD MCU, refused to release the basis of its findings and investigation, leaving Plaintiff only with the CITY's representations in the press. However, based on the CITY's press conferences and releases, through BCSD MCU, its

---

[3] https://www.theiacp.org/resources/policy-center-resource/mental-illness (last visited May 24, 2024).

[4] https://www.wkrg.com/baldwin-county/investigation-into-police-killing-of-bay-minette-man-otis-french-jr-closed/ (last visited March 24, 2024).

determination was based on an erroneous review standard, and there was no administrative investigation of the shooting to even determine whether THOMPSON's acts and omissions as they related to OTIS JR. were in compliance with any policy, procedure, supervision, and/or training.

169.    The CITY's routine use of BCSD MCU to investigate itself, using improper and inapplicable criminal standards for its review, and failure to provide any administrative review of the policies, procedures, supervision, and/or training related thereto constitutes actual or constructive notice that the likelihood of constitutional violations is so high that the need for policies and procedures is obvious.

170.    The CITY's routine use of BCSD MCU to investigate itself, using improper and inapplicable criminal standards for its review, and failure to provide any administrative review of the policies, procedures, supervision, and/or training related thereto constitutes actual or constructive notice that the likelihood of constitutional violations is so high that the need for supervision is obvious.

171.    The CITY's routine use of BCSD MCU to investigate itself, using improper and inapplicable criminal standards for its review, and failure to provide any administrative review of the policies, procedures, supervision, and/or training related thereto constitutes actual or constructive notice that the likelihood of constitutional violations is so high that the need for training is obvious.

172.    The CITY's routine use of BCSD MCU to investigate itself, using improper and inapplicable criminal standards for its review, and failure to provide any administrative review of the policies, procedures, supervision, and/or training related thereto constitutes deliberate indifference to the constitutional rights of persons who interact with BMPD, including OTIS JR.

173.    The CITY ratified the deficient investigation conducted by BCSD MCU, including statements and admissions by THOMPSON that he had no legal basis for the initial traffic stop.

174.    The CITY ratified the deficient investigation conducted by BCSD MCU, including statements and admissions by THOMPSON that he had no legal basis for the pat down of OTIS JR.

175.    The CITY ratified the deficient investigation conducted by BCSD MCU, including statements and admissions by THOMPSON that he had no legal basis for the arrest of OTIS JR.

176.    The CITY ratified the deficient investigation conducted by BCSD MCU, including the spoliated portions of the body worn camera.

177.    The CITY's acts and omissions were a proximate cause of OTIS JR.'s death and injuries to OTIS JR.

178.    As a direct, proximate, and foreseeable result of Defendants' acts and omissions, OTIS JR. was harmed and ultimately killed.

179.    The CITY's complained-of acts and omissions were within its control and within its feasibility to alter, adjust, and/or correct so as to prevent some or all of the unlawful acts and injuries complained of herein by Plaintiff.

**COUNT VII**
**Violations of the Americans with Disabilities Act**
**(Plaintiff against the City)**

180.    Plaintiff re-alleges preceding and subsequent paragraphs as if fully set forth herein.

181.    OTIS JR. was a qualified individual with a disability under the Americans with Disabilities Act ("ADA"). OTIS JR.'s disability was mental illness, specifically a diagnosis of bipolar disorder.

182.    Defendants knew or should have known of OTIS JR.'s disability, either through a flag in the Defendants' system or personal knowledge of OTIS JR.'s disability.

183.    There were no exigent circumstances that excluded THOMPSON from interacting with OTIS JR. and/or providing him a reasonable accommodation before, during, and after THOMPSON engaged with OTIS JR., including, but not limited to, the stop, demand to exit the vehicle, pat-down, use of force, attempt to arrest, tasing, and shooting of OTIS JR.

184.    The CITY did not have policies, procedures, and/or protocols, or if they were available, THOMPSON failed to follow such policies, procedures, and/or protocols, for de-escalating and interacting with a person with a disability.

185.    THOMPSON was told specifically by OTIS JR. that he did not like people touching him, and although THOMPSON had no basis to physically touch OTIS JR., THOMPSON proceeded with force and a pat-down of OTIS JR. without lawful justification.

186.    THOMPSON unduly escalated his physical interaction with OTIS JR. without lawful justification, resulting in THOMPSON shooting OTIS JR. seven (7) times over a purported and pre-textual left tail-light warning citation.

187.    The ADA prohibits discrimination against persons with disabilities in the provision of governmental services such as law enforcement. Defendants CITY and THOMPSON are agents, employees, supervisors, and/or representatives of a governmental entity that is required to comply with the ADA.

188.     At all times during his interaction with THOMPSON, OTIS JR. was diagnosed with a mental illness and/or bipolar disorder, and he was a qualified individual under the ADA.

189.     The failure to accommodate OTIS JR.'s disability was intentional and deliberately indifferent to his rights under Title II of the ADA and was the proximate cause of his death.

190.     The CITY, by and through THOMPSON, failed to make a reasonable accommodation for OTIS JR.'s mental health diagnosis and unduly escalated his interaction with OTIS JR.

191.     The CITY failed to provide policies, procedures, and/or training to THOMPSON and BMPD officers regarding its obligations under the ADA.

192.     The CITY's failure to properly train its officers in interacting with individuals with mental illness directly led to THOMPSON's inappropriate escalation of the situation and ultimately to OTIS JR.'s death. Had THOMPSON been properly trained, he would have recognized OTIS JR.'s mental health status and employed de-escalation techniques, potentially preventing the tragic outcome.

193.     As a result of the CITY's acts and omissions, OTIS JR.'s rights under the ADA were violated, and he was killed.

**COUNT VIII**
**Violations of Section 504 of the Rehabilitation Act**
**(Plaintiff against the City)**

194.     Plaintiff re-alleges preceding and subsequent paragraphs as if fully set forth herein.

195.     As a recipient of federal funds, the CITY is required by Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, ("Section 504") to make reasonable accommodations

29

to persons with disabilities in its facilities, program activities, and persons who receive BMPD services.

196.    Section 504 further requires such recipients of federal funds, such as the CITY, to modify such facilities, services, and programs as necessary to accomplish this purpose. Accordingly, Defendant CITY is subject to the mandate of Section 504.

197.    For the same reasons that OTIS JR. was deemed to have a disability for purposes of the ADA, OTIS JR. was also a qualified individual with a disability under Section 504.

198.    The same conduct of Defendant CITY that constituted an ADA violation also constituted failure to reasonably accommodate OTIS JR.'s disability under Section 504.

199.    The CITY's acts and omissions in failing to accommodate OTIS JR.'s disability was intentional and/or deliberately indifferent to his rights under Section 504, thereby constituting a violation of Section 504 by a recipient of federal funds.

**COUNT IX**
**Wrongful Death, Alabama Code § 6-5-410**
**(Plaintiff against the City)**

200.    Plaintiff re-alleges preceding and subsequent paragraphs as if fully set forth herein.

201.    For purposes of this Count, Plaintiff is entitled to relief against the CITY under state law because it owed a duty of reasonable care to OTIS JR. and breached its duty to exercise reasonable care, pursuant to Alabama Code Section 6-5-410, through its wrongful acts, omissions, and/or negligence.

202.    The CITY had a non-delegable duty of care owed to OTIS JR. and breached this duty in the following ways, including, but not limited to, failing to adequately provide policies, procedures, or training to BMPD officers, including, but not limited to Defendant THOMPSON,

regarding legal traffic stops, searches, seizures, uses of force, uses of less lethal force, uses of deadly force, and providing reasonable accommodations for individuals with disabilities.

203.     The CITY had an obligation to make an appropriate investigation of its agents and employees and failed to do so, including the use of BCSD MCU, which includes the BMPD Police Chief as the chairperson, for the investigation of the shooting of OTIS JR. by BMPD and THOMPSON.

204.     The CITY had an obligation to properly screen, train, supervise, control, discipline, and/or terminate its employees. Moreover, the CITY had an obligation not to rehire THOMPSON as a law enforcement officer once he was terminated from BMPD, as well as other law enforcement agencies.

205.     The CITY's actions and omissions fell far below the standard of care required under Alabama law for municipalities in hiring, training, and supervising police officers. The CITY's failure to properly train its officers on interactions with mentally ill individuals and its negligent retention of THOMPSON despite his history of misconduct constitute gross negligence under Alabama law.

206.     As a direct and proximate cause of the aforementioned acts of the CITY, OTIS JR. suffered great physical damage, suffering, and death, and Plaintiff is entitled to compensatory damages.

## COUNT X
### Wrongful Death, Alabama Code § 6-5-410
### (Plaintiff against Thompson in his Individual Capacity)

207.     Plaintiff re-alleges preceding and subsequent paragraphs as if fully set forth herein.

31

208.     For purposes of this Count, individual THOMPSON acted negligently, or, in the alternative, willfully, maliciously, and/or in bad faith with respect to OTIS JR.'s wrongful death.

209.     THOMPSON had no legal justification for the shooting death of OTIS JR.

210.     THOMPSON's actions in shooting OTIS JR. multiple times, despite OTIS JR. posing no immediate threat, demonstrate a reckless or callous disregard for OTIS JR.'s rights. THOMPSON's threat to kill OTIS JR. before shooting him evidences malice and supports an award of punitive damages to punish THOMPSON and deter similar conduct in the future.

211.     As a direct and proximate cause of the aforementioned acts of THOMPSON, OTIS JR. suffered great physical damage, suffering, and death, and Plaintiff is entitled to compensatory damages.

**WHEREFORE**, Plaintiff demands judgment as follows:

1.     An amount to be determined at trial, including compensatory and punitive damages, where applicable, plus interest;

2.     Injunctive and declaratory relief;

3.     Plaintiff's attorneys' fees pursuant to 42 U.S.C. §1988, 42 U.S.C. § 12205 and 29 U.S.C. § 794a(b);

4.     Costs and disbursements incurred in this action; and

5.     Any other such relief as the Court may deem just and proper.

Respectfully submitted,
MAY JUNG LLP

*/s/Je Yon Jung*
Je Yon Jung (*pro hac vice forthcoming*)
333 City Blvd. West
Suite 327
Orange, CA 92868
Tel: (818) 869-6476

Fax: (202) 618-8282
jeyon@mayjung.com

*Counsel for Plaintiff*

## <u>JURY TRIAL DEMAND</u>

Plaintiff requests a jury trial on all counts.

_/s/Je Yon Jung_____
Je Yon Jung