IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA

OTIS FRENCH, SR., as          *
Personal Representative of*
the Estate of Otis French,*
Jr.,                          *
          Plaintiff,          *  24-cv-265
                              *  November 6, 2024
vs.                           *  Mobile, Alabama
                              *  9:36 a.m.
THE CITY OF BAY MINETTE       *
and BRANDON THOMPSON,         *
          Defendants.         *
**************************

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE JEFFREY U. BEAVERSTOCK
CHIEF UNITED STATES DISTRICT JUDGE

FOR THE PLAINTIFF:

MS. JE YON JUNG, ESQ.
May Jung LLP
333 City Blvd. West
Suite 327
Orange, CA 92868
202-297-5638

FOR THE DEFENDANTS:

MS. MELISSA P. HUNTER, ESQ.
Galloway Wettermark & Rutens
P O Box 16629
Mobile, AL 36616-0629
251-476-4493

MR. ANDREW J. RUTENS, ESQ.
Galloway Wettermark & Rutens
P O Box 16629
Mobile, AL 36616-0629
251-476-4493

*CHERYL K. POWELL, CCR, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3003/cheryl_powell@alsd.uscourts.gov

COURTROOM DEPUTY: MS. MELANIE PAULK


COURT REPORTER: CHERYL K. POWELL, CCR, RPR, FCRR

Proceedings recorded by OFFICIAL COURT REPORTER, Qualified pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies and Procedures Vol. VI, Chapter III, D.2.  Transcript produced by computerized stenotype.

**P R O C E E D I N G S**

(In open court.)

COURTROOM DEPUTY:  Case set for a motion hearing in Civil Action 24-265, Otis French, Sr. versus The City of Bay Minette, et al.

Is the plaintiff ready to proceed?

MS. JUNG:  Yes, ma'am.

COURTROOM DEPUTY:  Is the defendant ready to proceed?

MR. RUTENS:  Yes, ma'am.

THE COURT:  All right.  Good morning.

MR. RUTENS:  Good morning, Your Honor.

MS. JUNG:  Good morning.

THE COURT:  We have a couple of things on the agenda to talk about this morning.  Let me get in the right place.

(Discussion off the record.)

THE COURT:  All right.  So we have a motion to seal and we have a motion to dismiss.

Why don't we talk about the motion to seal first?

MS. HUNTER:  Your Honor, where would you prefer that I stand?  Is -- can I stand here or would you like me --

THE COURT:  If you want to stand, I need you to go to the podium.  If you want to sit, you can do that and just pull the microphone close.  When we don't have a jury, I'm fine with lawyers sitting in court.  It's weird; I recognize that.

MS. HUNTER:  Just wanted to make sure if you have a

preference that I follow it.

THE COURT: No. If you would just pull the microphone a little closer though.

MS. HUNTER: Is that okay?

THE COURT: Perfect.

MS. HUNTER: All right.

Your Honor, the defendants have filed a motion for leave to file three different exhibits under seal, and those are exhibits to our motion to dismiss, Exhibits 1, 2, and 3.

As Your Honor is aware, this case involves the August 2022 death of Otis French, Jr. And we are asking the Court to seal three video exhibits.

The first video is Officer Thompson's dash cam footage, and then the second and third videos are Officer Thompson's body cam footage. And in those videos, we observe the initial interactions between Officer Thompson and French. We observe his request for French to exit the vehicle, the pat down of French, and then, ultimately, we observe a physical altercation that takes place between Thompson and French which results in Officer Thompson using deadly force against French.

There is additional footage that depicts medical attention that is given to French after the fact.

And the defendants' concerns with the release of the footage stems from several different factors, the first of those being the substantial amount of media attention that the

case has received. There was media attention at the time of the incident, media attention at the time of the lawsuit being filed, and additional media attention at the time that our motions to dismiss and motion to seal were filed.

There have also been a number of comments made on social media about the officer and the Bay Minette Police Department. They are hostile and threatening. Those comments are attached to our motion as well as our reply brief.

A third concern would be the graphic nature of the footage and what is depicted.

And then a fourth concern is that the release of the tape will compromise the defendants' right to a fair trial.

A fifth concern was actually raised in our initial motion, which was a concern for the privacy rights of the plaintiff. In plaintiff's response, they have indicated that they have no objection to release of that footage.

Now, as it concerns the applicable law, the defendants agree that there is a common law right of access to judicial records, but that right is not absolute. And, ultimately, the decision is within this Court's discretion to take into account the relevant facts and circumstances of a particular case and decide whether or not the record should be released to the public or closed to the public.

In the briefing -- in the plaintiff's brief and in our reply brief, there are a number of cases that are cited dealing

with the release of documents to the public. But there are three cases cited that deal with police body cam footage.

One of the cases cited that I will address -- there's a Mississippi case. It's *Winkely vs. Hancock County.* And, there, the defendant argued only that the footage be sealed due to the plaintiff's family's privacy interests. And the deceased family consented to the release of that footage, and the Court denied the motion to seal.

We are asking the Court to look at the facts and holdings of the two additional cases that are cited in the briefing which is the *Robinson vs. Huntsville* case and the *Pettaway vs. Barber* case.

The first of those cases, *Robinson vs. Huntsville,* is a 2021 case out of the northern district. It arose from the death of Crystal Ragland. She was killed by officers who were responding to reports that she had a gun and was pointing it at her neighbors. And when the defendants in that case filed their motion to dismiss, they moved for leave to file that body cam footage under seal, and the plaintiff objected, stating that it was in the best interest of the family and the public to have that footage released. And in light of the pending motion to dismiss, the Court granted the defendants' motion to file under seal but promised to revisit the issue after ruling on the motion to dismiss.

Now, the Court dismissed that lawsuit. And after it

was dismissed, AL.com filed a request, asking for access to the body cam footage that was filed in support of the motion. And the Court determined that, at that point, disclosure of the body cam footage was appropriate and allowed release of the footage.

THE COURT: I think he also redacted nonparty officers' appearances.

MS. HUNTER: Correct. There was some personal information about the officers that was redacted.

And then the *Pettaway vs. Barber* case relies heavily on the *Robinson* case. That's a 2022 case also out of the northern district, an action filed by plaintiff, family of the deceased individual, against Montgomery police officers. Sort of the same situation.

We had a burglary phone call; an officer went in; he had a K9 with him that attacked the plaintiff's brother; and, ultimately, he died from those injuries.

The defendants filed motions for summary judgment in that case, and the body cam footage was filed under seal. And in that case, the plaintiffs filed a motion to strike the confidentiality designations for the body cam recordings.

And the Court in that case relied heavily on *Robinson* in making its determination. They agreed with Judge Kallon's opinion in the *Robinson* case and his explanation of the interests that would be allowed by public access, particularly

in light of systematic policing issues, an issue we were having with police misconduct.

But the Court in that case took specific note of the contrasting procedural postures of *Robinson* and the *Pettaway* case in that it was only after the case had been concluded and there was no possibility of a trial on the horizon that the footage was released in *Robinson*. That way, there was no chance that the footage could have interfered with the administration of justice.

And the Court in *Pettaway* goes through the *Newman* and the *Romero* factors for determining good cause. And they determined that releasing the footage implicated significant considerations regarding the interests of the defendants and the public and the Court in ensuring that the reality and appearance of the fair and efficient administration of justice in upcoming proceedings could be protected.

And they noted that, in this age of social media and allegations of police violence and misconduct -- that, when released, these videos become instantly and pervasively available to the public and scrutinized by the public which would mean that the public would have their opportunity to develop their own legal theories and contentions other than those that might be presented at trial.

They also noted that, due to the graphic nature and emotional impact of the video, it was not possible that the

footage could be unseen, ignored, or easily set aside.

And, finally, they noted that it's better to err, if they have to err, on the side of generosity in the protection of a defendant's right to a fair trial before an impartial jury.

And that is what we're asking to Court to do here in sealing this video footage.

THE COURT: Okay. What's the status of the footage now? I mean, you filed under seal.

Does the plaintiff have a copy of it?

MS. HUNTER: Yes, Your Honor. We provided a copy to the plaintiffs when we filed our motion with the Court.

THE COURT: Okay. Okay. All right. Ms. Jung?

MS. JUNG: Jung.

THE COURT: Okay. I want to make sure I say that correctly.

MS. JUNG: Thank you, Your Honor.

THE COURT: Yeah. Same deal.

MS. JUNG: I'm going to stand because I think it makes it easier.

THE COURT: Yeah. I am sorry. It's kind of weird.

MS. JUNG: It's okay, Your Honor. It makes it easier for me to think on my feet.

THE COURT: I'm with you.

MS. JUNG: Your Honor, thank you for the opportunity.

It is a pleasure to meet you and for this hearing. I appreciate that time.

I think the important piece of the motion to seal here and distinguishable from the cases that my counsel has stated is that we have never alleged that it is absolute that they should be released, but what is required under the circuit law is to satisfy the *Romero* factors, something that defendants did not even bother to do in their opening briefs.

And I think it's important that each of those cases, regardless of how they apply or do not to the facts of this case -- that this Court should independently go through the *Romero* factors. And when we do that, Your Honor, you can see that defendants do not carry the day for sealing those documents.

When you look at allowing access would impair the Court's functions or harm legitimate privacy issues, the Court -- once a case is filed, the Court is a public body where these types of facts and video should be disclosed.

The fact that it may cause emotion, the fact that it may cause debate, public debate that is necessary -- as the *Robinson* Court pointed out, that's not a standard for then converting that into a toxic brew of vitriol. That's not what happened here.

It's important for the public to have access to information, particularly here, Your Honor, where the

defendants had no qualms discussing the video, the contents of the video, the basis of the video, supporting their position that there were no constitutional violations all before an investigation was concluded, all before the family was ever given access to the video.

So this is a little bit different because the defendants have used the video in a way in the public unilaterally to talk about why it helps their case. So they've already put this out into the public but, yet, hid the actual video from anyone's eyes.

I think the degree and likelihood of injury if the information is made public references to social media posts on their own social media where they have -- as open public access to the citizens -- those are two years old. There's no indication whatsoever that any threats were actually made; that there was anything actionable; that there was any harm that was made to the police department or to the involved officer, Thompson, here.

In fact, the only thing the family has done in the public with respect to criticism of the police department has been public, peaceful protests and requesting that a transparent and accountable -- for transparency and accountability, including the release of the video.

We had to file this lawsuit, Your Honor, in order to get the video. They would refuse to give that to the families,

but, yet, they talked about the video throughout the time here.

The third factor, the reliability of the information. I think what's important here as well, Your Honor, is that, while the plaintiffs do contend that there is some shenanigans with the body-worn camera and the malfunctioning, quote, unquote, of the camera -- and I think the public is entitled to see that as well, to see what they base their reasons for finding no violations -- is based on an imperfect and potentially spoliated and tampered piece of evidence.

THE COURT:  So on that, do we have any idea how long the gap is?

MS. JUNG:  Your Honor, the defendants claim it's 12 seconds.  I think it's hard to tell without having the metadata, which we anticipate using a forensic expert to review it.  I don't know how much time is missing.  I don't even know where they get 12 seconds.  So as you can see, both pieces -- the excerpts of the body camera are submitted in two pieces, and each one starts over at zero.

THE COURT:  Right.  And I looked at that.  And I think the dash camera doesn't have the gap.

MS. JUNG:  Correct.

THE COURT:  But you can hear the officer talking on the dash camera I think.  I don't know if the two systems are linked.  So that's why, short of breaking it down and measuring the time, I don't know.

Maybe -- is that where you identify the 12 seconds? From the dash?

MS. HUNTER: Yes. The 12-second gap -- if you listen, you're able to listen to the dash cam simultaneously with the body cam footage. It picks back up after those 12 seconds.

THE COURT: Okay. Okay. I'm sorry. That's just --

MS. JUNG: No problem. No, Your Honor. It's a good question, and that's not something that we have parallel checked on. And we would like to do that with the metadata.

THE COURT: Sure.

MS. JUNG: The fourth factor, whether there will be an opportunity to respond to the information, there's -- again, the plaintiffs have never had an opportunity to respond to the claims and the statements that defendants have made in the public. But I think it's clear that the defendants -- because we're here in federal district court before Your Honor, they will have that opportunity to respond.

I apologize. I'm probably going a little fast. I will slow down.

The fifth factor, whether the information concerned public officials or public concerns. I think, fundamentally, this is body camera that is part of the uniform of Bay Minette Police Department officers. Taxpayer money goes into, in part, providing that camera. These are public officials that, by virtue of their position, are public. And so what they do on

the job and during their duties and responsibilities should be open to the public.

Finally, Your Honor, the availability of less restrictive alternatives to sealing the documents -- whatever -- as I think Your Honor addressed, to the extent that uninvolved officers, to the extent there are any, can be redacted or that their faces be redacted may be a less restrictive alternative to sealing the documents.

But at the end of the day, Your Honor, these -- this video is important for the community, for the family, for everyone to have.

And hiding behind claims that there is -- hiding behind claims that there's privacy or that it's graphic -- yes; Mr. Otis French, Jr. was shot dead. So yes; it's graphic. And that's why we're here today, Your Honor.

I think the privacy rights of the family -- as the defendant indicated, the family has always asked for it to be released. I've addressed the social media comments. I've addressed -- the substantial amount of media attention was their first claim. The media attention was brought upon by the defendants themselves, Your Honor, particularly the claims that they made.

And, again, the graphic nature and that release will not compromise a fair trial because I think it's important for people to have and see that information. And we can address

that issue through voir dire or any other questions regarding viewing of the video.

THE COURT: Okay. All right. Let me hear from Ms. Hunter.

Anything else you want to add?

MS. HUNTER: I'll just briefly respond.

There was some discussion about social media comments and that they were made -- generated by posts from our own page.

And if you look at the social media comments, these are not on our own page. It's not something where we invited. These are news stories by third parties and personal comments that people have made as well as some comments from a page, the Bay Minette Justice League.

Additionally, plaintiff's counsel referenced a statement that's in their motion that they attribute, I believe, to one of the defendants concerning the footage itself. I believe that statement actually came from the Baldwin County Sheriff's Office who is not a defendant in this case.

And, finally, going through the *Romero* factors, if you look at the *Pettaway* case -- and this is Page 1282 of their -- of the brief or the order, they specifically note the two *Romero* factors that are at issue here which are whether allowing access would impair court functions or harm legitimate

privacy interests and the degree of likelihood of injury if made public. We believe those are the two issues that are at issue in this case.

THE COURT: Okay. I have a couple of more specific questions about your exchange of the video.

So I'm glad to know that you do have a copy of it, Ms. Jung.

Is that subject to any kind of -- like, there hasn't been any protective order from the Court.

Do you have any kind of agreement about that at this point?

MS. HUNTER: We have not had any specific discussions about the video itself. But we provided it in conjunction with the motion to file under seal.

THE COURT: Okay.

MS. HUNTER: So it has not been provided in any other manner other than, when we filed our motion to seal with the Court and provided the Court a copy of the footage, we also provided plaintiff with a copy of the motion and the footage.

THE COURT: Okay. So we're going to keep talking about the video some anyway because you disagree whether -- I say "you." The parties disagree as to whether it's appropriate for the Court to really even consider it at the motion to dismiss stage.

Ms. Jung, let me ask you a more specific question,

though.

Now that -- you pled your complaint when you did not have access to the video.

Had you seen it before at least?

MS. JUNG: Thank you, Your Honor.

We had seen it, parts of it. We were required to come in to the Baldwin County Sheriff's Office who is not a party but they were the investigator. So we were shown it. I'm not confident it's the same video excerpts that we received. Like I said, there's lots of questions about that.

But yes, Your Honor; we did see some videos before. It was hard to recall the specific details.

THE COURT: 100 percent. I understand where you're coming from there. My -- I guess the reason for my question even just at this point is you've pled your complaint without, I would say, unfetterred access or full access to the video. And I understand that. I'm not suggesting that you're agreeing it's full access to the video.

I would say, after having watched the videos -- and I'm not considering the evidence regarding the complaint; I'm just -- whether it's appropriate or not, I'm just going to ask you: Now that you have access to the video or you have a copy of it, would you replead anything in your complaint?

MS. JUNG: Yes, Your Honor.

I think that reserving the right to be able to look at

the metadata and to see if there's been any tampering or spoliation of that video, reserving that significant right here, we do believe that there are certain facts that we could replead and correct.

For example, it was Mr. French whose head was hit on the picnic table, not Mr. Thompson's; the taser was shot at -- when Defendant Thompson was facing --

THE COURT: I think maybe, like, on the left side of the house rather than the right side of the house?

MS. JUNG: Yes. So there are certain things that -- yes. And I think we addressed those in our motions to dismiss, Your Honor, again, walking that balance with the fact that we don't -- the things that we do think we need to replead are not substantively dispositive of the motion to dismiss or in our opposition thereto. But there are portions that we do believe are now clearer now that we have the actual video, Your Honor.

THE COURT: Okay. All right. Well, before the Court takes up the motion to dismiss -- I don't know -- is that something you would want to do? I know you say that those matters are not dispositive to the issues.

I have other questions about the complaint and about, like, which facts relate to some of the claims, you know. And I think this is from the experience of the Eleventh Circuit doesn't allow the Court to make arguments for a plaintiff, but sometimes, when you analyze the information -- sometimes it's

challenging to know which facts relate to which claims. Like, where is the seizure? Which event? Because, potentially, there's a couple where that could be.

MS. JUNG: Indeed, Your Honor.

And I think that that -- I understand Your Honor's point. I think it would be helpful, however, to the extent that, if plaintiffs are allowed to amend, we address all the issues or concerns, if any, that Your Honor has with what remains. We do believe that the pieces that we would amend are not dispositive of the motion to dismiss.

We do believe that there are at least three seizures, technically. It would be the stop, the removal, the handcuffing, and the shooting. Those would all technically fall under the Fourth Amendment seizure. And --

THE COURT: Which I count, from what you're telling me, as four actually. Potentially.

MS. JUNG: Potentially, Your Honor, yes.

THE COURT: Okay. All right. Ms. Hunter, what do you think about that?

MS. HUNTER: For purposes of the motion to dismiss and what we are here about today, I know that in responding to the motion to dismiss, plaintiff had indicated that there were some areas where they may be amending their complaint to address certain issues. But I think that, considering the video footage and the counts, as pled -- and even as they or if they

desire to amend them -- we are still entitled to qualified immunity.

We still have the same arguments that we do under *Reneau* as it concerns the city. And I think we should be able to move forward with the motion to dismiss today if the Court is so inclined to hear it.

THE COURT: Okay. Well, we're going to talk about it.

So, Ms. Jung, in the video that you have concerns about potential spoliation, it's the two chunks of the body camera that you have concerns about or --

MS. JUNG: And the missing pieces, Your Honor, the malfunctions.

THE COURT: I guess that's what I mean. The missing -- the gap appears to be in that body camera one and then the second piece.

MS. JUNG: Yes, Your Honor.

And I think, specifically related to that missing piece, that is squarely related to the excessive force/deadly force piece of plaintiff's allegations, whether -- what the struggle was, whether he had -- whether Mr. French had taken the taser or whether he was holding it to stop getting tased, just like the plaintiff in *Cantu*; whether Officer Thompson dropped the taser so that he could move back to shoot and discharge seven bullets into Mr. French -- all of those -- that key moment, oddly enough, is what's missing in those videos,

Your Honor.

THE COURT:  Part of the issue in *Cantu*, since you mention it -- Cantu didn't actually possess the taser; he reached for it I think.

MS. JUNG:  It was a material disputed fact.

That case was summary judgment, and they actually -- the defendants actually claimed that he did; the plaintiffs claimed that he didn't.  So -- and I don't think there was any opinion by the Court as to what did or didn't happen.

In fact, the Court said it was reasonable that the facts could support the plaintiffs; that he was trying to stop being tased and for self -- for defending himself and that he was not trying to grab it to use it against the officers.

Moreover, the fact that she then moved back and, within three seconds, discharged her firearm into the plaintiff was where the Court landed on why it should go forward to trial.

THE COURT:  Okay.  Well, and regardless of all of that, it's your position that the Court shouldn't be even considering the video in terms of the motion to dismiss.

MS. JUNG:  Particularly the deadly force piece, Your Honor.

We understand that Your Honor may look at the video and -- but our position is that that video should not be dispositive, should not be considered, particularly given the

indicia of foul play and that issue here, Your Honor.

THE COURT: Well, and, of course, I have to look at the video to decide whether it should be sealed or not.

MS. JUNG: Yes, Your Honor.

THE COURT: I'm definitely capable of putting up the wall between, you know, whether I consider it --

MS. JUNG: Of course.

THE COURT: -- and just take up the papers. But okay.

Well, okay. I have some thoughts about where we want to go regarding the motion to seal. But let's just transition to the motion to dismiss.

So, Mr. Rutens, I guess you're arguing the motion to dismiss?

MR. RUTENS: I am, Your Honor. Thank you.

First issue is the review of whether the body camera and the dash camera are going to be reviewed by the Court in support of the motion to dismiss. And we contend that it is.

Notably, in Paragraph 49 of the plaintiff's complaint, they allege that Thompson was wearing the body camera. Going back to 2002, the *Horsley vs. Feldt* case from the Eleventh Circuit -- in that instance, the Eleventh Circuit discussed a situation where there was a defamation lawsuit referencing, at least in part, an article. The article was referred to in the complaint and support for the claim of defamation, but it was not attached to the complaint itself.

And the -- at the motion to dismiss stage, the Eleventh Circuit analyzed it and said that it was central to the plaintiff's claim and it was undisputed. And it said undisputed means the authenticity is not challenged, not that the document wasn't challenged or the substance of the document wasn't challenged.

THE COURT: Well, so let me stop you there, then, because we do seem to have an issue with that here. Right?

MR. RUTENS: I don't believe so, Your Honor.

There's no legitimate claim of authenticity being at issue. There's a claim over the 12 seconds or 15 seconds, whatever it may be. As to it being a true and accurate copy, I don't believe there's a legitimate claim.

THE COURT: Hmm. Okay.

MR. RUTENS: Because it goes to there's no argument that that's not Mr. French on the video. There's no argument that that's the -- Officer Thompson on the video. There's no argument that that's not the day of what happened. There's no argument that that is not the stop. There's no argument that it's been altered by artificial intelligence in any way. The only argument is we're missing 12 seconds.

Now, we have linked up the audio from the dash camera and body camera one and body camera two, and it's about a 12-second gap. You can hear the video where the video ends on the body camera. It continues on the dash cam for about

12 seconds and then it starts back up. So we have that block of time where we're missing video but not audio.

In the *Baker vs. Madison* case, Eleventh Circuit case out of 2013, there were no allegations that the footage differs from what happened. And, there, there was a question about the authenticity, and they talked about, well, it's got to be a question about is the footage different.

And there's no question here, no legitimate question here supported by competent evidence in support of a motion or a position that it's not.

And in the *Baker vs. Madison* case, it's important that the Eleventh Circuit indicated that, at times, the videos -- in that case, it was both the dash and the body cam -- the videos did not paint the entire picture because of the view, because of some aspect of it, people were blocking things. Whether it was the dash cam or the body cam, the full events were not seen or observed. But in that motion to dismiss, the Eleventh Circuit said it was appropriate to view the video.

And we think that's what we're dealing with here. At best, you're dealing with a several-seconds gap of video but not audio because you have the audio on the dash camera. And you can link up the time because you have that audio. You can't say, well, it was really five minutes when it was really only 12 seconds because the dash camera disproves that.

And it's no different than an officer's body obscuring

some important piece of information that is shown in the other parts of the video.

And that's the important part of the *Baker vs. Madison* case where they discuss that you're not going to have a perfect Spielberg-like view of what happens. In this instance, it's a body camera and there was a wrestling match that happened. I don't think anybody disputes that.

And so, in fact, when the body cam comes back on, there are seven to eight seconds of all you see is what appears to be somebody's shirt.

So, you know, that's -- in this instance, there's no argument that what is shown is wrong. The argument is the 12 seconds is missing from the video and video only.

And so we think, in this instance, there is no legitimate claim as to an issue with authenticity.

THE COURT: So did the video stop recording and then start recording again or --

MR. RUTENS: Yes, Your Honor.

And this goes a little bit beyond what we're talking about here, but it -- honestly, the body camera has a little bit of an issue where its buttons are placed. There's a big turn-on/turn-off button on the front. And in this instance, while the two individuals were wrestling chest to back, chest to chest, depending on what time the event occurred, it turned off for 12 seconds and cycled back on.

THE COURT: Hmm. Okay.

MR. RUTENS: But, as I said, there's no argument that what is shown is incorrect. At best, there's an argument that what is shown is incomplete.

The *Baker vs. Madison* case stands for the proposition that it doesn't have to be complete. What has to be shown is accurate. And the Court is welcome to look at that if it's referred to or central to the claims of the plaintiff's complaint. And there's no argument that I've been able to divine in this instance that this video is not central to the plaintiff's complaint.

So we think, based on that caselaw along with the *Johnson vs. Atlanta* Eleventh Circuit case from 2024 -- the Court in that case said that they were not required to accept facts alleged what the video shows is incorrect. But what the video doesn't show, recognizing that the video doesn't show everything, then you go back and you default back to the complaint.

And in this instance, we believe that's a situation we're in. It is central to the complaint. There's no argument that what has been submitted is inaccurate. At best, it's an argument it's incomplete. So we feel that the video is appropriate to view at the motion to dismiss stage.

THE COURT: Okay. All right. You can continue on.

MR. RUTENS: Sure. And that brings us to the

complaint itself.

And if you -- so the question is if the video is viewable. And the *Madison* and *Johnson* cases discuss the fact that you don't have to disbelieve your eyes for what the video does show. If the video shows something and it's contradicted by allegations in the plaintiff's complaint, those allegations are not to be taken as truthful and not to be given any -- not to say truthful -- not to be accurate and not to be given the appropriate -- any appropriate deference.

And in this instance, if we go to the allegations in the plaintiff's complaint, they say Thompson had no legal basis for pulling Otis, Jr. over, but in the dash camera at one minute, 22 seconds through 24 seconds of the dash camera complaint [sic], you clearly see that the passenger side rear lighting system does not work at all. And that is appropriate for a police officer to pull away from.

Now, they continue in Allegation 18, Thompson approached the passenger side and asked Otis, Jr. for his driver's license and registration. And he asked if he was headed home and still lived at Old Robinson Road. They then say he provided his driver's license to Officer Thompson.

Well, if you go to the video, the body cam video, body cam one at 34 through 36 seconds, it shows it's actually flipped. Otis provided driver's license and registration to Officer Thompson first. Only after receiving that at Seconds

38 through 40 does Officer Thompson then say, do you still live on Old Robinson Road.

The allegation later in the complaint is he must have known where he lived because he asked him if he still lived on Old Robinson Road. However, in the context of the complaint, that's flipped -- or in the video, excuse me -- that's flipped.

You continue on. They say on Allegation 19, Thompson also told Otis, Jr. that he was pulling him over because he failed to use his left turn signal. Not exactly correct. Body camera one, you didn't use your signal, at Second 16 of the video. 16 through 18.

Then he continues on. The light on the left side is what he refers to at Seconds 22 through 23 of the video. However, he is standing on the passenger side of the vehicle. And if you watch that section of the video, Officer Thompson's hand refers to the end of the vehicle on the passenger side, which is the left side of the vehicle if you're facing the video. And it's undisputed that the light itself was out.

Continuing on --

THE COURT: So, now, this is the complaint that has been drafted before the plaintiff had access to the video.

MR. RUTENS: Completely understand.

THE COURT: And you're picking it apart. I'm just not sure how seriously I'm supposed to take that.

MR. RUTENS: I understand Your Honor's trepidation in

that regard. And I am -- have not and certainly not ever wanted to take unfair advantage of a situation against opposing counsel.

THE COURT: Mr. Rutens, I'm not accusing you of that.

MR. RUTENS: Oh, no. No.

THE COURT: But I'm just -- the matter comes before the Court when it does. And, you know, on one hand, you want me to consider the video. And the reason that I should consider it is because the facts of the complaint are -- and I'm making little air quotes -- are inaccurate, but I mean, the plaintiff didn't have access to break down the video as to every fact.

And, honestly, I'm a little concerned that we go through this exercise and if the Court follows the course that you're advocating, the response from the plaintiff would be, well, I want to amend the complaint so that the video isn't -- you know, there's no -- not even an argument that the Court shouldn't be considering the video at the motion to dismiss stage.

I don't know. I guess that's the reason I'm -- and I kind of have another thought. So put a pin in that.

So, Ms. Jung, you indicated that you have an interest in examining the metadata of the video. Does that potentially go to authenticity; that you have an issue or a concern that there may be an alteration other than simply incompleteness?

And I'm not accusing anyone of altering anything, but Mr. Rutens says there's no dispute that this is authentic although perhaps incomplete.

And so, thinking a little bit about the argument or at least the suggestion you made that you would want to look at the metadata -- does that -- like, if there was an issue that you discovered with the metadata, would that impact whether it's -- I don't know. Maybe it would still remain incomplete.

MS. JUNG: Yes, Your Honor. I appreciate that question.

I think there is a dispute of the authenticity because we can't agree that it's authentic, given the indicia of the missing 12 pieces [sic]. This is the first time we've heard from defendants that the reason why it's missing, which was never given that explanation -- even though asked several times of the Baldwin County Sheriff's Office, was never given to us.

In fact, if I look back at my notes, I do not believe they said what counsel just said, there's an off-and-on switch. That metadata, number one, will be able to determine whether it was on and off and what time those buttons were pushed.

Secondly, the fact that there is potentially allegations of spoliation or tampering and preservation of the evidence, under *United States vs. Lanzon*, 639 F.3d 1293, Eleventh Circuit 2011 case, that alteration to evidence may render it inadmissible and unreliable.

I can't say for sure, Your Honor, what the metadata is going to show us, but we surely want to look at the metadata to see. While I'm not here -- Mr. French is not here to be able to say that exactly depicts what happened, it likely did. But there's also indicia -- there's some funny business going on with the 12 seconds. We would like to see if there's anything else that the metadata from the beginning to the end -- whether certain portions have been downloaded, changed, deleted, those types of things.

And so I just can't say, given that critical 12 seconds -- I can't say that there wouldn't be other pieces of that metadata that would reveal further authenticity issues, Your Honor.

THE COURT: Okay. Why don't we do this because this is -- well, I mean, it's a significant question that needs to be answered. I'm not saying I'm going to consider the video for the purposes of motion to dismiss or not.

In light of my concern just with the argument about whether it should be considered or not, I want to give you an opportunity to conduct that metadata review. And I want to give you the opportunity to replead if you -- I'm not saying one way or the other if I think that that would be dispositive. But, you know, I think it's a lot to expect a complaint drafted before seeing body-worn and dash cam video of the actual event might not need to be adjusted.

I'm not saying that your answers change, but certainly there are some facts that might. And that might allow maybe a little more clarity as to the events that you allege are the -- relevant to the claims.

Mr. Rutens, do you have any objection to the Court doing that?

MR. RUTENS: No, Your Honor.

Like I said, I've never been one to hang on a technicality. That being said, the only thing I would request, Your Honor -- and Ms. Jung has been very gracious in this regard -- that while the motion to hold under seal or file under seal is pending that there be no general release of the video outside of her and her staff.

THE COURT: Yeah.

MR. RUTENS: She's been very gracious in that regard.

THE COURT: So, yeah. I haven't seen it on the news.

MS. JUNG: I've been respectful of this Court's pending motion.

THE COURT: I don't watch the news, but I feel confident that someone would say something. So yeah. It's filed under seal as part of the motion to seal. So it's going to remain sealed until I rule on that motion.

But, honestly, I think I need to know what your position is regarding its authenticity before I make that decision. And I think -- well, I mean, that would impact a lot

of other decisions as we go along.

So I think we should know what your position on that is, and you can't tell me until you do a little bit of a review.

So how much time do you think you need for that?

MS. JUNG:  Your Honor, I would ask that defendants make sure that they -- I don't know that they've produced all the metadata related to that video.  I know we got copies and excerpts.  I don't know that the metadata was uploaded for it.

If you could just confirm --

MR. RUTENS:  I don't know either, Your Honor.  We can check.

THE COURT:  I don't even know what that would look like.

MR. RUTENS:  I'm not sure either.

THE COURT:  Let me, Mr. Rutens, just ask you to make sure that that happens.  And if it wasn't uploaded -- honestly, I'm more of a danger regarding metadata, I'm sure, than anything else.

Yeah.  Communicate with each other about what you need for your review and facilitate that because I want an answer to the question.

MR. RUTENS:  Completely understand.

THE COURT:  And, then, assuming that you get that data in the format that is required for that review, I'm not going

to make you -- like, I don't know. Do you want 60 days and then you let me know if that's not enough time?

MS. JUNG: I appreciate that, Your Honor.

Yeah. I think 60 days. Given the holidays and some -- about two dozen depositions coming over the course of the next couple of months, I would appreciate 60 days --

THE COURT: Sure.

MS. JUNG: -- to have an answer or be able the review the video and also amend the complaint to comport, to the extent that that video is authentic and the portions thereof.

I think just -- I think there are certain characterizations that defendants have made. Even if that video is authentic, that the Court should not countenance here their interpretation of what it shows and doesn't show, Your Honor.

THE COURT: Well, that kind of interpretation of a document outside a document -- I'm being very general about something outside of the pleadings, but I'm -- I feel correctly reluctant to stray far from the pleadings at a motion to dismiss stage.

All right. Well, we're going to put this off for 60 days. I'm not the kind of judge that is crazy about that 60-day -- like, I want to put a date on it so -- because I recognize that everyone, lawyers and the Court, operate in a deadline mode. So it will have a date on the calendar. And if

more time is required, I'm not an unreasonable person. But this is something -- and I recognize -- I believe it in every case, but I recognize in this case that everyone involved, parties, plaintiff, and defendant and the public, have a significant interest and that it means a lot to -- you know, that the right decision is made.

And I would rather take the time and make the right decision at this level than have it go up and come back and go up and come back. And I recognize that that's something that it may do anyway, but I would like to just make an informed decision at this stage to the best of my ability to do it. So we'll --

MS. JUNG: Your Honor? I'm sorry for interrupting you.

May I amend that request to be 90 days? I just realized 60 days would put us to January 6th, and I have two large design construct defect motions for summary judgment due.

THE COURT: I have no problem with 90 days. But how about at the first of the year give me a joint status report on where we are at that time. And I recognize the holidays are all up in that and wound up. But just January 1st. By January 1st. So you can do it at the end of the December if you want. Whatever.

MS. JUNG: Yes, Your Honor.

THE COURT: But give me a joint status report on where

we are in the process.  And so that would be 90 days for your metadata review and for amending the complaint.

MS. JUNG:  Yes, Your Honor.

THE COURT:  Okay.  All right.  Well, anything else that we can take up while you're here?

MR. RUTENS:  I don't think so.

MS. JUNG:  I don't believe so.

Thank you for your time, Your Honor.

THE COURT:  Well, very good.

No.  Thank y'all.  I appreciate it.

MR. RUTENS:  Thank you, Your Honor.

THE COURT:  All right.

(The Proceedings were concluded at approximately 10:28 a.m. on November 6, 2024.)

C E R T I F I C A T E

I, the undersigned, hereby certify that the foregoing pages contain a true and correct transcript of the aforementioned proceedings as is hereinabove set out, as the same was taken down by me in stenotype and later transcribed utilizing computer-aided transcription.

This is the 12th day of March of 2025.

_____

Cheryl K. Powell, CCR, RPR, FCRR

Federal Certified Realtime Reporter

***CHERYL K. POWELL, CCR, RPR, FCRR***
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3003/cheryl_powell@alsd.uscourts.gov