IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA


OTIS FRENCH, SR., as          *
Personal Representative of*
the Estate of Otis French,*
Jr.,                         *
          Plaintiff,         *   24-cv-265
                             *   April 30, 2025
vs.                          *   Mobile, Alabama
                             *   9:38 a.m.
THE CITY OF BAY MINETTE;      *
BRANDON THOMPSON,            *
          Defendants.        *
*************************

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE JEFFREY U. BEAVERSTOCK
CHIEF UNITED STATES DISTRICT JUDGE


FOR THE PLAINTIFF:

MS. JE YON JUNG, ESQ.
May Jung LLP
333 City Blvd. West
Suite 327
Orange, CA 92868
202-297-5638

FOR THE DEFENDANTS:

MR. ANDREW J. RUTENS, ESQ.
Galloway Wettermark & Rutens
P O Box 16629
Mobile, AL 36616-0629
251-476-4493

MS. MELISSA P. HUNTER, ESQ.
Galloway Wettermark & Rutens
P O Box 16629
Mobile, AL 36616-0629
251-476-4493

COURTROOM DEPUTY: MS. MELANIE PAULK

*CHERYL K. POWELL, CCR, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3003/cheryl_powell@alsd.uscourts.gov

COURT REPORTER: CHERYL K. POWELL, CCR, RPR, FCRR

Proceedings recorded by OFFICIAL COURT REPORTER, Qualified pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies and Procedures Vol. VI, Chapter III, D.2.  Transcript produced by computerized stenotype.

**P R O C E E D I N G S**

(In open court.)

COURTROOM DEPUTY:  Case set for a motion hearing in Civil Action Number 24-265, French versus City of Bay Minette. Is the plaintiff ready to proceed?

MS. JUNG:  Yes, Your Honor.

COURTROOM DEPUTY:  Is the defendant ready to proceed?

MR. RUTENS:  Yes, Your Honor.

THE COURT:  All right.  Good morning.  Thanks for coming in.

Two things on the docket to talking about.  First, the motion to seal which the defendant has supplemented and said you think is moot?

MS. HUNTER:  Yes, Your Honor.  Based on the fact that the video is still available in the public domain at this point, we believe that our motion is moot.

THE COURT:  Okay.  So you suggesting it's moot is different than you withdrawing it.  So I guess I'm --

MS. HUNTER:  We are happy to withdraw the motion at this point, Your Honor.

THE COURT:  Okay.  Well, then, so I guess what we would do for the record is construe your motion as a motion to withdraw and, to the extent it has to be granted, which I don't think it does -- you are free to withdraw your motions that you filed.  So we'll just note it as being withdrawn.

Okay.  So, then, that leaves us with the motion to dismiss the amended complaint.  Who wants to talk about that first?

MR. RUTENS:  It's my motion, Your Honor, so I guess I will talk about it.

THE COURT:  Well, that makes perfect sense.

Mr. Rutens, why don't you let me ask a general -- I don't usually ask stylistic questions.  You changed your font on the last brief.  What font is it?  This is like a burning question.

MR. RUTENS:  I do not know offhand, Your Honor.

MS. HUNTER:  What font is it?

THE COURT:  Yeah.

MS. HUNTER:  I think it's Century Schoolbook, but I could be --

THE COURT:  No.  That's fine.  And, look, I'm not like a person who sits up at night thinking about fonts or our rules on fonts.  I was surprised to learn that our local rule says Roman style font, like, I don't even think that's been a thing for a long time.  I mean, you know, Times New Roman or something like that.  But, of course, that's a font, but just categorizing a font as Roman -- I don't know.  Maybe our rule is from the Roman era.

But, honestly, I kind of liked the final font and -- but it definitely -- it impacts your eyes.  And I know other

judges who might observe that it, like, hurts your eyes.  I don't know.  I kind of like it, honestly.  But I'm just curious.

Okay.  All right.  I'm curious about a lot of things that relate to this motion.

So, Mr. Rutens, I won't slow you down any further.  Let's talk about it.

MR. RUTENS:  Thank you, Your Honor.

We're here on a motion to dismiss the plaintiff's first amended complaint.  At this stage of the case, as Your Honor is well aware, we have to accept everything in the plaintiff's complaint as true.

THE COURT:  That's right.

MR. RUTENS:  With two exceptions.  First is where a document or, in this case, a video observes the events and contains information concerning those events.

Under *Horsley vs. Phillips*, the Eleventh Circuit 2002 case we cited in our brief, the Court discussed in that situation an inflammatory article -- actually, two defamatory actions, one being an article, one being a CNN video.

In that instance, the Court analyzed the article and said, since it was referred to in the complaint and there's no contesting that it is or disputing its accuracy, that that could be viewed and taken into account at the motion-to-dismiss stage.

*CHERYL K. POWELL, CCR, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3003/cheryl_powell@alsd.uscourts.gov

Now, in the *Johnson vs. Atlanta* case, the Eleventh Circuit case out of 2024, as well as the *Baker vs. Madison* case out of the Eleventh Circuit in 2023, that was expended or expanded to apply to videos as well and specifically body camera videos.

In this instance, French has not challenged in the complaint or in the brief that what is shown on the video is not authentic; that what it depicts isn't what actually happened. There's no contention that something different happened. There may be contentions that certain things weren't shown and, indeed, there were three allegations where they discuss the 15 seconds of missing body camera footage.

In this instance, though, I think the *Baker vs. Madison* case is very instructive. In that case, the Court did view the body camera and noticed there were several portions of the body camera where the view was obstructed by the nature of body cameras. And where most officers usually have them on their chest, their arms can block the view; it can keep you from viewing certain events.

In this instance, there's yet to be any type of argument that, other than that 15 seconds, anything is mistaken [sic].

Now, if you go back to the *Baker* case, the Court talks about video that is well lit; there's audio of the entire event; and that, for the most part, there are good angles of

the video but that there were sections where you couldn't see what was going on because of whatever the situation was. And they allowed that video to be viewed at the motion-to-dismiss stage, saying it was appropriate at that point in time.

And if you look at the video that has been submitted or the three videos that have been submitted, body camera one, body camera two, as well as the dash cam video, the last seconds of the first body camera video is -- you can't see what's going on. Mr. French and the officer are in a tussle, and all you can see is black. And, indeed, the first few seconds of video number two when it turns on, it's the same situation. You can't see what's going on.

So I think in this instance, we believe that it's appropriate for the Court to review the video and to take into account what is shown because the courts have discussed the fact that you don't have to ignore your eyes and accept blindly allegations in the complaint which are not accurate, which the video shows are inaccurate.

And in this instance, as explained in the briefing, there are a series of instances which show where the officer's actions were appropriate at different times during this event.

So we believe that the body camera and the dash camera are appropriate for viewing at the motion-to-dismiss stage.

With that understanding, there are some facts that are very different than what has been portrayed in the complaint

and some of the briefing.

When the stop occurs, it is clear that the -- as you're viewing the video from the front, the left-hand taillight is completely inoperable.  It appears as though a portion of the driver's side light is also inoperable.

When the officer, Thompson, opens the door to talk to Mr. French, Mr. French asks him, what's the issue.  He appears to be totally ignorant of the fact that most of the electronics and lights on the rear end of the vehicle were inoperable.

And while it's been discussed that there was a failure to make a left turn or I didn't see him make a left turn, important in that video is Officer Thompson never said anything about a left turn.  In fact, he never says the phrase "left turn."

The video shows and the audio shows that he says, you didn't use your signal back there.  And shortly after that, he says, you've got to get your left taillight fixed.  However, at this point in time, he is not standing behind the vehicle.  He is standing towards the front of the vehicle, talking to Mr. French.

Now, it's axiomatic if you're standing at the back of the vehicle, the left side is one way and if you're standing at the front of the vehicle, the left side is another way.  So that does not prove or disprove anything.  What we do know is that the taillight was inoperable.

THE COURT:  So is it appropriate for me at this point to decide what it is?  I mean, because it sounds like you're asking me to make -- like, to take conflicting facts, facts that I have to accept as true, facts that you are arguing are demonstrated as something else, make a determination?

MR. RUTENS:  I don't believe so, Your Honor, because I think if you look at the video, both taillights were malfunctioning.  The stoplight on the one on the driver's side was working, but it was not working entirely -- that taillight system.  And the passenger side was completely inoperable.

So I believe you are in a situation where the evidence shows, no matter which side of the vehicle you're looking at, the taillight was inoperable.

So I believe at that point in time, again, it's not saying, hey; you made a bad left -- I didn't see your left turn signal when you turned left.  Left turn signal is never discussed.  The only time left is discussed is concerning a taillight.

In this instance, the video shows both taillights, one completely and the other substantially were inoperable at that point in time, both of which would be violations of equipment codes under the State of Alabama laws of the road.

So I don't believe Your Honor has to make a decision and has to say, I value this over that.  I believe the facts are, regardless of how it's construed -- support the contention

of the defendants and support the motion to dismiss.

THE COURT:  Well, what if I disagree with you about whether I can consider the video or not at this point?

MR. RUTENS:  Sure.  I think I alluded to first -- earlier that there are two exceptions to the having to accept the plaintiff's complaint, regardless of what you see on the video.

The second exception is under the *Iqbal* standard.  And this discusses where there are unadorned conclusions of law in the complaint which plaintiff contends support various parts of the complaint.

In this case, we believe that we have -- are dealing with several conclusions of law, which the *Iqbal* decision and subsequent decisions like *Jennings vs. Stewart* out of the Northern District of Florida discuss -- it is not required by the Court to accept and, indeed, should not be accepted.  There should be factual support that would establish facial plausibility of the claims being raised.

In this instance, there are a series of claims raised of failure to train, failure to supervise, failure to properly investigate.  But they are all based on this one instance.  There are no factual assertions saying that it has occurred in other cases such as the *Smith* case or the *Jones* case or whatever it may be.

They are completely ipso facto arguments that there

were -- based on supervisory liability and municipal liability under *Monell*, it's almost impossible for there to be a single instance that supports a constitutional violation.

There must be some level of appreciation of the issue by the municipality of the problem, as alleged. And as discussed in the motion to dismiss, the Court should look at what facts establish a prior understanding of the events. The *Marsh vs. Butler* case, Eleventh Circuit, 2001, which is indeed pre *Iqbal*, the Court says, a single act of unconstitutional conduct by a non-policymaker is insufficient to show a municipal custom.

And we believe that the claims being raised in that regard, setting aside the video -- there is no support even after the complaint, as amended.

Importantly, if you look at the actual allegations in the amended complaint, Count Six, absence of administrator review and investigation created a custom that officers knew their actions would not be meaningfully reviewed. Failed to train, supervise, and have policies on stops, seizures, pat downs and use of force, failure to have policies on how to interact with individuals with mental illness.

*Vinyard vs. Wilson*, the Eleventh Circuit case cited in our brief, discusses a few things very salient on this point. First, they say there is no constitutional right to have your matter investigated. That's not substantive due process and

that's not procedural due process.  But at Page 1356 of that opinion, the Court unequivocally says, no; that's not actionable.

So the question becomes because the plaintiff alleges there was no meaningful investigation of this case, the Court has to jump the Rubicon and determine that there were no meaningful investigations of other claims of wrongful seizure, wrongful pat down, wrongful use of force in the Bay Minette Police Department.  And there's just no factual allegations to support that.  And in this instance, we believe that those claims just fail completely as a matter of law in that regard.

Now, going back to the -- we have the stop, the seizure, the use of force.  And each of those have different aspects to it.  Different factual allegations, different prongs, if you will, as alleged by the plaintiff.  The first is the stop.

*U.S. vs. Cooper*, Eleventh Circuit, 1998, clear that a police officer has a right to stop a driver who is violating traffic and equipment regulations.  *Whren vs. United States*, United States Supreme Court 1996, U.S. Supreme Court said it doesn't matter how minor the violation, there is a right to stop.

Now, in this instance, we believe the video shows the equipment violations.  And, in fact, the video also shows Mr. French's ignorance of that or those problems when he says,

what's the problem.  Or what's the issue -- I'm sorry -- is exactly what he says.

So in this instance, he had the right to stop.  Now, the argument is when he asked him to get out of the vehicle; that that's where it crossed a line.

Now, in *Pennsylvania vs. Mimms*, United States Supreme Court 1997, there was a traffic stop.  The police ordered the gentleman out of the vehicle.  And the Supreme Court said that is fine.  And once -- the Court unequivocally held, once pulled over, the officer may order the driver to get out of the vehicle.

Importantly, in the *Mimms* case, the Court recognized that there's an inordinate risk when an officer approaches a car.  And that they expressly declined to accept the argument that traffic offenses involve less danger to the officer. While that offense itself may not, the event itself does.  And as echoed by that Court in 1983 in the *Michigan vs. Long* decision, they discuss the traffic stops are especially fraught with danger to police officers.

Now, *Rodriguez vs. United States*, 2015, United States Supreme Court, is instructive in talking about the parameters of a traffic stop.  The Court there talked about the seizure for a traffic violation and discusses that it's analogous to a *Terry* stop.  And they conclude and state that the mission of the stop, the traffic stop itself, is to address the traffic

violation and attend to related safety concerns.  In this case, the taillights that are out.

Mr. French himself had said, what's the problem or what's the issue.  He did not understand.  When Officer Thompson asked him to get out of the vehicle -- and we cite the case law discussing is it an order or is it a request.  What's the tone of language?  What is the language actually used?  Were weapons drawn?  In this instance, none of those things -- all of those point to the effect that this was a request by the officer to show him -- step back here; let me show you what the problem is.

In this instance, we believe the officer had a right to do it because it was the related safety concern so that Mr. French could understand exactly what he was being pulled over for and what needed to be addressed.  Because if it wasn't addressed, it could result in something more serious.

That brings us to the next event is the deciding or telling him he's going to frisk him.  I want to pat you down is actually the language he uses.  And from a factual standpoint, he asks Mr. French to exit the vehicle, tells him, let me show you what's going on back here, and then he said, I'm just going to pat you down.  And Mr. French says, I don't like to be touched.  That phrase plays on several of the claims raised in the complaint.

In this instance, clearly on the audio, Officer

Thompson says, I feel sorry for you, but my safety is paramount.

During that same exchange, Mr. French admitted he had things in his pockets.  That's when Officer Thompson begins the pat down -- he starts on the left side.  Clearly depicted in the video, you can see he sees or feels something on that left side.  You can see an item.  Obviously, it's in his pocket; you can't see what it is.  But he's feeling around for it.

At that point in time, that's when Mr. French reaches down and starts to impede the pat down.  At this point in time, he's still not patted down his right side or any other part of his body to see if there's anything in there that can be used as a weapon against him.

So in this instance, at that point in time is when he says, place your hands behind your back and he pulls out his handcuffs.  There's verbal and physical action by Mr. French trying to frustrate the handcuffing process.

And one thing important that they try and argue as a negative is actually required to the extent possible.  During that event while he initially tries to handcuff him, place him in handcuffs, again, to complete a pat down that he has started, he has never said, you're under arrest.  In fact, he never says that during that whole event by the car.  He never says, you're under arrest.  He does say, quit resisting.  And he also says, I'm going to tase you.  Listen to me.  I'm going

*CHERYL K. POWELL, CCR, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3003/cheryl_powell@alsd.uscourts.gov

to tase you.

That turn in audio as well as coupled where he says, I'm going to kill you during the physical altercation is important because *Tennessee vs. Garner* from the United States Supreme Court says you should warn when you can before using force.  That is a factor supporting the officer's actions.

While they try and say, oh, it shows premeditation, it shows an understanding of the U.S. Supreme Court saying warn when you can.  And it's important.  He says, I'm going to tase you.  He continues.  And then he says, listen to me.  He is trying to obtain compliance at that point in time.

That's when, at four minutes and ten seconds into the video, Mr. French throws the officer to the ground and runs off.

Now, at no point in time do we see a taser and no point in time do you see a taser deployed until the other -- we're at the other side of the building.  So at that point in time, the officer has been shoved to the ground, which is an assault.  He had no right to throw him to the ground like that.  He runs off.  The officer gets on his mic, calls for backup, he starts to chase.

Mr. French has already just about cleared the back of the house and begins running to the left.  That's when Officer Thompson decides to cut across the front of the house and try and go up the opposite side.

What the video clearly shows is that when Officer Thompson clears the front of the house and turns towards the back of the house, Mr. French is running directly at him.  The plaintiff argues that Mr. French attempted to evade Officer Thompson and attempted to get around him.  However, if you look at the video, what is clear, Mr. French is running directly at him.  He never begins to avoid anything.

THE COURT:  So if I can just interrupt you, I mean, not -- and I have watched the video.  But isn't that, like, a factual determination the finder of fact would review and weigh?  I mean, obviously, the plaintiff interprets it differently.

MR. RUTENS:  Not in this instance, Your Honor, because when we get to the fundamental requirements, it's objective reasonableness of an officer on the scene.  The objective reasonableness of a police officer confronted with a gentleman running straight at him who only begins to duck when you see the officer raise his taser.  There is no ducking before he raises his taser.  Clear on the video.

An objectively reasonable officer in that instance -- somebody is rushing towards him, close quarters -- does he have the right to use force at that point in time?  And at that point in time, it's just the tasing.  He attempts to tase at that point in time.  Both gentlemen end up on the ground in a matter of seconds.

Both in the *Graham vs. Connor* and the *Tennessee* case, *Tennessee vs. Elliott*, the Supreme Court talks about split-second decisions.

You know, in this lovely, wood-lined courtroom, we can dissect and we can break down frame by frame and look at things.  Officer Thompson didn't have that ability.  He had to make a decision in a split second.

They both end up on the ground for several seconds and, during that, there are periods that the body camera is not viewable because somebody, whether it's Mr. French's -- some part of Mr. French or some part of Officer Thompson, the actual imagine is dark because something is covering the lens.

And then we have the period, the 15 seconds, and then we have the start-up.  And, again, you're dealing with video which is -- you can see certain flashes of things and certain things you can't see.  But the audio is on for the entire period of time because, remember, the dash cam which has also been submitted, has audio as well, and that includes the audio of that 15 seconds.

And, again, they argue the phrase "I'm going to kill you" is -- was inappropriate and shows some type of malice.  Well, but for the *Elliott* discussion where the Supreme Court says don't use deadly force -- if you can use a warning, give a warning.  That's exactly what Officer Thompson did before he used any force.  And what you can see in the video is that

Mr. French has -- they are one -- number one, in close quarters at this moment in time.  And Mr. French has his hand on the butt and trigger of the taser.  He is in control of the taser.  And it's only after that period of time that Officer Thompson uses his service weapon.

What is also clear if you look at body camera two, the second portion, is that when the shots are fired, they are right next to one another on top of one another.  There's discussion about Officer Thompson withdrawing several feet and then using a service weapon.  That's not supported by the video.

More importantly, what is supported by the video is, after Officer Thompson had been able to crab walk his way back several feet while he's still on the ground, his service weapon is down.  He does not raise his service weapon again until Mr. French who has the taser in his hand at this point in time raises it towards Officer Thompson.  Officer Thompson raises his service weapon.  When Mr. French drops the taser, he drops his service weapon.  He does not fire it at all at that moment in time.

So we believe, based on the case law that's been cited -- and I'm happy to go through the case law for Your Honor, but we believe, based on the totality of the circumstances, number one, the video should be viewed and, if the video is viewed, it's clear that the initial stop, the

request to exit the vehicle, the attempt to handcuff, and the ultimate use of force are appropriate.

Moreover, under the *Iqbal* standards, if you look at the claims raised under the *Monell* provisions as well as the claims under the ADA and rehabilitation provisions, there's no claim or allegation that a reasonable accommodation was sought. And based on the case law cited in the brief, that is a requirement. There has to be some request not to -- for this not to happen or that not to happen. But based on the *Iqbal* requirements and the unadorned possible deficiencies -- are insufficient as a matter of law and the motion is due to be dismissed in that regard.

As it regards the state law causes of action both against the city as well as Officer Thompson, we believe the 6-5-338 establishes immunity for the officer and also for the city. Allegation 4 of the plaintiff's complaint, at all material times, Officer Thompson was acting in the line and scope of his authority as a law enforcement officer -- that is the keystone of the analysis under 6-5-338. So we believe that is appropriate for granting in that regard as well.

I can discuss some more case law for Your Honor if you would like.

THE COURT:  Well, I'd love that.

MR. RUTENS:  Okay.

THE COURT:  No.  That's okay.  I'll be honest with

you.  I'm having issues with considering the video.  I'm going to hear from the plaintiff.  But, like -- well, let me hear from the plaintiff and then maybe we'll talk about the video some more.

Ms. Jung?

MS. JUNG:  Yes, Your Honor.  I'm just used to standing, Your Honor.

THE COURT:  That's fine.  If it's easier, you're welcome to use the podium.

MS. JUNG:  I may do that, Your Honor.  Thank you.

THE COURT:  Sure.

MR. RUTENS:  Je Yon Jung on behalf of the plaintiffs, Your Honor.

I think, just to start with -- I think it's very simple and it's interesting, Your Honor, that you have not viewed the video.

THE COURT:  Let me be clear.  I have viewed the video.  But my comment here is essentially whether I want to consider it, you know, because I'm -- for good or bad, I feel like I can compartmentalize a lot of things in my life.  And so -- but I have a real concern about whether the video should be appropriately considered at the motion to dismiss.

MS. JUNG:  Agreed, Your Honor.  And I think for the argument of my opposing counsel, you heard a lot of interpretation and translation of what defendants believe the

video show and whether it depicts what the plaintiffs have presented in its complaint. So even if you didn't have the video, Your Honor, I think you do have to rely on the allegations of the complaint. But even if you do look at the video, we believe that there are disputed facts.

This is not a summary judgment motion. And I think pleadings -- factual pleadings need to be given deference to the plaintiffs in this case. I think the point that I want to make here regarding the counsel's argument is that he makes a lot of leaps and asks this Court to make a lot of leaps to see and surmise certain things that are not anywhere in the complaint and not anywhere in the video. And I'll give a few examples.

We'll start with where my opposing counsel started, Your Honor, and here it is: When he talked about the videos and the fact of the left side versus right side -- he's incorrect. The plaintiffs quote in the complaint where Defendant Thompson in Paragraph 20 of the amend complaint -- where he says, you didn't use your signal back there; the light's out on that left side. That's within the same sentence. So that context, he did talk about the signal. Did he say left turn signal? No. But he was always talking about the left taillight and the turn signal. Paragraph 22, he also says, get that left taillight fixed.

Now, Mr. Rutens would like Your Honor to say, well, he

was facing the front of the car.  I didn't quite even understand that argument, Your Honor, to justify and try to reconcile the facts that are plainly pled in the plaintiff's complaint regarding Defendant Thompson's own comments about the left side.  He never says anything during the traffic stop about the left side.  Even after doing the investigation, in the incident report, he talks about the left side.

So, Your Honor, I think it would be an incredible leap and improper under this motion-to-dismiss stage for you to consider the explanations or justifications that defense counsel comes up here with simply even just that initial fact.

I think it would require some mental gymnastics and justifications to understand that Defendant Thompson was thinking about the right side when he said left side.  That's just not supported by the facts or the statements of Defendant Thompson himself.

Your Honor, I think also when Mr. Rutens talked about the various constitutional violations, as you know, Your Honor, we were here before you and we talked about amending the complaint so that it's clear for Your Honor to be able to identify all the actual claims frame by frame, piece by piece.

And I appreciated that, Your Honor, because it did allow us to make that -- to set forth that framework for Your Honor to consider and to understand that each of those Fourth Amendment considerations are required to have legal

justification. And at those several moments when you talk about the initial traffic stop, the seizure from the car, asking him to get out, the pat down, the ultimate handcuffing and turn around so I can arrest you -- the chase and ultimately the use of deadly force -- those are all incidents each which require Fourth Amendment basis and justification for Thompson to have done what he did.

And in all of those, they fail to -- they failed in that regard, and Mr. Thompson -- Officer Thompson did not have the justification that he needed under the constitution, under the very basic tenants of our Fourth Amendment and constitution.

*Terry vs. Ohio* has been around for a very, very long time. And it has made it very clear that even if you have a *Terry* stop, as they say, you have to have some articulable reasonable suspicion that the individual is engaged in a crime or could be engaged in a crime.

Defendant Thompson makes it very clear that he didn't have that. And, in fact, he says to the investigating officers, as a general rule, I'm always concerned about my safety and I'm always looking for drugs and guns.

First of all, *Terry* stop is about weapons, not drugs. And you can't convert that into a search for drugs because you decide that everyone you stop can be subject to a search because you're a police officer and everyone else could be a

potential criminal.

It's really important, Your Honor, to understand that the sequence of events all led from an alleged failure to use a turn signal. And from the beginning, there's no justification and no support in the record. You'll see that defendants in their legal argument say, well, he could have seen it in his rearview mirror. He could have been at the front of the car, mistakenly thought it was the left side or the passenger side. All of it doesn't matter, Your Honor. That's for another day. And we'll see where we are when the trier of fact can look at those disputed facts and decide for themselves which ones to believe.

So Mr. Thompson when he says, I just do a search generally, that's just patently a violation of the law. And that statement and his justification of what he did actually is part and parcel to our *Monell* argument as well. I disagree with counsel that there's no factual allegation and that the complaint is full of conclusory allegations regarding the *Monell* in particular.

The *Monell* argument talks a lot about the fact that the investigation -- excuse me. That the criminal investigation that was conducted by the Baldwin County Sheriff's Office, chaired by the chief of the Bay Minette Police Department, the law enforcement agency at issue here, they conducted the very cursory review. We haven't seen the

results.  And I think, Your Honor, and the trier of fact in discovery is entitled to see what their real basis is.

We do know in press conferences before they made any determination said there was no probable cause to believe that Officer Thompson acted wrongly.  It's not the standard, Your Honor.

And if that's the way a law enforcement agency conducts an investigation of a police officer shooting, then, of course, the officers don't believe there's any accountability.  Not only does Thompson not have accountability.  But every other officer in the Bay Minette Police Department knows they're not going to do an investigation of a shooting and whether it was constitutional, whether it complied with any policies and procedures that exist.

In fact, our custom in this department is nothing to see here.  We didn't rise to the criminal standard which is a higher standard of whether we had probable cause to shoot someone.  That's not what any of the cases talk about regarding the constitutional review of a shooting.

So not only was his statement justified and used to support the investigation, the criminal investigation to absolve him of any violations, they never conducted any administrative investigation.  That's just generally accepted practice for any good law enforcement agency who cares that

their officers are constantly coming into contact with individuals with mental health issues, having to use their guns, having to use their tasers.  So this police department doesn't conduct an administrative investigation.

Mr. Rutens talked about *Vinyard*.  That case was about the complainant who made a complaint, a specific complaint to the police department about the allegations.  And she raised those in her lawsuit.  And the Court said that's -- there's no substantive right that they were required to do an investigation.  That's different than what we're talking about here, Your Honor.

We're talking about the custom, the policy, the practice as to how Bay Minette deals with their police officers, deals with their contact with their citizens, says, hey; we need further training on this; we need a policy; we need to go over a basis for a stop; we need to go over the basis for a search and a seizure.  All of those things didn't happen, and they admitted to it.  They ratified it.  They said there was nothing more to be done and that was it.

So there are numerous indicia of problems indicating a policy, practice, and custom.  And there's Supreme Court case law under *Cantu* that says a single event can show that there was enough to rise to the level that training was necessary and didn't happen under *Monell*.  And that's exactly what happened here, Your Honor.

**CHERYL K. POWELL, CCR, RPR, FCRR**
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3003/cheryl_powell@alsd.uscourts.gov

You have their own statements.  This is not a case where we are simply saying they don't have this, they don't have that.  We have evidence.  We have their own statements. We have their statements in the press as to what they did and how they did it, and that has to do with *Monell*.

Briefly on the search, removal of Mr. French from the vehicle -- to be clear, Your Honor, *Pennsylvania vs. Mimms* is not applicable to the facts of this case.  And here's why: *Pennsylvania vs. Mimms* involved officers who said they routinely at the beginning of the stop for safety related issues ask people to come out of the vehicle, and that's what they did.  So from the beginning of the stop, that's what they did.  Supreme Court said that's fine.

That's not the case here.  Mr. Thompson -- Officer Thompson had initiated the stop, went through everything he needed to do, ran all the attendant tasks of a traffic light warning infraction, had printed out the warning, and had come back to the car.  And at that point is when it switches from the traffic stop violation to the seizure and removal from the car.

And, Your Honor, it's also important to note that in *Pennsylvania vs. Mimms* in Footnote 5, the Court actually states that this is not a situation -- I'll get the exact quote for you here, Your Honor.

Footnote 5 in *Pennsylvania/Mimms* says, this is not an

issue where they are frisking -- sorry.  I'm summarizing, but that it's not about frisking everyone.  That's not the issue in *Pennsylvania vs. Mimms*.  If that case had involved the officers extracting everyone from the car at the beginning of the traffic stop and frisking them, it would be a totally different case, Your Honor.  And that's why *Pennsylvania vs. Mimms* is not applicable to this case.

What is applicable, as Mr. Rutens I think identified, is *Rodriguez*.  And we believe there are salient facts in *Rodriguez* because that Court talked about the -- all the tasks related to the stop and those were completed.  In fact, *Rodriguez* talks about license, registration, searching for warrants, all of that.

That had been done.  At that point that he walked back with the warning citation in his hand and Mr. French's driver's license and still had it in his hand when he demanded that he get out of the car, that converted it at that point to another Fourth Amendment violation.

Once Mr. French against his will but was not free to leave because of a number of reasons -- Officer Thompson still had his driver's license in his hand; he was a police officer who told him to get out; he was parked behind his car.  No reasonable person -- citizen believes that they can just leave or maneuver around Officer Thompson's car to leave.

He got out.  But he didn't want to.  And it was not

consensual.  And defendants don't even address that piece of it in their opposition.

He gets out and then that's where Officer Thompson says, for my safety, but he also admits he had no individualized basis whatsoever for the frisk.  And, again, there's nothing in the complaint or even the video, from my recollection, as Mr. Rutens states that Mr. French admitted he had things in his pocket.  I think what happens is that Officer Thompson says, do you have any weapons.  He says, no.

So the problem is Officer Thompson didn't provide the basis that he needed to for the constitutional -- for the Fourth Amendment seizure that he conducted outside of the car.

Mr. Rutens also argues that they never -- Defendant Thompson never says he was under arrest.  Your Honor, he pulled him out and then he turned around, told him to put his hands behind his back and pulled out his handcuffs.  That was a seizure at that moment.  It doesn't matter that he didn't say the magic words "under arrest."

Now, it's at this moment, Your Honor, where, again, we now transition to another moment of a Fourth Amendment violation.

Mr. French at this point, I'm sure -- rest in peace, but I'm sure at that moment he was very fearful of what was happening.  It had escalated to him being pulled over for an alleged taillight.  He comes back, being asked to get out of

the car.  Then he's frisked.  Then he's told to turn around to get handcuffed.  So he ran away.  He ran away so that what tragically ended up happening wouldn't happen.  And can you blame him?

Under Alabama law, you are allowed to resist an illegal arrest.  And up to this point, Your Honor, there were multiple violations against Mr. French.  So he ran away.  Lost his shoe.  He was running away.  And he went around the house. And Officer Thompson chased after him to block his path. Mr. French ducks because he sees the taser is being pulled. Doesn't want to get tased but wants to run around him.  Officer Thompson tackles him.  But let's stop there for a moment.

Even at that moment when Thompson is running after him, Mr. Rutens -- defendant argues it's because he was assaulted.  He was not assaulted.  Mr. French had every right -- and I think the Alabama law is clear that you have a right without slaying an officer or seriously injuring an officer to extricate yourself.  The plaintiff in *Cantu* did the same thing and the Court found that as well.

There was no harm that was brought to Officer Thompson for Mr. French to push him off of him so that he doesn't get arrested at that point where he knew there was no reason for it.

At that point, also, Officer Thompson knew he had no weapons because he had already conducted the illegal search.

He knew there was no danger to him.  And under *Tennessee vs. Garner*, Mr. Rutens says, well, you -- those cases support what Officer Thompson did.  That's not true, Your Honor.

Even at the time at the other side of the house when Officer Thompson pulls out the taser, what was the basis of that use of force?  Let's not -- we haven't gotten to the deadly force.  You're chasing a man because he didn't want to get arrested.  Because he was fleeing.  He had no weapons on him.  He was barefoot, and he was trying to get away from you.  But you went after him, and you discharged your taser on him.  He ducks.  He clearly ducks.  And he -- defense counsel admitted he ducks because he doesn't want to get tased.  He's not trying to tackle Mr. Thompson.  Officer Thompson is the one that came into his path.

So then there's a struggle.  Then they fall.  Officer Thompson tackles French.  French hits the picnic table.  His head is bleeding.  They're struggling.  The body-worn camera is off.

But at that point, Your Honor, importantly the leads in the taser have already been discharged.  It is now only operable in stun mode.  Any law enforcement who has any kind of training will tell you that, at that point, stun gun can hurt, but it's not going to kill you and it's not going to cause serious bodily injury.  And the *Cantu* Court says that as well.  Because the same thing happened in *Cantu*.  The leads had been

discharged and it was in stun mode.  And law enforcement officers know we will have, if necessary, law enforcement experts who talk about that.

So at that point, he knows -- Officer Thompson knows the taser is not going to cause him harm.  So you black out and then, very curiously, defendants admit that Brandon Thompson says, I'm going to kill you.  And they want your Court -- Your Honor to take those words to mean that he was giving the requisite warnings under the Supreme Court law.  I'm going to kill you.  He didn't say, stop or I'll have to shoot, because that's not what he intended.  There was malice.  There was intent that he was just angry and he wanted to kill Mr. French.  And that's exactly what he did.

And when you look at the video, there's no basis whatsoever for Mr. -- for Officer Thompson to believe that he was in eminent fear of death or serious bodily injury to cause him to discharge his weapon and input five bullets into Mr. French's body as he backs away, backed away enough -- and you'll see it in the video.  If you look at the video -- but it doesn't matter -- he backed away, shot him from several feet away.  He was not on top of him when he shot him.  He had enough sense to get up.  And the video comes back on and you can see in the video the distance between himself and Mr. French who is lying, head gashed.  And he's shooting.  He's discharging.  He just continues to discharge.  And you can see

his hand in the body-worn camera coming out, and you can see the distance, Your Honor.

There was no basis for him to shoot and kill Mr. French that day. So you have multiple bases for constitutional violation and ever single one is not justified under the constitution, Your Honor.

I think that -- I think -- I think that that's it on the constitutional arguments, Your Honor. Happy to answer any questions.

One other thing on that. The split-second decisions, all those are related to situations where there are serious danger situations. And we acknowledge there are serious dangerous situations where officers have to decide what to do. Those always -- well, they almost always involve weapons. That wasn't here.

So a split-second decision to decide to shoot to kill somebody still needs constitutional basis, and that is what is not here.

Under the ADA and rehab claims, Your Honor, he did make a reasonable accommodation [sic]. And, importantly, Defendant Thompson knew that there was a mental health flag on his -- on Mr. French's identification. When he went back to the car with the license and registration -- and it's in the CAD reports -- he was able to see there's a mental health problem. So he knew there was something he needed to do there.

Now, whether they have training or whether they have any types of policies or procedures or customs, it's still unclear because he knew he had that flag.

There are situations where officers don't know what they're dealing with. This one, he did. And, in fact, he still escalated him to the point where he said, get out. He said, I don't like people touching me. Officer Thompson said basically, I don't care; it's my own safety; that's what I care about.

And so -- and then on the wrongful death, Your Honor, I think there's no immunity if there are constitutional violations.

And with that, Your Honor, I'm happy to answer any further questions you have.

THE COURT: So you also made an argument about the authenticity of the video or issues with the video.

MS. JUNG: So, Your Honor, I appreciate the last time we were here you gave us time and leave to look at the metadata.

We did look at the metadata. We did actually retain a forensic expert. And his position was that more needs to be done and that there needs to be third-party subpoena to Motorola to review the basis of defendants' claims. And while we don't have a basis -- a good faith basis to challenge the contents of the video that Your Honor can see, we believe the

blackout portions and the questions that we raise do call into question the rest of the videos. And -- but even if Your Honor does look at the portions that you can see, we do not believe that it supports the defendants' accounts. And they support plaintiff's accounts. But, at worst, they represent conflicting facts that Your Honor cannot -- would have to resolve as a matter of law and that Your Honor would be improper at the motion-to-dismiss stage and even at the motion-for-summary-judgment stage because the disputes as to how we translate those facts, many of which defendants have raised for the first time in their brief and not supported in any statements and actually contradicted by Defendant Thompson.

So we think that even if Your Honor does look at the portions of the video, we think it supports plaintiff's statement, but you don't need to look at them to deny defendants' motions to dismiss here.

THE COURT: All right. Thanks, Ms. Jung.

Mr. Rutens, anything else you want to add?

MR. RUTENS: Sure.

Just to be clear, if you listen to the audio, Officer Thompson never says, I'm going to kill you. However, we -- they have it in their complaint, so we're going to argue that as appropriate.

THE COURT: Okay. Let's just suppose that I don't think it's appropriate to consider the video at the

motion-to-dismiss stage. So why don't you talk to me about that?

MR. RUTENS: Sure.

And I think, as I discussed earlier, while it certainly is more difficult if Your Honor is not going to view the video at this stage to grant the motion to dismiss, it's not a forgone conclusion.

In this instance, we still have unadorned statements specifically on the *Monell* and the ADA and rehabilitation act claims where there are no facts to support it other than the single instance we're dealing with here.

The individual claims about what happened during the event are much closer during the motion-to-dismiss stage than they would -- than the *Monell* claims. So completely understand that.

If Your Honor is not going to view the video and you're going to disregard what that shows, what they cite in their motions, they have a lot of facts. And in the *Johnson vs. Atlanta* case, '24 decision from the Eleventh Circuit, they specifically say you don't have to cite that you referred to the video. If it's clear you did, then we should be able to look at it.

In this instance, there were only two people there. And either the facts they allege in their complaint are from the video or they are made out of complete whole cloth. I

believe they are from the video, but that's not for me to say.

So in this instance, I do believe even if Your Honor is not inclined to look at the video -- and I would draw your attention to the *Richmond vs. Badia* case, Eleventh Circuit from 2022 where they talk about the analysis must be for each individual event.

The seizure, while you may have facts that overlap between the seizure and the -- in this case, the use of force, you have to look at the use of force event separate and apart from a legal analysis standpoint. The same would apply for the stop; the same would apply for the asking to exit the vehicle; the same would be applied to the use of deadly force which didn't occur until both gentlemen were on the ground.

And we have significant dispute over what the video shows in that regard. I appreciate opposing counsel's position. Obviously, we think differently. But that being said, each count is to be viewed separately from a legal standpoint. And we think while maybe not all counts under the motion to dismiss are appropriate should the video not be viewed -- or considered, excuse me -- several of them are still due to be denied.

Again, in going to the *Iqbal* decisions, there's only one event. They talk about failure to vet and hire, negligent hiring as a wrap-in on their *Monell* claims. But they never talk about anybody else where the same issue was raised.

So I believe that even if the Court is not inclined to look at the video, there's still analysis that needs to take place on each individual claim.

THE COURT: Okay. I spent a lot of time thinking about this case. Obviously, it's been in the news, of course. But even so, I have a significant concern about considering the video as part of the motion to dismiss.

For a variety of reasons, the different interpretations of it -- I mean, again, candidly, I've watched it. I can understand how lawyers can view it and reach different conclusions and make good faith arguments in either direction. I don't think that's always the case. I think I've seen other cases where it's very different.

The gap is concerning to me, the issue that plaintiff has raised in that regard is concerning to me as an additional reason why I shouldn't consider it at this point. So I'm not gonna.

And I think in that lens, without considering the video and everything that comes from it in terms of argument that I've heard today, I don't think granting the motion to dismiss is appropriate under the circumstances.

I recognize the -- and I hope Ms. Jung does because she's from -- not from living in the Eleventh Circuit, but this is a very uphill claim in the Eleventh Circuit. I was reversed recently on a qualified immunity issue. But I would say that

it's even an issue with the Eleventh Circuit because it was a split opinion in that case.

So I'm -- I am going to demur from granting the motion to dismiss.

Now, you have sought qualified immunity and I've indicated I'm not going to grant it.  You have a right to appeal.  Do you want an order from me in that regard?

MR. RUTENS:  Yes, please.  If we could.

THE COURT:  Okay.  And I ask not because I'm lazy, but if you're not intending to appeal at this stage, you know, the case should move forward.  And if that's something that you're inclined to do, which is perfectly within your rights -- I mean, it's going to take a minute, but we'll do that.

MR. RUTENS:  Let me say, Your Honor, I believe there's a significant chance there will be an appeal.  If there's a decision made contrary, I am happy to notify both you and opposing counsel of that so that effort isn't wasted in that regard.

THE COURT:  Okay.  I appreciate that.  We're happy to do the work because -- and I'm confident to my mind that that's the appropriate decision to make at this stage, recognizing that we'll hear you on all of these matters at summary judgment.  And that's a different situation and -- but there would be a little more discovery that goes along with it as well before we get to that point.  But I'm not going to grant

the motion to dismiss.  So I tell you that so you know.

We'll start preparing an order.  If you decide that's unnecessary, let us know because I just don't want the case to hold up if we're not going to take an interlocutory appeal.

So let us know.  But in the absence of -- in the Army, we used to say, in the absence of orders, we'll assume the initiative.  We're going to move forward with preparing an order then.

MR. RUTENS:  Thank you, Your Honor.

THE COURT:  Thank you.  Excellent argument.  I appreciate -- you know, we spent longer than I had intended.  But that's okay.  Important things take the time they take.  And this is an important case.  So thank you for the argument.

Ms. Jung -- am I saying your name right?

MS. JUNG:  Yes, Your Honor.  It's Jung, J-U-N-G.

THE COURT:  I know it's J-U-N-G.  Sometimes pronunciations are different.

MS. JUNG:  Yes, Your Honor, thank you.

THE COURT:  Thank y'all.

MR. RUTENS:  Thank you, Your Honor.

MS. JUNG:  Thank you.

(The Proceedings were concluded at approximately 10:44 a.m. on April 30, 2025.)

*CHERYL K. POWELL, CCR, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3003/cheryl_powell@alsd.uscourts.gov

C E R T I F I C A T E


        I, the undersigned, hereby certify that the foregoing pages contain a true and correct transcript of the aforementioned proceedings as is hereinabove set out, as the same was taken down by me in stenotype and later transcribed utilizing computer-aided transcription.

        This is the 16th day of May of 2025.

        *Cheryl K Powell*

        _____

        Cheryl K. Powell, CCR, RPR, FCRR

        Federal Certified Realtime Reporter

*CHERYL K. POWELL, CCR, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3003/cheryl_powell@alsd.uscourts.gov