## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| OTIS FRENCH, SR., as Personal Representative of the Estate of Otis French, Jr., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:24-cv-00265-JB-B |
| THE CITY OF BAY MINETTE, et al., | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, JUDGMENT ON THE PLEADINGS

COUNSEL FOR THE CITY OF BAY MINETTE AND BRANDON THOMPSON:

ANDREW J. RUTENS
MELISSA P. HUNTER
LAWRENCE M. WETTERMARK
GALLOWAY, WETTERMARK & RUTENS, LLP
P.O. Box 16629
Mobile, Alabama  36616-0629
Telephone: (251) 476-4493
Facsimile: (251) 479-5566
arutens@gallowayllp.com
mhunter@gallowayllp.com
lwettermark@gallowayllp.com

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................... i

INTRODUCTION ............................................................................................................... 1

SUMMARY OF THE UNDISPUTED FACTS .................................................................. 1

    Officer Thompson's Discretionary Authority............................................................. 1

    The Events of August 20, 2022................................................................................... 2

    The Outside Investigation ......................................................................................... 26

    The Internal Investigation ......................................................................................... 26

    Officer Thompson's Body-Worn Camera Footage................................................... 26

    Plaintiff's Claims ...................................................................................................... 28

THE STANDARDS OF REVIEW ................................................................................... 28

    The Summary Judgment Standard ............................................................................ 28

    The Judgment-on-the-Pleadings Standard ............................................................... 29

ARGUMENT..................................................................................................................... 29

    I.      Officer Thompson and the City are entitled to summary judgment or, in the alternative, judgment on the pleadings because Counts I, II, III, and IV and parts of Counts V, VI, VII, and VIII (i.e., the non-wrongful death claims) abated upon French's death. ......................................................... 29

    II.    Officer Thompson meets the discretionary authority requirement to invoke qualified immunity.......................................................................................... 32

    III.   Officer Thompson is entitled to qualified immunity against Count I's Fourth Amendment unlawful stop claim. ............................................................ 33

    IV.   Officer Thompson is entitled to qualified immunity against Count II's Fourth Amendment unlawful seizure from vehicle claim. ................................... 36

    V.    Officer Thompson is entitled to qualified immunity against Count III's Fourth Amendment unlawful pat down claim. ............................................. 38

    VI.   Officer Thompson is entitled to qualified immunity against Count IV's Fourth Amendment unlawful handcuffing claim........................................... 39

VII.    Officer Thompson is entitled to qualified immunity against Count V's Fourth Amendment excessive force claim..........................................................44

VIII.   The City is entitled to summary judgment on Count VI's § 1983 municipal liability claim. ...........................................................................52

IX.    The City is entitled to summary judgment on Count VII's Americans with Disabilities Act claim and Count VIII's Rehabilitation Act claim. ...................................................................................................56

X.    Officer Thompson and the City are entitled to summary judgment and State-agent immunity against Count IX's and Count X's Alabama law wrongful death claims..........................................................................58

XI.    The City is entitled to summary judgment and municipal immunity against Count IX. ...................................................................................61

CONCLUSION.........................................................................................................62

CERTIFICATE OF SERVICE ...............................................................................63

## INTRODUCTION

Bay Minette Police Officer Brandon Thompson stopped Otis French, Jr. for a traffic violation. During a *Terry* frisk, Officer Thompson felt what he believed was a baggie of drugs in one of French's pockets. When Officer Thompson felt the baggie, French blocked Officer Thompson's hand. French then vigorously resisted handcuffing, shoved Officer Thompson to the ground, and ran behind a house. French circled the house, and Officer Thompson intercepted him at the front corner. As French charged toward Officer Thompson, he balled his fist, lowered his shoulder, and threw his elbow at Officer Thompson. Officer Thompson discharged his Taser, but the Taser did not affect French. A struggle ensued during which French took the Taser away from Officer Thompson and attacked Officer Thompson with it. French also grabbed Thompson's handgun. After a warning, Officer Thompson fired six shots, striking French five times. French died at the scene. State and local investigations cleared Officer Thompson of any wrongdoing. Because Officer Thompson reasonably believed French posed an imminent threat to his life, Officer Thompson is entitled to immunity. This Memorandum explains why Officer Thompson and the City are entitled to judgment as a matter of law on all claims and on their immunity defenses.

## SUMMARY OF THE UNDISPUTED FACTS

**Officer Thompson's Discretionary Authority**

On August 20, 2022, Officer Thompson was a certified law enforcement officer by the Alabama Peace Officers Standards and Training Commission and employed by the City of Bay Minette as a police officer. (Ex.4,¶6.) His duties included the enforcement of the criminal laws of the State of Alabama and the investigation and reporting of violations of the criminal laws of the State of Alabama. (Ex.4,¶7.) He was empowered by the laws of the State of Alabama to execute

1

warrants and to arrest and to take into custody persons who violated the criminal laws of the State of Alabama, including the traffic code. (Ex.4,¶7.)

During the events in question, Officer Thompson was on duty and was readily identifiable as a Bay Minette police officer. (Ex.4,¶16.) He wore an official navy blue Bay Minette Police Department uniform with a badge on the front and patches on the sleeves. (Ex.4,¶16; Exs.14&15.) He drove a marked SUV that displayed the words "Bay Minette Police" and an image of the badge on the doors. (Ex.4,¶14; Ex.16.) At all times while Officer Thompson interacted with French, the blue emergency lights on Officer Thompson's vehicle were activated. (Ex.4,¶14.) Officer Thompson wore a body camera that recorded most of the events in question. (Ex.4,¶¶17–18; Exs.1&2.) A dash camera in Officer Thompson's vehicle also recorded the incident. (Ex.4,¶15; Ex.3.)



*Officer Thompson and his vehicle at the scene.*

**The Events of August 20, 2022**

Shortly after 8:00 a.m. on the morning of Saturday, August 20, 2022, Officer Thompson was patrolling Bay Minette's Douglasville neighborhood when he noticed a green Chevrolet Traverse SUV driving in the area. (Ex.4,¶24; Ex.6,328:6–10.) The Douglasville neighborhood was a high-crime area with a recent history of drug activity and violence. (Ex.4,¶24; Ex.6,270:17—

271:9,322:5–8.) The neighborhood included Freeview Avenue, Shedrick Hardy Parkway, Rain Drive, Pecan Street, Grove Street, and Lower Street. (Ex.4,¶24.)



*Google Map (north on top)*[1]

Later that morning, Officer Thompson returned to the Douglasville neighborhood. (Ex.3,10:18:49.) At 10:19 a.m., Officer Thompson saw the same green Traverse traveling north on Shedrick Hardy Parkway. (Ex.5,Pgs.1–2.) In his driver's side-view mirror, Officer Thompson saw the Traverse turn right (east) onto Rain Drive. (Ex.5,Pg.2; Ex.6,272:8–17.) When the Traverse turned onto Rain Drive, Officer Thompson noticed that the driver did not give a turn signal. (Ex.5,Pg.2; Ex.6,Pgs.272:23—273:1.) When Officer Thompson saw the turn signal violation, he decided to stop the Traverse. (Ex.5,Pg.2; Ex.6,Pg.273:3–9.)

Officer Thompson turned around in a driveway and drove north on Shedrick Hardy Parkway trying to catch up to the Traverse. (Ex.5,Pg.2; Ex.3,10:19:20—10:19:32.) Officer Thompson then turned right (east) on Rain Drive. (Ex.5,Pg.2; Ex.3,10:19:38.) When Officer

---

[1] Ex.4,¶22; Ex.19.

3

Thompson turned onto Rain Drive, he could not see the Traverse. (Ex.5,Pg.2; Ex.3,10:19:41.) The

posted speed limit on Rain Drive was twenty miles-per-hour. (Ex.5,Pg.2; Ex.3,10:19:43.)



*Officer Thompson's dash camera depicts the 20 miles-per-hour speed limit sign on Rain Drive.[2]*

Officer Thompson passed the intersections of Rain Drive and Pecan Street and then Rain

Drive and Grove Street without seeing the Traverse. (Ex.5,Pg.2; Ex.3,10:19:46—10:19:52.)

Because the Traverse disappeared so quickly, Officer Thompson believed the driver had exceeded

the posted speed limit and was trying to elude him. (Ex.4,¶25; Ex.5,Pg.2; Ex.6,Pg.279:1–14.) As

Officer Thompson drove east on Rain Drive trying to find the Traverse, he activated his blue

---

[2] The vehicle in this screenshot is not the Traverse.

emergency lights and police siren. (Ex.5,Pg.2; Ex.3,10:19:50.) Officer Thompson found the Traverse on Lower Street. (Ex.5,Pg.2; Ex.3,10:20:00.)

Officer Thompson turned right (south) onto Lower Street and drove up behind the Traverse. (Ex.5,Pg.2; Ex.3,10:20:00.) As the Traverse braked, Officer Thompson saw that its right stop lamp (brake light) did not illuminate. (Ex.5,Pgs.2–3; Ex.3,10:20:12.)



*The Traverse's right brake light does not illuminate when Officer Thompson makes the stop.*

When Officer Thompson closed the distance to the Traverse, the Traverse turned left into a private driveway instead of pulling to the right curb. (Ex.5,Pg.3; Ex.3,10:20:13.)



*The Traverse turns left into private property instead of pulling to the right curb.*

In Officer Thompson's experience, people who are engaged in illegal activity like drug and gun crimes often pull into the driveways of strangers in the hope that the police officer will believe they have reached their destination and not stop them. (Ex.4,¶26; Ex.5,Pg.3; Ex.6,295:22—297:2.) A "No Trespassing" sign faced the private driveway that the Traverse entered. (Ex.1,10:20:58; Ex.4,¶20; Ex.17.)

6



*The Traverse stopped in a private driveway with a "No Trespassing" sign posted.*

The driver of the Traverse slumped in the driver seat and looked back over his shoulder at Officer Thompson. (Ex.4,¶27.) Officer Thompson made a passenger-side approach. (Ex.1,10:20:56; Ex.3,10:20:42.) The driver said his passenger window would not roll down. (Ex.1,10:21:04.) Officer Thompson opened the passenger door. (Ex.1,10:21:03.) Officer Thompson saw a bulge in the driver's right front pants pocket. (Ex.5,Pg.6; Ex.1,10:21:07.)

7



*The driver has a visible bulge in his right pants pocket.*



*Enlarged view of bulge in driver's right pants pocket.*

Officer Thompson asked the driver for his license. (Ex.1,10:21:05.) Officer Thompson told the driver that he pulled him over for failure to use his turn signal. (Ex.1,10:21:08.) Officer

8

Thompson also told the driver that his taillight was out.[3] (Ex.1,10:21:10.) Officer Thompson said he would not issue a citation but that the driver needed to repair the light. (Ex.1,10:21:16.)

The driver handed Officer Thompson his license, which identified him as Otis French, Jr. (Ex.1,10:21:24; Ex.4,¶39; Ex.30.) Officer Thompson asked French where he was headed. (Ex.1,10:21:24.) French said he was "heading home." (Ex.1,10:21:25.) As Officer Thompson read the address on French's license, he asked French if he still lived on Old Robinson Road. (Ex.1,10:21:28; Ex.30.) French said he did. (Ex.1,10:21:30.) Officer Thompson knew that when he passed French on Shedrick Hardy Parkway, French was traveling in the opposite direction of his home on Old Robinson Road. (Ex.5,Pg.5; Ex.6,Pg.328:18–22.) Officer Thompson asked French who lived in the house where French stopped. (Ex.1,10:21:32.) French did not know. (Ex.1,10:21:33.) Officer Thompson said he would give French a warning. (Ex.1,10:21:37.) Officer Thompson returned to his vehicle. (Ex.1,10:21:43.)

Officer Thompson used his laptop to print a written warning. (Ex.1,10:24:02; Ex.4,¶40; Ex.31.) Officer Thompson reapproached French's vehicle on the driver's side. (Ex.1,10:24:20; Ex.3,10:24:04.) Officer Thompson asked French to activate his hazard lights and exit the vehicle. (Ex.1,10:24:23; Ex.3,10:24:05.) Officer Thompson wanted to show French the inoperable brake light so French would know what piece of equipment to repair. (Ex.5,Pgs.4–5.)

By the time Officer Thompson asked French to exit the vehicle, Officer Thompson also had probable cause to believe French was trespassing on private property. (Ex.5,Pg.5.) Officer Thompson had asked French, "Who lives here?" (Ex.1,10:21:32; Ex.5,Pg.5.) French did not know. (Ex.1,10:21:33.) Officer Thompson also had reason to suspect French was engaged in drug

---

[3] Officer Thompson misspoke and told French that his *left* taillight was out. Because Officer Thompson was facing the vehicle's passenger side when he said that, the defective taillight was to Officer Thompson's left, but it was the vehicle's right taillight that was out. (Ex.6,290:20—291:3.)

activity. (Ex.5,Pg.5.) French had apparently tried to elude Officer Thompson. (Ex.4,¶25; Ex.5,Pg.2.) French lied about his destination. (Ex.5,Pg.5.) Officer Thompson knew the area in which he encountered French had a recent history of high drug activity and violent crimes. (Ex.5,Pgs.5–6.)

When French exited the vehicle, Officer Thompson saw bulges in both of French's front pants pockets. (Ex.1,10:24:31; Ex.5,Pg.6; Ex.6,365:2–5.) The bulges were large enough to contain weapons. (Ex.5,Pg.6; Ex.6,365:15–16.)



*French has bulges in both front pants pockets.*

10



*Enlarged view of bulges in both front pockets.*

Officer Thompson said he wanted to pat French down for his protection. (Ex.1,10:24:32; Ex.3,10:24:17; Ex.4,¶28.) In addition to the bulges in French's pockets, Officer Thompson was concerned about French for other reasons. (Ex.4,¶28; Ex.5,Pg.7.) The area in which Officer Thompson encountered French had a recent history of violent crimes. (Ex.5,Pg.7.) Officer Thompson had seen French driving around the area earlier. (Ex.4,¶24.) French sped away from Officer Thompson when Officer Thompson turned around to initiate the traffic stop. (Ex.5,Pg.7.) Instead of pulling to the right curb when Officer Thompson caught up to him, French turned into a stranger's driveway. (Ex.5,Pg.7.) French lied about his destination. (Ex.5,Pg.7.) Officer Thompson was engaging with French alone without a backup officer present. (Ex.5,Pg.7.)

When Officer Thompson said he was going to pat French down, French told Officer Thompson he was not comfortable with people touching him. (Ex.1,10:24:42; Ex.3,10:24:27.) That statement also led Officer Thompson to suspect French had some type of contraband on his person—either weapons or drugs. (Ex.4,¶9.)

Officer Thompson started the protective frisk at French's right front pants pocket. (Ex.3,10:24:33; Ex.5,Pg.8.) French did not physically interfere with Officer Thompson's frisk of

11

his right pocket. (Ex.5,Pg.8.) When Officer Thompson started to frisk French's left front pants pocket, however, Officer Thompson felt a plastic baggie, the contents of which felt granular or rock-like—exactly like crack cocaine or methamphetamine. (Ex.5,Pg.8.) Officer Thompson immediately recognized that the item felt like a baggie of crack cocaine or methamphetamine. (Ex.4,¶30.) French placed his left hand over the object to block Officer Thompson from feeling it. (Ex.1,10:24:49; Ex.3,10:24:34; Ex.5,Pg.8.)



*French blocks Officer Thompson's frisk of the left pocket.*

Based on the feel of the baggie and its contents, and also based on French's effort to block the frisk, Officer Thompson believed French had an illegal controlled substance in his left pocket. (Ex.5,Pg.8.) Officer Thompson did not believe French would have had any reason to block the frisk if the contents of the pocket were legal. (Ex.5,Pg.8.) Officer Thompson had not completed the frisk. (Ex.4,¶31.) Officer Thompson decided to handcuff French so he could investigate further. (Ex.5,Pg.8.) French's obstruction of the frisk was one of the reasons Officer Thompson decided to handcuff him. (Ex.4,¶31.)

12

Officer Thompson gave Mr. French three orders to put his hands behind his back. (Ex.1,10:24:54; Ex.3,10:24:39.) French said, "No!" four times and "I'm not!" nine times. (Ex.1,10:24:54—10:25:10; Ex.3,10:24:39—10:24:55.) As Officer Thompson tried to pull French's hands behind his back, French physically resisted by tensing the muscles in his arms, preventing Officer Thompson from bringing French's hands back. (Ex.3,10:24:39—10:24:55; Ex.5,Pg.9.) Officer Thompson warned French three times that he would use his Taser if French did not submit to handcuffing. (Ex.1,10:25:01—10:25:07; Ex.3,10:24:46—10:24:52.) Instead of submitting, French grabbed the door of his vehicle to prevent Officer Thompson from pulling his hands behind his back. (Ex.1,10:25:05; Ex.3,10:24:50; Ex.5,Pg.9.)



*French grabs the door.*

When French still did not comply, Officer Thompson tried to take French to the ground to get him off his feet. (Ex.3,10:24:52; Ex.5,Pg.9.) That is a common police technique in a struggle because the offender's leg muscles are the most powerful muscles in his body. (Ex.5,Pg.9.) Officer

Thompson tried to execute a leg sweep, but French held onto the door to prevent Officer Thompson

from taking him to the ground. (Ex.3,10:24:52; Ex.5,Pg.9.)



*French holds onto the vehicle to prevent Officer Thompson from taking him to the ground.*

14

Then French shoved Officer Thompson to the ground. (Ex.1,10:25:10; Ex.3,10:24:55; Ex.5,Pg.10.)



*French shoves Officer Thompson to the ground.*
*(Note the bulge in French's left pocket.)*

French fled by running east along the south side of the house. (Ex.1,10:25:11; Ex.5,Pg.10.) French turned north and ran behind the house. (Ex.1,10:25:16; Ex.5,Pg.12.) French then turned west and ran along the north side of the house back toward Lower Street. (Ex.1,10:25:21; Ex.5,Pg.12.) Officer Thompson intercepted French at the northwest corner of the house. (Ex.1,10:25:21; Ex.5,Pg.12.)

15



*Aerial Image of the Scene*[4]

French increased his speed, lowered his right shoulder, and ran straight toward Officer Thompson. (Ex.1,10:25:21; Ex.4,¶32; Ex.5,Pg.12.) As French charged Officer Thompson, French threw his right elbow at Officer Thompson. (Ex.4,¶32; Ex.5,Pg.12.)

---

[4] Ex.4,¶21; Ex.18 (this image has been rotated 180 degrees so that north is on top).

16



*French throws his right elbow at Officer Thompson.*

Officer Thompson moved to the side and discharged the probes of his Taser at French. (Ex.1,10:25:21; Ex.4,¶32; Ex.5,Pg.12.)



*Officer Thompson deploys the Taser probes.*

The Taser deployment was ineffective. (Ex.11,Pg.16.) French clipped Officer Thompson as he moved past him. (Ex.4,¶32.) French collided with a picnic table and landed on the ground. (Ex.1,10:25:22; Ex.5,Pg.12.) Officer Thompson gave French at least three orders to "Stay down!" and applied his Taser to French by drive-stun in an attempt to subdue him. (Ex.1,10:25:26–28; Ex.5,Pg.12.)

18



*Officer Thompson applies a drive stun.*

As Officer Thompson struggled to arrest French, French bucked Officer Thompson forward, causing Officer Thompson to lose control of his Taser. (Doc.4,¶33.) French grabbed the Taser while the Taser was on the ground. (Doc.4,¶33.) Officer Thompson wrestled with French for control of the Taser. (Doc.4,¶33.) Officer Thompson regained hold of the Taser with his finger in the trigger guard. (Ex.4,¶33.) French snatched the Taser out of Officer Thompson's hand.

19

(Ex.4,¶33.) French now had full control of the Taser. (Ex.4,¶33.) Officer Thompson continued to

struggle with French to try to regain control of the Taser. (Ex.4,¶33.)



*French has control of the Taser.*

French activated the Taser for a period of 9.75 seconds. (Ex.2,10:25:45; Ex.5,Pg.12;

Ex.11,Pgs.19–20.) The rapid crackling sound that is audible on Exhibit 2 beginning at 10:25:45

was the sound the Taser made while French was attacking Officer Thompson with it. (Ex.4,¶38.)

The wire from the Taser was wrapped around Officer Thompson's right arm. (Ex.4,¶34;

Ex.6,400:15–19.) Officer Thompson felt excruciating pain from the Taser shocking him from his

right hand, up his right arm, all the way to the base of his neck. (Ex.2,10:25:45—10:25:54;

Ex.4,¶34; Ex.5,Pg.13; Ex.6,400:15–19; Ex.11,Pg.21; Ex.12,70:2–12.) Officer Thompson saw a lot

of blood. (Ex.5,Pg.13.) At the time, Officer Thompson did not know whether the blood was

French's blood or Officer Thompson's own blood. (Ex.5,Pg.13.) Officer Thompson was gasping

for air and exhausted. (Ex.5,Pg.13.) French was no longer trying to escape. (Ex.5,Pg.13.) French

was attacking Officer Thompson. (Ex.5,Pg.13.) Officer Thompson was alone without anyone to

help him. (Ex.5,Pg.13.) French drove the Taser toward Officer Thompson's chest and face. (Ex.4,¶35.)



*French drives the Taser toward Officer Thompson's face.*

Officer Thompson was in danger of experiencing neuromuscular incapacitation (loss of voluntary muscle control) from the Taser. (Ex.6,393:7–18; Ex.11,Pgs.27–30; Ex.12,115:1–15, 119:16–20, 134:6—135:22.) Officer Thompson feared that French would overpower him, take his handgun, and use the handgun against him like French was using the Taser against him. (Ex.5,Pg.13.) Officer Thompson drew his handgun and warned French that he would use deadly force. (Ex.2,10:25:50; Ex.4,¶35; Ex.5,Pg.13; Doc.35,PageID.232,¶44.) French reached for Officer Thompson's handgun. (Ex.2,10:25:54; Ex.4,¶35; Ex.5,Pg.13.) As French grabbed Officer Thompson's handgun, Officer Thompson began to fire. (Ex.2,10:25:54; Ex.4,¶35; Ex.5,Pg.13.) French was grabbing the handgun when Officer Thompson fired his first shot. (Ex.2,10:25:54; Ex.4,¶35; Ex.5,Pgs.13–14.)

22



*French grabs Officer Thompson's handgun.*

22



*French grabs Officer Thompson's handgun.*

After Officer Thompson fired his first two shots, French reactivated the Taser. (Ex.2,10:25:55; Ex.11,Pg.22,¶2.) French was also rising to his feet. (Ex.4,¶36.) French still controlled the Taser and was still within arm's reach of Officer Thompson. (Ex.4,¶36.) Officer Thompson continued to fire his handgun. (Ex.4,¶36.) Officer Thompson fired a total of six shots in a three-second period. (Ex.2,10:25:54–10:25:57; Ex.4,¶36; Ex.5,Pg.14.) Even after Officer Thompson fired the last shot, French still controlled the Taser. (Ex.2,10:25:57.)



*After Officer Thompson fired the last shot, French was still rising with the Taser.*

French aimed the Taser at Officer Thompson and pulled the trigger again. (Ex.2,10:26:04; Ex.5,Pg.14; Ex.11,Pgs.25–26.)



*After Officer Thompson fired the last shot, French aimed the Taser at Officer Thompson and pulled the trigger again.*

Officer Thompson did not fire any more shots. (Ex.5,Pg.14.) Officer Thompson called for an ambulance and provided medical care to French until the medics arrived. (Ex.2,10:26:09—10:34:15; Ex.5,Pg.14.)

Tasers are manufactured by a company named Axon. (Ex.12,13:19–20.) After the incident, Axon's senior forensics manager, Bryan Chiles, analyzed the data from Officer Thompson's Taser and Officer Thompson's videos. (Ex.11,Pgs.4–5.) Chiles later explained that when French gained control of the Taser, "Officer Thompson was placed in danger of serious injury or death." (Ex.11,Pg.32.) Even though Officer Thompson had already deployed the Taser's probes, the Taser's wires were still attached to the cartridge, which was still attached to the Taser. (Doc.4,¶34.) Chiles explained how simultaneous contact with the front of the Taser and one of the wires could have completed a circuit and caused Officer Thompson to experience neuromuscular incapacitation (loss of voluntary muscle control). (Ex.4,¶34; Ex.6,393:7–18; Ex.11,Pgs.11–12&30,¶1; Ex.12,24:7–10, 25:18—26:8, 115:1–15, 119:16–20, 134:6—135:22, 143:12–17.)

Chiles also explained the elevated threat level that arises when a Taser falls into the hands of a violent offender. (Ex.11,Pg.30.) Police officers "are trained to avoid sensitive parts of the body that could cause serious injury." (Ex.11,Pg.30.) However, "misuse of the weapon can cause serious injury or even death." (Ex.11,Pg.30.) According to Chiles, French could have used the Taser to crush Officer Thompson's trachea, discharge electricity into Officer Thompson's eyeball, or enable him to take control of Officer Thompson's handgun. (Ex.12,82:5–12, 143:11–17.) The video evidence proves Officer Thompson faced all three of these dangers during his struggle with French—French drove the Taser toward Officer Thompson's face (i.e., toward Officer Thompson's trachea and eyes) and grabbed Officer Thompson's handgun. (Ex.2,10:25:54; Ex.4,¶35; Ex.5,Pgs.13–14.)

**The Outside Investigation**

The Baldwin County Major Crimes Unit conducted an outside investigation and presented its findings to the State of Alabama Attorney General's Office. (Ex.13,208:19–20.) The Attorney General's Office determined that Officer Thompson's use of force "was a reasonable exercise of his official duties and that his use of deadly physical force was objectively reasonable under the totality of the circumstances." (Ex.7,Pg.1; Ex.13,246:1–10.)

**The Internal Investigation**

The Bay Minette Police Department conducted an internal investigation. (Ex.8,65:4—66:13; Ex.9.) The internal investigation "found no violations of Bay Minette's Standard Operating Procedure." (Ex.9,Pg.12.) The internal investigation determined that "Officer Thompson followed Bay Minette's use of force policy." (Ex.9,Pg.11.)

**Officer Thompson's Body-Worn Camera Footage**

During the struggle, Officer Thompson's body-worn camera suddenly rebooted, resulting in twelve seconds of the struggle not being recorded. The last image on the video before the camera rebooted depicts a metal bracelet on Officer Thompson's right wrist striking the body of the camera. (Ex.1,10:25:28.)

26



*The first BWC video ends when Officer Thompson's metal bracelet strikes the camera.*

Sudden rebooting upon impact was a known problem with the model of Motorola body-worn camera that Officer Thompson was wearing. (Ex.10,¶17; Ex.32; Ex.33,¶2.) Officer Thompson did not intentionally deactivate the camera during the incident or delete or alter any recording. (Ex.4,¶19; Ex.10,¶¶21–22.)

27

**Plaintiff's Claims**

The First Amended Complaint asserts the following claims:

| Count | Claim | Defendant |
|:---:|:---:|:---:|
| I | Fourth Amendment Unlawful Stop | Officer Thompson |
| II | Fourth Amendment Unlawful Seizure from the Vehicle | Officer Thompson |
| III | Fourth Amendment Unlawful Pat Down | Officer Thompson |
| IV | Fourth Amendment Unlawful Handcuffing | Officer Thompson |
| V | Fourth Amendment Excessive Force | Officer Thompson |
| VI | Section 1983 Municipal Liability | City of Bay Minette |
| VII | Title II of the Americans with Disabilities Act | City of Bay Minette |
| VIII | Section 504 of the Rehabilitation Act | City of Bay Minette |
| IX | Alabama Law Wrongful Death | City of Bay Minette |
| X | Alabama Law Wrongful Death | Officer Thompson |

## THE STANDARDS OF REVIEW

**The Summary Judgment Standard**

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

28

**The Judgment-on-the-Pleadings Standard**

"Judgment on the pleadings is appropriate where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law." *Cannon v. City of W. Palm Beach*, 250 F.3d 1299, 1301 (11th Cir. 2001). "In determining whether a party is entitled to judgment on the pleadings, we accept as true all material facts alleged in the non-moving party's pleading, and we view those facts in the light most favorable to the non-moving party." *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014).

## ARGUMENT

I.   **Officer Thompson and the City are entitled to summary judgment or, in the alternative, judgment on the pleadings because Counts I, II, III, and IV and parts of Counts V, VI, VII, and VIII (i.e., the non-wrongful death claims) abated upon French's death.**

"By its terms, 42 U.S.C. § 1983 does not provide for the survival of civil rights actions. Due to this 'deficiency' in the statute, the survivorship of civil rights actions is governed by 42 U.S.C. § 1988(a)." *Est. of Gilliam ex rel. Waldroup v. City of Prattville,* 639 F.3d 1041, 1045 (11th Cir. 2011). Section § 1988(a) provides that "the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil … cause is held … shall … govern." Alabama's abatement law governs the survival of the § 1983 claims. *See Gilliam,* 639 F.3d at 1047 (holding Alabama law governs survival of § 1983 claims in Alabama). Alabama law also governs the survival of the ADA and Rehabilitation Act claims in Counts VII and VIII. *See Reed v. Ponder Enters., Inc.,* No. 1:11CV554-CSC, 2012 WL 1957592, at *3 (M.D. Ala. May 31, 2012) ("Because the ADA does not address the survivorship of claims, the court must first look to the forum state's law applicable to personal injury claims to determine whether this action survives the death of Crystal Reed."); *Nordwall v. PHC-LAS Cruces, Inc.,* 960

29

F. Supp. 2d 1200, 1237 (D.N.M. 2013) (looking to forum state's law to determine whether Rehabilitation Act claim survives).

"The applicable Alabama survivorship law is Ala. Code § 6-5-462.[5] Under that provision, 'a deceased's unfiled tort claims do not survive the death of the putative plaintiff.'" *Gilliam*, 639 F.3d at 1046 (quoting *Bassie v. Obstetrics & Gynecology Assocs. of Nw. Ala., P.C.*, 828 So. 2d 280, 282 (Ala. 2002)). To mitigate the impact of this rule, the Alabama legislature enacted the Wrongful Death Act, which allows "[a] personal representative [to] commence an action and recover such damages as the jury may assess ... for the wrongful act, omission, or negligence of any person ... *whereby the <u>death</u> of the ... intestate was <u>caused</u> ... .*" Ala. Code § 6-5-410(a) (emphasis added).

"Causation is an essential element in a wrongful death action." *Perkins v. City of Decatur*, No. 5:23-CV-1685-CLM, 2024 WL 3678684, at *12 (N.D. Ala. Aug. 6, 2024). Even if one assumes hypothetically that Officer Thompson unlawfully stopped French, unlawfully ordered French to exit the vehicle, unlawfully subjected French to a protective frisk, unlawfully tried to handcuff French, and unlawfully used a Taser against French, those actions did not proximately cause French's death—French died of gunshot wounds. (Ex.20,Pg.1; Ex.34,37:22—38:13.) It is not enough for an earlier constitutional violation to "immediately contribute to" a person's death.

---

[5] Ala. Code § 6-5-462 provides:

> In all proceedings not of an equitable nature, all claims upon which an action has been filed and all claims upon which no action has been filed on a contract, express or implied, and all personal claims upon which an action has been filed, except for injuries to the reputation, survive in favor of and against personal representatives; and all personal claims upon which no action has been filed survive against the personal representative of a deceased tort-feasor.

*Gilliam*, 639 F.3d at 1048 n.12. The plaintiff "must establish that the defendant's tortious conduct proximately caused the decedent's death." *Hughes v. Marley*, 390 So. 3d 545, 549 (Ala. 2023).

"Proximate cause is an act or omission that in a natural and continuous sequence, *unbroken by any new independent causes*, produces the injury and without which the injury would not have occurred." *Martin v. Arnold*, 643 So. 2d 564, 567 (Ala. 1994) (emphasis added). "For damages to be proximately caused by a constitutional tort, a plaintiff must show that, except for that constitutional tort, such injuries and damages would not have occurred and further that such injuries and damages were *the reasonably foreseeable consequences* of the tortious acts or omissions in issue." *Jackson v. Sauls*, 206 F.3d 1156, 1168 (11th Cir. 2000) (emphasis added). In this case, Officer Thompson did not violate *any* of French's constitutional rights. Even if he had, however, French's violent resistance broke the chain of proximate causation between any earlier allegedly unconstitutional actions and French's death:

> [A] police officer cannot foresee all conduct occurring after a stop or arrest, even if illegal. For example, when a uniformed officer, or an undercover officer identifying himself as a policeman, draws his gun during an illegal stop or arrest, third party civilians and detained persons do not normally begin shooting. Thus, in those situations, an officer would not reasonably foresee a shooting in response to a stop or arrest, even if illegal.

*Jackson*, 206 F.3d at 1169; *see also Yates v. Mack*, No. CV 20-00131-KD-B, 2021 WL 6063956, at *10 (S.D. Ala. Dec. 22, 2021) ("the causation link is broken if an officer identifies himself and in response is met with gunfire").

When French shoved Officer Thompson to the ground, charged into Officer Thompson at the corner of the house, and took officer Thompson's Taser and used it against him, French committed "new, distinct crime[s]" that independently justified his seizure. *United States v. Bailey*, 691 F.2d 1009, 1016–17 (11th Cir. 1982) ("notwithstanding a strong causal connection in fact between lawless police conduct and a defendant's response, if the defendant's response is itself a

31

new, distinct crime, then the police constitutionally may arrest the defendant for that crime"); *see also Morris v. Town of Lexington*, 748 F.3d 1316, 1325 (11th Cir. 2014) (holding that even though "the detention amounted to an unlawful seizure[,] ... once [plaintiff] punched [an officer], the officers had probable cause, or at the very least arguable probable cause, to believe that [plaintiff] had committed assault" and did not violate the Fourth Amendment by forcefully arresting him).

Counts I, II, III, and IV and the parts of Counts V, VI, VII, and VIII that are based on actions that did not proximately cause French's death abated upon French's death. *See Gilliam*, 639 F.3d at 1045 (holding claim of excessive force that did not proximately cause decedent's death abated upon decedent's death). Officer Thompson and the City are entitled to summary judgment or, in the alternative, judgment on the pleadings on all claims that are based on actions that did not proximately cause French's death (i.e., actions other than the shooting). All counts also fail for the additional reasons explained below.

## II.     Officer Thompson meets the discretionary authority requirement to invoke qualified immunity.

Officer Thompson invokes qualified immunity against all § 1983 claims. "For qualified immunity to apply, a government official must first establish that he was acting within his discretionary authority when the alleged wrongful acts occurred." *Garcia v. Casey*, 75 F.4th 1176, 1185 (11th Cir. 2023). "To determine whether an official was engaged in a discretionary function, we consider whether the acts the official undertook 'are of a type that fell within the employee's job responsibilities.'" *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004) (citation omitted)).

Officer Thompson's duties included the enforcement of the criminal laws of the State of Alabama and the investigation and reporting of violations of the criminal laws of the State of Alabama. (Ex.4,¶7.) He was empowered by the laws of the State of Alabama to take into custody

persons who violated the criminal laws of the State of Alabama. (Ex.4,¶7.) He was engaged in a discretionary function when he stopped French and when he subsequently used force to try to arrest French. *See Wilson v. Tillman*, 613 F. Supp. 2d 1254, 1267 (S.D. Ala. 2009) ("the officers were acting within the course and scope of their discretionary authority in pulling the plaintiff over in a traffic stop"); *Johnson v. City of Atlanta*, 107 F.4th 1292, 1301 (11th Cir. 2024) ("It is well established that an arrest of someone suspected of violating the law is within the discretionary authority of a police officer."); *Stafford v. City of Argo*, No. 4:20-CV-00340-SGC, 2021 WL 211983, at *3 (N.D. Ala. Jan. 21, 2021) ("under appropriate circumstances, deadly force is among the tools an officer may use in the course of performing his job").

"Once it has been determined that the official was acting within his discretionary duties, the burden shifts to the plaintiff to show (1) that the official violated a constitutional right and (2) that the right was clearly established at the time of the alleged violation." *Marbury v. Warden*, 936 F.3d 1227, 1232 (11th Cir. 2019). "The test is conjunctive, and if a plaintiff fails either prong of the qualified immunity analysis, his claim is barred." *Edger v. McCabe*, 84 F.4th 1230, 1235 (11th Cir. 2023).

### III.    Officer Thompson is entitled to qualified immunity against Count I's Fourth Amendment unlawful stop claim.

Officer Thompson is entitled to qualified immunity against Count I's Fourth Amendment unlawful stop claim. (Doc.35,PageID.237–38,¶¶68–80.) "A traffic stop is a seizure within the meaning of the Fourth Amendment." *United States v. Campbell*, 26 F.4th 860, 880 (11th Cir. 2022) (en banc). "A traffic stop is constitutional if the officer had reasonable suspicion to believe that criminal activity has occurred, is occurring, or is about to occur." *Baxter v. Roberts*, 54 F.4th 1241, 1256 (11th Cir. 2022). The reasonable suspicion can relate to any crime, even if the officer did not articulate the crime as the basis for the seizure. *See United States v. Lewis*, 674 F.3d 1298, 1304

33

n.3 (11th Cir. 2012) (upholding stop based on reasonable suspicion of crime not articulated by officers who made stop). "When an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion to support an investigatory stop." *Jackson*, 206 F.3d at 1166. For this claim—and for all other claims alleging Fourth Amendment violations—Plaintiff has the burden to prove the absence of reasonable suspicion or probable cause. *See Cuesta v. Sch. Bd. of Miami-Dade Cnty.*, 285 F.3d 962, 970 (11th Cir. 2002) ("[I]n a § 1983 action, the plaintiff bears the burden of persuasion on every element.").

By the time Officer Thompson seized French, Officer Thompson had actual and arguable reasonable suspicion (and actual and arguable probable cause) to believe French committed at least six crimes: (1) an equipment violation; (2) a turn signal violation on Shedrick Hardy Parkway; (3) speeding; (4) a turn signal violation on Lower Street; (5) failure to properly yield to an emergency vehicle; and (6) criminal trespassing.

First, Officer Thompson had actual and arguable reasonable suspicion (and actual and arguable probable cause) to believe French violated Alabama Code § 32-5-241(b)(2) by failing to maintain the right brake light ("stop lamp") "in good working condition." *See* Ala. Code § 32-5-241(b)(2) ("When a vehicle is equipped with a stop lamp or other signal lamps, such lamp or lamps shall at all times be maintained in good working condition.").

Second, Officer Thompson had actual and arguable reasonable suspicion (and actual and arguable probable cause) to believe French violated Alabama Code § 32-5A-133(a) by failing to give a turn signal when he turned from Shedrick Hardy Parkway onto Rain Drive. *See* Ala. Code § 32-5A-133(a) ("No person shall turn a vehicle … without giving an appropriate signal in the

34

manner hereinafter provided."). French could not possibly have complied with § 32-5A-133 because his right brake light was inoperable. (Ex.3,10:20:12.)

Third, Officer Thompson had actual and arguable reasonable suspicion (and actual and arguable probable cause) to believe French exceeded the speed limit on Rain Drive. *See* Ala. Code § 32-5A-171 ("no person shall drive a vehicle at a speed in excess of the maximum limits").

Fourth, Officer Thompson had actual and arguable reasonable suspicion (and actual and arguable probable cause) to believe French violated Alabama Code § 32-5A-133 a second time by failing to give a turn signal when he turned into the driveway on Lower Street. (Ex.3,10:20:11.)

Fifth, Officer Thompson had actual and arguable reasonable suspicion (and actual and arguable probable cause) to believe French violated Alabama Code § 32-5A-115(a) by making a left turn into a private driveway instead of pulling to the right curb after Officer Thompson activated his emergency lights and siren. *See* Ala. Code § 32-5A-115(a) ("Upon the immediate approach of an authorized emergency vehicle ... , the driver of every other vehicle ... shall immediately drive to a position parallel to, and as close as possible to, the right-hand edge or curb of the roadway").

Sixth, Officer Thompson had actual and arguable reasonable suspicion (and actual and arguable probable cause) to believe French committed the crime of criminal trespass when French drove into the private driveway. *See* Ala. Code § 13A-7-4(a) ("A person is guilty of criminal trespass in the third degree when he knowingly enters or remains unlawfully in or upon premises."); Ala. Code § 13A-7-1(3) ("A person 'enters or remains unlawfully' in or upon premises when he is not licensed, invited or privileged to do so."); *see also Chambers v. Opelika,* 698 So. 2d 792, 795 (Ala. Crim. App. 1996) (treating residential property as "premises [that] are private and not open to the public" and holding "when . . . premises are private and not open to the

35

public, there is no requirement that the prosecution prove that a prior written or verbal warning was given to the intruder").

French was not seized until he brought his vehicle to a stop. *See Brendlin v. California*, 551 U.S. 249, 263 (2007) (holding Plaintiff was seized the moment his car came to a halt on the side of the road). Before French stopped his vehicle, French was the subject of an *attempted* seizure, which is "beyond the scope of the Fourth Amendment." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845 n.7 (1998). Even if Officer Thompson's initial attempt to stop French had been unlawful, Officer Thompson still became justified to stop French when, after Officer Thompson activated his blue lights, French committed additional offenses by failing to pull to the right curb, turning into the driveway without giving a turn signal, and trespassing on private property. *See United States v. Mobely*, No. 116CR145TWTJKL6, 2017 WL 10574358, at *7 (N.D. Ga. Oct. 26, 2017) ("Mobely had no right, even if the initial attempted traffic stop was unlawful, to lead police on a high-speed chase in an attempt to elude capture. He engaged in additional criminal conduct, which this Court readily concludes gave police probable cause to arrest him.") (citing *United States v. Bailey*, 691 F.2d 1009, 1016–17 (11th Cir. 1982)), *R. & R. adopted sub nom. United States v. Mobley*, No. 1:16-CR-145-6-TWT, 2018 WL 5077755 (N.D. Ga. Oct. 18, 2018). Because Officer Thompson had actual and arguable reasonable suspicion (and actual and arguable probable cause) to believe French committed six offenses, Officer Thompson is entitled to qualified immunity against Count I's unlawful stop claim.

**IV.    Officer Thompson is entitled to qualified immunity against Count II's Fourth Amendment unlawful seizure from vehicle claim.**

Officer Thompson is entitled to qualified immunity against Count II's claim alleging unlawful seizure from the vehicle. (Doc.35,PageID.238–39,¶¶81–95.) A police officer conducting a traffic stop is entitled to order the driver to exit the vehicle. *See Pennsylvania v. Mimms*, 434

U.S. 106, 111 n.6 (1977) ("We hold ... that once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures."); *Baxter*, 54 F.4th at 1262 ("*Mimms* imposes a per se rule: during a lawful traffic stop, an officer may order the driver out of the vehicle."). Federal courts have held that a police officer does not unreasonably prolong a traffic stop that was based on an equipment violation by ordering the driver to exit the vehicle to show the driver the defective equipment. *See, e.g., Pegg v. Klempa*, 651 F. App'x 207, 210 (4th Cir. 2016) (holding officers' order for Mr. Pegg to exit the vehicle "to show Mr. Pegg the burned-out light and issue a verbal warning ... was not unconstitutional. ... [D]emonstrating to Mr. Pegg that there was a legitimate defect with his vehicle, and issuing a verbal warning relating to that defect" were "reasonably directed toward the proper purpose of the stop."); *United States v. Goins*, No. 4:20-cr-380, 2021 WL 37697, at *3 (N.D. Ohio Jan. 5, 2021) (holding officer "did not unduly prolong the stop" when he "asked [the driver] to exit the vehicle [and] showed her the partially obstructed license plate"); *United States v. Singleton*, 846 F. Supp. 2d 505, 513 (E.D. Va. 2012) (holding it was "entirely reasonable for [the officer] ... to ask the driver to exit the vehicle so that he could ... show her the defective vehicle equipment"); *see also Commonwealth of Pennsylvania v. Ingram*, No. 3433 EDA 2014, 2015 WL 7737629, at *4 (Pa. Super. Ct. Dec. 1, 2015) (holding officer's request for driver to exit vehicle "to show him the defective taillight" did not unconstitutionally prolong the stop because "it was integral to the purpose of the stop to show Appellant the defective light"). In any event, Officer Thompson also had actual and arguable reasonable suspicion to believe French was engaged in drug activity and was trespassing. *See United States v. Perkins*, 348 F.3d 965, 970 (11th Cir. 2003) ("A traffic stop may be prolonged where an officer is able to articulate a reasonable suspicion of other illegal activity beyond the

traffic offense."). Officer Thompson did not violate the Fourth Amendment or clearly established law when he asked French to exit the vehicle.

### V.   Officer Thompson is entitled to qualified immunity against Count III's Fourth Amendment unlawful pat down claim.

Officer Thompson is entitled to qualified immunity against Count III's unlawful pat down claim. (Doc.35,PageID.240–41,¶¶96–111.) "An officer who has a reasonable suspicion that an individual is engaged in illegal activity and is armed with a concealed weapon is justified in conducting a limited search for weapons." *United States v. Hunter*, 291 F.3d 1302, 1307 (11th Cir. 2002). French had bulges in both of his front pants pockets. (Ex.1,10:24:31.) The bulges were large enough to contain weapons. (Ex.5,Pg.6.)



*Enlarged view of bulges in both front pockets.*

The bulges in French's pockets alone justified a protective frisk. *See Mimms*, 434 U.S. at 112 (upholding protective frisk because "[t]he bulge in the jacket permitted the officer to conclude that Mimms was armed and thus posed a serious and present danger to the safety of the officer"); *United States v. Jordan*, 635 F.3d 1181, 1187 (11th Cir. 2011) ("the presence of 'a visible, suspicious bulge' on an individual may give rise to reasonable suspicion, particularly when the

individual is present in a high-crime area") (quoting *United States v. Hunter*, 291 F.3d 1302, 1306 (11th Cir. 2002)).

In addition to the bulges in French's pockets, the area in which Officer Thompson stopped French had a recent history of violent crimes. (Ex.5,Pgs.5–6.) French sped away when Officer Thompson turned around to initiate the traffic stop. (Ex.5,Pg.2.) *See District of Columbia v. Wesby*, 583 U.S. 48, 59 (2018) ("Unprovoked flight upon noticing the police, we have explained, is certainly suggestive of wrongdoing and can be treated as suspicious behavior that factors into the totality of the circumstances.") (citation and internal punctuation omitted); *Illinois v. Wardlow*, 528 U.S. 119, 124–25 (2000) (holding flight from police in high-crime area constitutes reasonable suspicion). Instead of pulling to the right curb when Officer Thompson caught up to him, French turned into a stranger's driveway. (Ex.5,Pgs.3&5.) French lied about his destination. (Ex.5,Pgs.5&7.) Officer Thompson was dealing with French alone without backup present. (Ex.5,Pg.7.) All of these factors supported a reasonable belief that Officer Thompson's safety was in danger. Officer Thompson did not violate the Fourth Amendment or clearly established law when he frisked French.

VI.    **Officer Thompson is entitled to qualified immunity against Count IV's Fourth Amendment unlawful handcuffing claim.**

Officer Thompson is entitled to qualified immunity against Count IV's unlawful handcuffing claim. (Doc.35,PageID.241–43,¶¶112–26.) "[N]either handcuffing nor other restraints will *automatically* convert a *Terry* stop into a *de facto* arrest requiring probable cause." *United States v. Kapperman*, 764 F.2d 786, 791 n.4 (11th Cir. 1985) (emphasis in original). In any event, when Officer Thompson felt the apparent drugs in French's pocket, he had actual and arguable probable cause to believe French committed the felony of unlawful possession of a controlled substance. *See* Ala. Code § 13A-12-212(a)(1) ("A person commits the crime of unlawful

39

possession of controlled substance if … he or she possesses a controlled substance … ."). When French used his hand to block Officer Thompson's frisk of his left pocket, French committed the additional crime of obstructing governmental operations. *See* Ala. Code § 13A-10-2(a)(2) ("A person commits the crime of obstructing governmental operations if, by means of ... physical ... interference ... he ... [i]ntentionally prevents a public servant from performing a governmental function.").



08/20/2022 10:24:49  BWC2-027923

*French blocks Officer Thompson's frisk of the left front pocket.*

"[A]n officer is entitled to qualified immunity if he had arguable probable cause to arrest a suspect for any crime, even if that crime was not 'the offense announced by the officer at the time of the arrest.'" *Garcia*, 75 F.4th at 1187 (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1195–96 (11th Cir. 2002)). By the time Officer Thompson tried to handcuff French, Officer Thompson had actual and arguable probable cause to believe French had committed eight crimes and that French was

actively obstructing Officer Thompson's investigation of apparent drugs in French's pocket.[6] French had also tried to evade the initial traffic stop by speeding away. (Ex.5,Pg.2). Officer Thompson and French were in an area that had a recent history of violent crimes. (Ex.5,Pg.6.) Officer Thompson was alone without a backup officer present. (Ex.5,Pg.7.) French had prevented Officer Thompson from completing the weapons frisk. (Ex.4,31.) "In such inherently dangerous situations, the use of handcuffs minimizes the risk of harm to both officers and occupants." *Muehler v. Mena*, 544 U.S. 93, 100 (2005). Officer Thompson did not violate the Fourth Amendment or clearly established law by trying to handcuff French.

---

[6] The eight crimes were (1) unlawful possession of controlled substance; (2) obstructing governmental operations; (3) an equipment violation; (4) a turn signal violation on Shedrick Hardy Parkway; (5) speeding; (6) a turn signal violation on Lower Street; (7) failure to yield to an emergency vehicle; and (8) trespassing.

41

Officer Thompson did not even succeed in applying the handcuffs. *See Lewis*, 523 U.S. at 845 n.7 ("Attempted seizures of a person are beyond the scope of the Fourth Amendment."). Instead, French shoved Officer Thompson to the ground and ran away.



*French shoves Officer Thompson down.*

In doing so, French committed at least four additional crimes: (1) resisting arrest; (2) fleeing or attempting to elude; (3) harassment; and (4) disorderly conduct. *See* Ala. Code § 13A-10-41 ("A person commits the crime of resisting arrest if he intentionally prevents or attempts to prevent a peace officer from affecting a lawful arrest of himself or of another person."); Ala. Code § 13A-10-52(a) ("It shall be unlawful for a person to intentionally flee by any means from anyone the person knows to be a law enforcement officer if the person knows the officer is attempting to arrest the person."); Ala. Code § 13A-11-8(a)(1)(a) ("A person commits the crime of harassment if, with intent to harass, annoy, or alarm another person, he ... shoves ... a person"); Ala. Code § 13A-11-7(a)(1) ("A person commits the crime of disorderly conduct if, with intent to cause public

42

inconvenience, annoyance, or alarm, or recklessly creating a risk thereof, he ... [e]ngages in fighting or in violent tumultuous or threatening behavior.").[7]

During the seconds that followed, French committed five additional felonies. French committed the crime of disarming a law enforcement officer by snatching the Taser out of Officer Thompson's hand and by depriving Officer Thompson of the use of the Taser. *See* Ala. Code § 13A-10-5.1 ("A person commits the crime of disarming a law enforcement ... officer if the person intentionally removes a ... weapon from a law enforcement ... officer or deprives a law enforcement ... officer of the use of a ... weapon when the officer is acting within the scope of his ... duties and the person knows or reasonably should have known that the individual is a law enforcement ... officer.") French committed the crime of attempting to disarm a law enforcement officer by trying to take Officer Thompson's handgun away from him. *See* Ala. Code § 13A-4-2 ("A person is guilty of an attempt to commit a crime if, with the intent to commit a specific offense, he or she does any overt act towards the commission of the offense."). French committed theft in the first degree by taking the Taser from Officer Thompson's person (snatching it out of Officer Thompson's hand). (Ex.4,¶33; Ex.6,394:3–14.) *See* Ala. Code § 13A-8-3(a) ("The theft of ... property of any value *taken from the person of another*[ ] constitutes theft of property in the first degree.") (emphasis added). French committed assault in the second degree by using the Taser against Officer Thompson. *See* Ala. Code § 13A-6-21(a)(4)(a) ("A person commits the crime of assault in the second degree if the person ... [w]ith intent to prevent a peace officer ... from performing a lawful duty, he ... intends to cause physical injury and he ... causes physical injury to any person"). Alabama Code § 13A-1-2(12) defines "physical injury" to include "substantial

---

[7] French also likely committed the felony of third degree escape. *See Vickers v. State of Alabama*, 547 So. 2d 1191, 1192–93 (Ala. 1989). When French fled, Officer Thompson had not yet given him the written warning. (Ex.4,¶40.)

43

pain." When French used the Taser against Officer Thompson, Officer Thompson felt excruciating pain from the electrical shock. (Ex.4,¶34; Ex.5,Pg.13.) French committed robbery in the third degree by using force in the course of the theft of the Taser. *See* Ala. Code § 13A-8-43(a)(1) ("A person commits the crime of robbery in the third degree if in the course of committing a theft he ... [u]ses force against the person of the owner or any person present with intent to overcome his physical resistance or physical power of resistance.").

VII.    **Officer Thompson is entitled to qualified immunity against Count V's Fourth Amendment excessive force claim.**

Officer Thompson is entitled to qualified immunity against Count V's excessive force claim. (Doc.35,PageID.243–46,¶¶127–53.) To overcome qualified immunity in an excessive force case, a plaintiff must "identify a case where an officer taking similar actions in similar circumstances 'was held to have violated' the Constitution." *Zorn v. Linton*, 146 S. Ct. 926, 931 (2026) (quoting *City of Escondido v. Emmons*, 586 U.S. 38, 43 (2019)).

A. **Officer Thompson is entitled to qualified immunity for his use of nondeadly force.**

As Argument I explains, all claims for uses of force other than gunfire abated upon French's death. In an abundance of caution, however, Officer Thompson and the City will address the nondeadly force claims. Officer Thompson's wrestling with French in an attempt to handcuff French did not violate the Fourth Amendment or clearly established law. *See Baxter*, 54 F.4th at 1269 ("grab[bing suspect's] arm; forc[ing suspect] to the ground; twist[ing] his arm around and jerk[ing] it up; and then plac[ing] him in handcuffs ... was clearly de minimis force that was permissible under the Fourth Amendment"); *Brown v. City of Huntsville*, 608 F.3d 724, 740 (11th Cir. 2010) ("For even minor offenses, permissible force includes physical restraint, use of handcuffs, and pushing into walls.").

44

Officer Thompson's use of the Taser in an attempt to subdue French after French shoved Officer Thompson down and after French lowered his shoulder, charged toward Officer Thompson, and threw his elbow at Officer Thompson also did not violate the Fourth Amendment or clearly established law. *See, e.g., Charles v. Johnson*, 18 F.4th 686, 700–01 (11th Cir. 2021) (holding officers did not violate Fourth Amendment when they tackled and applied Taser to suspect who actively resisted handcuffing); *Zivojinovich v. Barner*, 525 F.3d 1059, 1073 (11th Cir. 2008) ("We have previously held that in a 'difficult, tense and uncertain situation' the use of a taser gun to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force.") (citing *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004)); *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015) ("Our cases firmly establish that it is *not* excessive force for the police to tase someone (even multiple times) when the person is actively resisting arrest.") (emphasis in original).

**B. Officer Thompson is entitled to qualified immunity for his use of deadly force.**

"The use of deadly force by the police is a seizure subject to the Fourth Amendment's requirement of reasonableness." *Hunter v. City of Leeds*, 941 F.3d 1265, 1278 (11th Cir. 2019). The Eleventh Circuit has "held that it is reasonable, and therefore constitutionally permissible, for an officer to use deadly force when he has probable cause to believe that his own life is in peril." *Hammett v. Paulding Cnty.*, 875 F.3d 1036, 1048 (11th Cir. 2017) (quoting *Singletary v. Vargas*, 804 F.3d 1174, 1181 (11th Cir. 2015)). "A reasonable officer would not be expected to take the risk of being assaulted by a fleeing man who was so close that he could grapple with him and seize the gun." *Carswell v. Borough of Homestead*, 381 F.3d 235, 243 (3d Cir. 2004). Officer Thompson did not use deadly force until French's assaultive behavior escalated to a level that posed an imminent danger to Officer Thompson's life. (Ex.2,10:25:54.) The severity of the threat that French posed escalated as the encounter evolved:

| *Action by French* | *Record Citations* |
|---|---|
| Shoved Officer Thompson to the ground. | Ex.1,10:25:10<br>Ex.5,Pg.11 |
| Lowered his shoulder and charged Officer Thompson beside the house. | Ex.1,10:25:21<br>Ex.4,¶32 |
| Snatched the Taser out of Officer Thompson's hand. | Ex.2,10:25:51<br>Ex.4,¶33 |
| Attacked Officer Thompson with the Taser while the Taser wire was wrapped around Officer Thompson's arm, shocking Officer Thompson from his hand to his neck and placing Officer Thompson in danger of neuromuscular incapacitation. | Ex.2,10:25:21<br>Ex.4,¶34<br>Ex.6,393:7–18<br>Ex.11,Pgs.19–20,30 |
| Drove the Taser toward Officer Thompson's face, exposing Officer Thompson to the risk that French would use the Taser to crush Officer Thompson's trachea or discharge electricity into Officer Thompson's eye. | Ex.2,10:25:52<br>Ex.4,¶35<br>Ex.12,143:12–17 |
| Grabbed Officer Thompson's handgun. | Ex.2,10:25:54<br>Ex.4,¶35 |

French both controlled the Taser and used the Taser to attack Officer Thompson throughout the shooting sequence—before Officer Thompson fired the first shot, while Officer Thompson was firing the shots, and after Officer Thompson fired the last shot. (Ex.4,¶38.)

46



*French controlled the Taser before Officer Thompson fired the first shot.*



*French still controlled the Taser and was regaining his feet
after Officer Thompson fired the last shot.*

By the time Officer Thompson shot French, French had committed at least five felonies.[8] Officer Thompson was gasping for air and near physical exhaustion. (Ex.5,Pg.13.) Officer Thompson was alone without backup present. (Ex.5,Pg.13.) French drove the Taser toward Officer Thompson's face. (Ex.2,10:25:52; Ex.4,¶35.)



*French drives the Taser toward Officer Thompson's face.*

---

[8] The five felonies were (1) disarming a law enforcement officer of a Taser; (2) attempting to disarm a law enforcement officer of a firearm; (3) theft of property in the first degree; (4) assault in the second degree; and (5) robbery in the third degree. Officer Thompson also reasonably could have believed French had committed the felonies of unlawful possession of a controlled substance and escape third degree. (Ex.5,Pg.8.)

Two seconds later, French grabbed Officer Thompson's handgun. (Ex.2,10:25:54; Ex.4,¶35; Ex.5,Pg.13.)



*French grabbed Officer Thompson's handgun.*

Officer Thompson fired all six shots while French was actively shocking him with the Taser. (Ex.2,10:25:54—57; Ex.11,Pg.15.) French even re-triggered the Taser during the volley of gunfire. (Ex.11,Pg.22,¶2.) Officer Thompson's handgun was loaded with twenty-one bullets. (Ex.5,Pg.15.) If French had gained control of Officer Thompson's handgun, French could have shot Officer Thompson twenty-one times. (Ex.5,Pg.15.) French had not hesitated to use the Taser against Officer Thompson. (Ex.5,Pg.15.) In that moment, Officer Thompson reasonably believed French would also use the handgun against him. (Ex.5,Pg.15.) French was literally grabbing the handgun as Officer Thompson fired the first shot. (Ex.5,Pg.15.) Officer Thompson fired his handgun to prevent French from disarming him and killing him with his own gun. (Ex.5,Pg.15.)

Officer Thompson did not violate the Fourth Amendment or clearly established law by using deadly force against French. "[A]n officer 'need not wait until there is a physical struggle

49

for control of his weapon before a situation presents an imminent danger of serious physical injury.'" *Torres v. Howell*, No. 20-14646, 2022 WL 1664355, at *4 (11th Cir. May 25, 2022) (quoting *DeLuna v. City of Rockford*, 447 F.3d 1008, 1013 (7th Cir. 2006)); *see also Johnson v. City of Philadelphia*, 837 F.3d 343, 350 (3d Cir. 2016) ("We begin with a proposition that can scarcely be disputed: once Newsuan began reaching for Dempsey's gun, Dempsey was justified in using deadly force to defend himself."); *Johnson v. Lewis*, No. 20-13125, 2021 WL 6138289, at *2 (11th Cir. Dec. 29, 2021) (holding that in light of plaintiff striking officer in face, resistance to lawful arrest, and reasonable perception of officer that plaintiff was tugging at his duty belt and attempting to reach his gun or another weapon, officer reasonably believed plaintiff posed serious threat of physical harm and it was objectively reasonable for officer to shoot plaintiff); *Williams v. Deal*, 659 F. App'x 580, 601–02 (11th Cir. 2016) (holding officer did not violate Fourth Amendment when officer shot suspect who advanced on officer with his hands raised after suspect punched officer in head and tried to grab officer's gun); *Mitchell v. City of Mobile*, No. CV 15-0360-CG-C, 2017 WL 1740364, at *14 (S.D. Ala. May 3, 2017) ("Had Mitchell succeeded in tasing Wilson again, he could have gained control of Wilson's handgun and used it on her or others.").

Plaintiff's expert has suggested that Officer Thompson should have retreated after he fired the first shot. Exhibit 2 proves Officer Thompson *did* separate himself from French within three seconds of firing the first shot and that Officer Thompson then stopped shooting—even though French continued to rise and reactivated the Taser. (Ex.2,10:25:54—10:26:10.) In any event, Officer Thompson was not required to retreat. *See Terrell v. Smith*, 668 F.3d 1244, 1252 (11th Cir. 2012) ("the law does not create a duty for a law enforcement officer to retreat or abandon his efforts to effect an arrest simply because a fleeing felon is noncompliant"). Officer Thompson also

50

was "not required to shoot once … and then reassess [his] next shot." *Foulke v. Weller*, No. 22-13942, 2024 WL 2761778, at *7 (11th Cir. May 29, 2024). To the contrary, "if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) (upholding 15 shots in 10-second span).

Officer Thompson's service weapon contained twenty-one rounds, but Officer Thompson only fired six. (Ex. 3 at 10:25:54 to 10:25:57). Officer Thompson fired all six shots in a three-second period. (Ex. 3 at 10:25:54 to 10:25:57). Even after Officer Thompson stopped shooting, French rose to his feet and reactivated the Taser. (Ex.3,10:25:57; Ex.11,Pg.22.) Officer Thompson did not shoot again. (Ex.5,Pg.14.) All six of Officer Thompson's shots were reasonable. *See Foulke v. Weller*, No. 22-13942, 2024 WL 2761778, at *8 (11th Cir. May 29, 2024) ("And although many shots were fired, the entire volley lasted only three seconds, and the law of this Circuit counsels that an officer need not interrupt his justified force until he knows the suspect is 'fully secured' and 'ha[s] been disarmed.'") (quoting *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821–22 (11th Cir. 2010)); *see also Baxter v. Santiago-Miranda*, 121 F.4th 873, 881, 891 (11th Cir. 2024) (holding officer "did not violate the plaintiffs' constitutional rights" when "[w]ithin 2.1 seconds, [the officer] rapidly fired 10 shots with each shot fired at an average of only 0.236 seconds apart"); *Swifford v. Santos*, 121 F.4th 179, 183–85, 190–91 (11th Cir. 2024) (holding officers "did not commit a constitutional violation" when they fired twenty-one shots in four seconds, striking decedent six times including twice in the back). Officer Thompson is entitled to qualified immunity against Count V's excessive force claim.

51

**VIII.      The City is entitled to summary judgment on Count VI's § 1983 municipal liability claim.**

Count VI asserts a § 1983 municipal liability claim against the City. (Doc.35,PageID.246–50,¶¶154–79.) "The Supreme Court has placed strict limitations on municipal liability under § 1983." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). "Liability under § 1983 cannot be based on the theory of vicarious liability." *Ireland v. Prummell*, 53 F.4th 1274, 1289 (11th Cir. 2022). "Instead, municipal liability must be based on a governmental policy or custom." *Davis v. City of Apopka*, 78 F.4th 1326, 1352 n.7 (11th Cir. 2023). "Therefore, to establish municipal liability against the [City], [Plaintiff] must establish that (1) [French's] constitutional or federal statutory rights were violated; (2) the [City] had a custom or policy that constituted deliberate indifference to those rights; and (3) the policy or custom caused the violation." *K.J. v. Henry Cnty. Sch. Dist.*, No. 1:18-CV-004251-LMM, 2019 WL 13268209, at *5 (N.D. Ga. Jan. 9, 2019) (alteration adopted).

**A.  Plaintiff cannot prove an underlying constitutional violation.**

"A *Monell* claim is derivative of—and so requires—an *actual* constitutional violation by an officer." *Land v. Sheriff of Jackson Cnty.*, 85 F.4th 1121, 1129 (11th Cir. 2023) (emphasis in original). "Only when it is clear that a violation of specific rights has occurred can the question of § 1983 municipal liability for the injury arise." *Vineyard v. Cnty. of Murray*, 990 F.2d 1207, 1211 (11th Cir. 1993). Count VI fails because French did not suffer an underlying constitutional violation.

**B.  Plaintiff cannot prove a municipal policy or custom that constitutes deliberate indifference to a constitutional right.**

"[T]he touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). "A plaintiff ... has two methods by which to

establish a [city's] policy: identify either (1) an officially promulgated [city] policy or (2) an unofficial custom or practice of the [city] shown through the repeated acts of a final policymaker for the [city]." *Grech v. Clayton Cnty.*, 335 F.3d 1326, 1329 (11th Cir. 2003). Plaintiff invokes the second method. Count VI alleges the City adopted a custom and practice of "the absence of any administrative review of its constitutional obligations to its citizens." (Doc.35,PageID.246,¶156.) Count VI also alleges the City failed to supervise, train, and/or provide policies or procedures regarding (a) lawful seizures, including pat-downs; (b) lawful force, including deadly force; and (c) in the use of force and/or interactions with individuals with mental illness. (Doc.35,PageID.246–47,¶¶158–60.) Count VI alleges the City engaged in a pattern or practice of deliberate indifference to the risk of constitutional violations and need for policies and procedures, supervision, and/or training to avoid and/or mitigate unconstitutional policing. (Doc.35,PageID.247,¶161.) As Argument I explains, all claims related to actions that did not proximately cause French's death (actions other than the use of deadly force) abated upon French's death.

In any event, the undisputed evidence proves the City required Officer Thompson to have attended the police academy, which trained Officer Thompson on Fourth Amendment principles applicable to traffic stops, protective frisks, arrests, and use of force. (Ex.4,¶2.) The City also adopted a comprehensive use-of-force policy (SOP 54) and trained Officer Thompson on the use of force. (Ex.4,¶¶2–5&11; Exs.25–29.) The City promulgated policies that addressed traffic stops (SOP 35), searches of persons (SOP 44), and training (SOP 50). (Ex.4,¶¶8–10; Exs.22–24.) In the year before the French incident, Officer Thompson underwent training on de-escalation, effective communications, use of force, psychological compliance, implicit bias, and tactical operations. (Ex.4,¶4; Ex.26.) Between October 2020 and August 2022, Officer Thompson received 250 hours

53

of training. (Ex.21,115:15–17.) Only four months before the French incident, Officer Thompson achieved a perfect score on his handgun qualification. (Ex.4,¶5; Ex.27.) The City investigated French's death. (Ex.8,65:4—66:13; Ex.9.)

Even if Plaintiff could prove an underlying constitutional violation (and he cannot), "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *City of Okla. City v. Tuttle*, 471 U.S. 808, 823–24 (1985). Plaintiff has not identified a policy that is itself unconstitutional. "[W]here the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Id.* "Demonstrating a policy or custom requires 'show[ing] a persistent and wide-spread practice.'" *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1332 (11th Cir. 2007) (brackets in original) (quoting *Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986)). "[A] plaintiff [cannot] establish a *Monell* claim when he [cannot] point to any other incidents involving similar facts." *Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005). Plaintiff cannot identify any other incidents involving similar facts and, therefore, cannot demonstrate municipal liability under *Monell*.

Plaintiff also cannot show deliberate indifference. "'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997). Plaintiff cannot show that a final policymaker of the City acted with deliberate indifference.

54

Deliberate indifference cannot even exist without an underlying violation of clearly established law. *See Pilcher ex rel. Myers v. City of Foley*, No. CV 25-00072-KD-B, 2026 WL 785534, at *19 (S.D. Ala. Mar. 2, 2026) ("Municipalities cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly established.") (emphasis in original) (quoting *Anderson ex rel. Anderson v. City of Minneapolis*, 934 F.3d 876, 884 (8th Cir. 2019)), *R. & R. adopted as modified*, No. CV 25-00072-KD-M, 2026 WL 783989 (S.D. Ala. Mar. 19, 2026). Because Officer Thompson did not violate clearly established law, the City cannot be guilty of deliberate indifference.

## C. Plaintiff cannot prove causation.

"It is not sufficient for a government body's policy to be tangentially related to a constitutional deprivation." *Cuesta*, 285 F.3d at 967. "A municipality may only be held liable under § 1983 when one of its policies causes a constitutional injury." *American Fed'n of Labor and Cong. of Indus. Orgs. v. City of Miami*, 637 F.3d 1178, 1187 (11th Cir. 2011). "This high standard of proof is intentionally onerous for plaintiffs; imposing liability on a municipality without proof that a specific policy caused a particular violation would equate to subjecting the municipality to respondeat superior liability—a result never intended by section 1983." *Gold*, 151 F.3d at 1351 n.10. "[T]o prove that a policy or its absence caused a constitutional harm, a plaintiff must point to multiple incidents or multiple reports of prior misconduct by a particular employee." *Piazza v. Jefferson Cnty.*, 923 F.3d 947, 957 (11th Cir. 2019) (citation omitted). Plaintiff cannot meet the causation standard.

## D. Plaintiff cannot prove ratification.

Finally, Count VI alleges the City ratified certain actions following French's death. (Doc.35,PageID.250,¶¶173–76.) Plaintiff cannot impose municipal liability upon the City through a ratification theory. Under a ratification theory, "a local government may be held liable for a

55

constitutional tort when policymakers have *had the opportunity to review subordinates' decisions before they become final*." *Thomas ex rel. Thomas v. Roberts*, 261 F.3d 1160, 1174 (11th Cir. 2001) (emphasis added), *cert. granted, judgment vacated sub nom. Thomas v. Roberts*, 536 U.S. 953 (2002), and *opinion reinstated*, 323 F.3d 950 (11th Cir. 2003). A final policymaker's "after-the-fact approval of the investigation, which did not itself cause or continue a harm against [the decedent], [is] insufficient to establish the *Monell* claim." *Burgess v. Fischer*, 735 F.3d 462, 479 (6th Cir. 2013). "Because [French's] constitutional rights were allegedly violated *before* the [City's] investigation, the investigation could not have caused any constitutional violation, and the [City] cannot have ratified it." *Colardo-Keen v. Rockdale Cnty.*, 775 F. App'x 555, 572 n.8 (11th Cir. 2019) (emphasis in original). "Awareness of the [alleged] constitutional violation coupled with a failure to punish after the fact is insufficient." *Patton v. Etowah Cnty.*, No. 4:15-CV-540-VEH, 2016 WL 48163, at *6 (N.D. Ala. Jan. 5, 2016). Because no final policymaker of the City had an opportunity to review and approve Officer Thompson's actions with French before they occurred, a ratification theory is not viable.

## IX.    The City is entitled to summary judgment on Count VII's Americans with Disabilities Act claim and Count VIII's Rehabilitation Act claim.

Counts VII and VIII assert discrimination claims against the City under Title II of the Americans with Disabilities Act ("the ADA") and Section 504 of the Rehabilitation Act ("the RA"). (Doc.35,PageID.250–53,¶¶180–99.) Plaintiff has waived both claims. (Doc.133,PageID.782n.1 ("Plaintiff agreed to dismiss claims VII (ADA) and VIII (Section 504) with prejudice in September 2025").) *See Campbell*, 26 F.4th at 872 ("if a party affirmatively and intentionally relinquishes an issue, then courts must respect that decision"). In any event, the City is entitled summary judgment on both claims.

56

"Given the textual similarities between the two statutes, 'the same standards govern' claims under both, and we 'rely on cases construing Title II and § 504 interchangeably.'" *Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1133 (11th Cir. 2019) (quoting *T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cnty.*, 610 F.3d 588, 604 (11th Cir. 2010)). As Argument I explains, all claims in Counts VII and VIII arising from actions that did not proximately cause French's death abated upon his death.

Officer Thompson also did not discriminate against French on the basis of a disability or on any other basis. (Ex.4,¶23.) Plaintiff cannot prove "(1) that [French was] a qualified individual with a disability; (2) that [French] was either excluded from participation in or denied the benefits of [the City's] services, programs, or activities, or was otherwise discriminated against by the [City]; and (3) that the [alleged] exclusion, denial of benefit, or discrimination was by reason of [his alleged] disability." *Ingram v. Kubik*, 30 F.4th 1241, 1256–57 (11th Cir. 2022) (citation omitted).

An individual is disabled if he:

a) Has a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

b) Has a record of such impairment; or

c) Is regarded as having such an impairment.

42 U.S.C. § 12102(2).

There is no evidence of an impairment (or a record of an impairment) that substantially limited one or more of French's major life activities. Officer Thompson did not regard French as disabled. (Ex.4,¶23.) French never told Officer Thompson that he had a disability. (Ex.4,¶23.) Officer Thompson had no knowledge of any disability, mental illness, or other physical or mental condition that French may have suffered from. (Ex.4,¶23.) French never requested an

accommodation. (Ex.4,¶23.) *See Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999) ("a plaintiff cannot establish a claim under the Rehabilitation Act alleging that the defendant discriminated against him by failing to provide a reasonable accommodation unless he demanded such an accommodation").

Moreover, "vicarious liability is unavailable." *Ingram*, 30 F.4th at 1259. "[I]n order to hold [the City] liable, [Plaintiff] must demonstrate that an official who at a minimum ha[d] authority to address the alleged discrimination and to institute corrective measures on the [City's] behalf had actual knowledge of discrimination in the [City's] programs and failed adequately to respond." *Silberman*, 927 F.3d at 1134 (alterations adopted and citation omitted). Plaintiff cannot demonstrate that an official who had authority to address the alleged discrimination and to institute corrective measures on the City's behalf had actual knowledge of discrimination and failed adequately to respond. To recover monetary damages, Plaintiff must prove "intentional discrimination, which requires a showing of 'deliberate indifference.'" *Id.* There is no evidence of deliberate indifference. The City is entitled to summary judgment on Counts VII and VIII.

X.      **Officer Thompson and the City are entitled to summary judgment and State-agent immunity against Count IX's and Count X's Alabama law wrongful death claims.**

Counts IX and X assert state law claims for wrongful death against Officer Thompson and the City. (Doc.35,PageID.253–55,¶¶200–11.) Officer Thompson and the City are entitled to summary judgment because "[i]n making the arrest, a police officer may use reasonable force and may be held liable only if more force is used than is necessary to effectuate the arrest." *Franklin v. City of Huntsville*, 670 So. 2d 848, 852 (Ala. 1995). Because Officer Thompson only used reasonable force, Plaintiff cannot prove Officer Thompson committed a tort that caused French's death.

Officer Thompson and the City are also entitled to State-agent immunity and statutory peace officer immunity under Alabama Code § 6-5-338 against Counts IX and X:

> Every peace officer ... shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.

Ala. Code § 6-5-338(a).[9]

"As a police officer, [Officer Thompson] qualifies as a peace officer for purposes of § 6-5-338." *Borders v. City of Huntsville*, 875 So. 2d 1168, 1178 (Ala. 2003). Officer Thompson is also independently entitled to common law State-agent immunity under *Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000), because "immunity applies to employees of municipalities in the same manner that immunity applies to employees of the State." *Ex parte Tucker*, 303 So. 3d 367, 472 (Ala. 2019) (quoting *City of Birmingham v. Brown*, 969 So. 2d 910, 916 (Ala. 2007)). "The restatement of State-agent immunity as set out ... in *Ex parte Cranman* governs the determination of whether a police officer is entitled to immunity under § 6-5-338(a), Ala. Code 1975." *Downing v. City of Dothan*, 59 So. 3d 16, 19 (Ala. 2010). The *Cranman* standard holds:

> A state agent <u>shall</u> be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based on the agent ...
>
> > (4)    Exercising judgment in the enforcement of the criminal laws of the state, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons, or serving as peace officers under circumstances entitling such officer to immunity pursuant to § 6-5-338(a), Ala. Code 1975 ...

---

[9] "The Alabama legislature repealed Ala. Code § 6-5-338, effective October 1, 2025. 2025 Ala. Laws Act 2025-423 (2025). Because [Plaintiff's] cause of action accrued before October 1, 2025, Ala. Code § 6-5-338 governs in this matter." *Musso v. City of Trussville*, No. 2:25-CV-00239-MHH, 2026 WL 734066, at *5 (N.D. Ala. Mar. 16, 2026).

59

> Notwithstanding anything to the contrary in the foregoing statement of the rule, a state agent <u>shall not</u> be immune from civil liability in his or her personal capacity:
>
> > (1)   When the Constitution or laws of the United States, or the Constitution of this state, or laws, rules, or regulations of this state enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
> >
> > (2)   When the state agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

*Cranman*, 792 So. 2d at 405 (Category 4 modified by *Hollis v. City of Brighton*, 950 So. 2d 300, 309 (Ala. 2006)).

When a defendant invokes State-agent immunity, he "initially bears the burden of demonstrating that he was acting in a function that would entitle [him] to immunity." *Brown v. City of Huntsville*, 608 F.3d 724, 741 (11th Cir. 2010). Officer Thompson meets this burden. "Exercising judgment in the enforcement of the criminal laws of the State is a recognized discretionary function." *Ex parte Tuscaloosa Cnty.*, 796 So. 2d 1100, 1106 (Ala. 2000). Likewise, an officer's decision about how much force to use during an arrest is a discretionary function. *See Ex parte Kennedy*, 992 So. 2d 1276, 1283 (Ala. 2008) (officer-involved shooting); *Thurmond v. City of Huntsville*, 904 So. 2d 314, 326 (Ala. Civ. App. 2004) ("we conclude that the … officers were engaged in the exercise of a discretionary function … when they made the judgment call on how much force to use and under what circumstances to use it"). Because Officer Thompson was engaged in a discretionary function, Plaintiff has "the burden … to demonstrate that" State-agent immunity does not apply. *Shell v. Butcher*, 339 So. 3d 226, 231 (Ala. 2021). Plaintiff cannot meet his burden.

"The Alabama Supreme Court has largely equated qualified immunity with discretionary-function immunity, and so the same facts which establish an entitlement to qualified immunity may also establish that the officers are entitled to discretionary-function immunity." *Hunter*, 941 F.3d at 1284. "The evaluation of whether an assault and battery took place in regards to an arrest mirrors whether excessive force was used in a federal claim." *Rogers v. City of Selma*, 178 F. Supp. 3d 1222, 1247 (S.D. Ala. 2016). "[B]ecause [Officer Thompson's] use of deadly force was reasonable under the Fourth Amendment, [he] is entitled to state-law immunity for the state-law claims against him." *Pipkins v. City of Hoover*, 134 F.4th 1163, 1173 n.4 (11th Cir. 2025); *see also Walker v. City of Huntsville*, 62 So. 3d 474, 494 (Ala. 2010) (holding doctrine of collateral estoppel bars Alabama law assault-and-battery claim when federal court found officer's use of force constitutionally reasonable).

Plaintiff did not assert a respondeat superior claim against the City. (Doc.35,PageID.253–54,¶¶200–06.) Even if he had, however, "Alabama's statutory, discretionary function immunity explicitly extends an officer's immunity to the employing municipality." *Brown*, 608 F.3d at 742 (citing Ala. Code § 6-5-338(b)). Also, under Alabama's common law, "[i]f a putative servant is not liable, either because he is innocent or because he is immune, no liability exists as to be visited upon the putative master under the rule of respondeat superior." *Hollis v. City of Brighton*, 885 So. 2d 135, 142 (Ala. 2004). Accordingly, Officer Thompson and the City are both entitled to summary judgment and State-agent and peace officer immunity against the Alabama law wrongful death claims.

XI.     **The City is entitled to summary judgment and municipal immunity against Count IX.**

Again, Count IX does not plead a respondeat superior claim against the City. (Doc.35,PageID.253–54,¶¶200–06.) Even if it had, except for certain premises defects Alabama

61

Code § 11-47-190 limits municipal liability to "injury … done … through the neglect, carelessness, or unskillfulness of some agent, officer, or employee of the municipality engaged in work therefor and while acting in the line of his or her duty." Section 11-47-190 bars all state law claims against the City because Officer Thompson's use of force "was intentional." *Brown*, 608 F.3d at 742–43.

Section 11-47-190 also bars all claims that are based on Officer Thompson's hiring, training, and supervision. *See City of Crossville v. Haynes*, 925 So. 2d 944, 956 (Ala. 2005) ("Haynes was not entitled to assert a 'direct' claim against the City of Crossville under § 11-47-190."); *Styron v. City of Foley*, No. 03-572-CG-L, 2005 WL 3098926, at *4–5 (S.D. Ala. Nov. 18, 2005) ("Alabama does not recognize an action against a municipality for negligent hiring, supervising, or training."). In any event, Plaintiff cannot prove an underlying tort upon which to impose liability on the City because Officer Thompson only used reasonable force. *See Flying J Fish Farm v. Peoples Bank of Greensboro*, 12 So. 3d 1185, 1196 (Ala. 2008) ("[A] party alleging negligent supervision and hiring must prove the underlying wrongful conduct of the defendant's agents."). Plaintiff also cannot prove that French was harmed "as a consequence of [Officer Thompson's alleged] incompetence." *Jones Exp., Inc. v. Jackson*, 86 So. 3d 298, 305 (Ala. 2010).

## CONCLUSION

Officer Thompson and the City ask the Court to grant them summary judgment or, in the alternative, judgment on the pleadings on all claims and on their immunity defenses.

62

*/s/ Andrew J. Rutens*

Andrew J. Rutens
Melissa P. Hunter
Lawrence M. Wettermark
GALLOWAY, WETTERMARK & RUTENS, LLP
P.O. Box 16629
Mobile, Alabama 36616-0629
Telephone: (251) 476-4493
Facsimile: (251) 479-5566
arutens@gallowayllp.com
mhunter@gallowayllp.com
lwettermark@gallowayllp.com

*Attorneys for The City of Bay Minette and Officer Brandon Thompson*

## CERTIFICATE OF SERVICE

I, Melissa P. Hunter, certify that on May 18, 2026, I electronically served this document, via the CM/ECF system, upon:

Je Yon Jung
LEAR WERTS, LLP
2 Venture Plaza, Suite 400
Irvine, California 92618

*/s/ Andrew J. Rutens*

Andrew J. Rutens

## CERTIFICATE OF COMPLIANCE

I certify that this motion complies with the type-volume limitation set forth in Fed. R. App. P. Rule 32(a)(7)(B). This brief is typed in Times New Roman 12 pt. and contains 12,991 words.

*/s/ Andrew J. Rutens*

Andrew J. Rutens

63